IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CLIENTRON CORP., a Taiwanese                §
Corporation,                                §
                                            §
            Plaintiff,                      §        CASE NO.:
                                            §
                                            §
      vs.                                   §
                                            §
                                            §
DEVON IT, INC., a Pennsylvania              §
Corporation;                               §
                                            §
            Defendant.                      §
                                            §
                                            §

## COMPLAINT

Plaintiff, Clientron Corp. ("Clientron"), by and through its undersigned counsel, files this Complaint against Devon IT, Inc. ("Devon IT or "Defendant"), and alleges as follows:

### THE PARTIES

1.      Plaintiff, Clientron, is a corporation organized under the laws of Taiwan, having its principal place of business at 3F, No.75, Sec.1, Sintai 5th Rd., Sijhih Dist., New Taipei City, Taiwan 221, ROC.

2.      On information and belief, Defendant Devon IT is a Pennsylvania corporation having its principal place of business at 1100 First Avenue, Suite 100, King of Prussia, PA 19406.

### JURISDICTION AND VENUE

3.      Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332 because Clientron is a foreign citizen, Defendant is a resident of this district, and because the amount in controversy exceeds $75,000.

4.      Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b) and (c) because it is the judicial district in which a substantial part of the events or omissions giving rise to the claim arose.  It is also the judicial district in which the Defendant has assets.  Additionally

venue is proper under Count Two pursuant to 9 U.S.C §204, because, save for the arbitration agreement, venue is proper in this Court.

**FACTS**

**Clientron**

5.     Clientron is a "thin client" manufacturer and distributor based in Taiwan. A "thin client" is a computer or a computer program which depends heavily on some other computer (its *server*) to fulfill its computational roles. Thin clients are components of a broader computer infrastructure. Clientron's predecessor was established in 1983 and was renamed Clientron in 2007. Clientron is the world's top independent thin client ODM manufacturer, with over 2.6 million units of thin client PC sold since 2006.

**Devon IT**

6.     Devon IT is an information technology company that offers thin client hardware and software. Devon IT is part of the Devon International Group, of which John Bennett is also the president.

**Arbitration Proceeding**

7.     On or about August 15, 2008, Plaintiff and Defendant Devon IT entered into a Supply and Purchase Agreement ("the Agreement") wherein Clientron agreed to manufacture and sell products to Devon IT. A true and correct copy of the Agreement is attached herein as Exhibit A. Under Paragraph 13.3 of the Agreement titled "Dispute Resolution", the parties agreed to resolve any dispute before the Taiwan trade arbitration council.

8.     Pursuant to the Agreement, Clientron submitted its request for arbitration or about September 13, 2012 alleging Devon IT breached its obligations under the Agreement. The arbitral tribunal of the Chinese Arbitration Association ("CAA") was formed on or about November 29, 2012. On or about March 20, 2013, the Chinese Arbitration Association ("CAA") issued a Midterm Arbitration Award in favor of Movant (the "Midterm Award"). The Midterm Award concluded that CAA has proper jurisdiction over the matter. Devon IT had a full and fair opportunity to defend itself in the arbitration. The arbitration hearing lasted a total of six hearing days and took place on the following dates: January 4, 2013; February 1, 2013; March 7, 2013;

2

May 7, 2013; July 10, 2013; and August 5, 2013. Devon IT was represented by competent Taiwan counsel and appeared at all of the above of listed hearings. In addition to the hearings detailed above, CAA reviewed pleadings and evidentiary documents submitted by the parties. For its part, Clientron submitted a total of twelve court documents and fifty-three supporting documents as evidence. Devon IT, by contrast, submitted twelve court documents and a total of thirty-four supporting documents.

9.     On or about August 5, 2013, the CAA issued its final award in favor of Clientron for $6,574,546.17 U.S. Dollars. In addition, the CAA awarded Clientron 5% per annum interest and arbitration costs. On or about August 28, 2013, the CAA issued the official award document finalizing the August 5, 2013 award ("Final Arbitration Award"). The Final Arbitration Award contains the CAA's award and the CAA's opinion explaining the decision of the arbitrator. The CAA's award is the equivalent of a judgment in the United States and is three (3) pages in length. A certified English translation of the three page award and a duly certified copy of the three page award in Mandarin (but not the longer opinion) is attached herein. *See* Exhibit B.

## COUNT ONE
## CONFIRMATION OF FINAL ARBITRATION AWARD TO A JUDGMENT PURSUANT TO PENNSYLVANIA UNIFORM FOREIGN MONEY JUDGMENT RECOGNITION ACT

10.     Clientron repeats and incorporates by reference the allegations in paragraphs 1-9 as if fully set forth herein.

11.     Pennsylvania has adopted the Uniform Foreign Money Judgment Recognition Act, 42 P.S. §§22001-22009 ("the Act").

12.     The basic elements of due process were met in the CAA arbitration proceeding.

13.     The Republic of China Arbitration Law ("Arbitration Law of ROC") was enacted on January 20, 1961 and amended on June 24, 1998, governs arbitration awards issued under the CAA.

14.     The Final Arbitration Award is non-appealable and is considered a final monetary judgment in Taiwan.

15.     Under the Act, a judgment rendered by a foreign court is enforceable in

Pennsylvania.

16.    The Act provides for the enforcement of foreign monetary judgments such that Clientron is entitled to a judgment of $6,574,546.17, in addition to a 5% per annum interest and arbitration costs against Defendant, which Plaintiff has determined to be $38,574.00.

**COUNT TWO**
**CONFIRMATION OF ARBITRATION AWARD**
**PURSUANT CONVENTION ON THE RECOGNITION ON THE RECOGNITION AND**
**ENFORCEMENT OF FOREIGN ARBITRAL AWARDS**

17.    Clientron repeats and incorporates by reference the allegations in paragraphs 1-15 as if fully set forth herein.

18.    This Count seeks an alternative basis for relief under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards 9 U.S.C. §§201-208 (the "Convention").

19.    The CAA Final Arbitration Award is final and non-appealable.

20.    While Taiwan is not a signatory to the Convention, the United State courts recognize final foreign arbitration awards made in countries that are not a signatory to the Convention.

21.    The Court should affirm the Final Arbitration Award as it is enforceable and because none of the grounds for refusal to confirm an arbitration award are applicable to this case.

22.    The Convention authorizes this Court to confirm the Final Arbitration Award in the amount of $6,574,546.17, in addition to a 5% per annum interest and arbitration costs against Defendant, which Plaintiff has determined to be $38,574.00.

**PRAYER FOR RELIEF**

**WHEREFORE** the Plaintiff prays for judgment as follows:

A.    On Count One: Judgment in the following amount : a) on the arbitration award of $6,574,546.17; b) 5% per annum interest of the award per the Final Arbitration Award; c) arbitration costs in the amount of $38,574.00 U.S. Dollars; and d) prejudgment interest under Pennsylvania law;

4

B.      On Count Two: Judgment a) confirming the Final Arbitration Award in the amount of $6,574,546.17; b) 5% per annum interest of the award per the Final Arbitration Award; c) arbitration costs in the amount of $38,574.00; and d) prejudgment interest under Pennsylvania law;

C.      That this Court award to Clientron such further relief as the Court may deem just and proper;

D.      For post-judgment interest under the law;

E.      For costs of this suit.

DATED: September 25, 2013

George Krueger (PA Bar No. 30501)
Email: GKrueger@foxrothschild.com
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, PA  19103-3222
Tel: (215) 299-2028

*Co-Counsel*
John D. van Loben Sels (CA SBN: 201354)
(Concurrently seeking Pro Hac admission)
Email: johnvanlobensels@whgclaw.com
WHGC, P.L.C.
2570 W. El Camino Real, Suite 440
Mountain View, CA  94040
(650) 209-1230

*Attorneys for Plaintiff Clientron Corp.*

**EXHIBIT A**

# SUPPLY AND PURCHASE AGREEMENT

This Supply and Purchase Agreement (the "Agreement") is entered into as of the date signed by the last signatory ("Effective Date") between Devon IT, Inc., an American corporation, with its principal place of business at 1100 First Avenue, Suite 100, King of Prussia, PA 19406, U.S.A. ("Devon IT") and Clientron Corp., a Taiwanese corporation, with its principal place of business at 3F, No. 75, Sec. 1, Sintai 5th Rd., Sijhih City, Taipei County, Taiwan, R.O.C. ("Clientron").

WHEREAS, Clientron manufactured for Devon IT thin client products and sold those products to Devon IT; and

WHEREAS, Devon IT desires to have a dependable source with a high standard of quality for the new products as well as related spare parts and Clientron is willing to supply Devon IT with such new products and related parts; and

WHEREAS, Devon IT and Clientron desire to establish the terms and conditions that will apply to Devon IT's purchase of new products and related spare parts from Clientron.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties, intending to be legally bound hereby, agree as follows:

1. Design/Offer Products

    1.1.   During the Term, Devon IT may provide a draft Product Requirements Document for new products ("PRD"). Clientron will review and propose changes, if any, to the PRD. The final draft PRD ("Final PRD") shall be mutually agreed by Devon IT and Clientron.

    1.2.   Clientron will provide a project plan, including product specifications, design verification plan, etc. for each Final PRD for Devon IT's review and approval. Devon IT shall not unreasonably withhold its approval.

    1.3.   Clientron will provide a project schedule for each Final PRD for Devon IT's review and approval ("Project Schedule"). Devon IT shall not unreasonably withhold its approval. Clientron will design/offer product in accordance with the agreed upon project plan and the Project Schedule and submit the samples for each new product ("Samples") in accordance with the Project Schedule.

    1.4.   Devon IT and Clientron will mutually agree upon the non-recurring engineering ("NRE") costs, if any, including exclusive models or customized modification on standard models, for each Product and the means by which such costs will be paid by the parties prior to Clientron commencing the design activities set forth in Section 1.

2. Purchase and Sale

2.1.    Clientron agrees to supply and sell the Products defined in the detailed product Appendix A to Devon IT, and Devon IT agrees to purchase the Products defined in Appendix A from Clientron, in accordance with the terms and conditions of this Agreement.

A new Product defined by a new Final PRD shall be further attached in Appendix A as a supplement to the Agreement, and could be registered as Appendix A1, A2, … etc.

2.2.    Clientron agrees to use its best commercial efforts to perform the work (the "Work") it is required to perform under Purchase Orders issued by Devon IT and accepted by Clientron. "Work" shall mean to procure components, materials, equipment, and other supplies and to manufacture, assemble and test the Products.

2.3.    Clientron shall have the right to sell or offer for sale to any third party its products and to provide its manufacture or design services, provided that such products, and or manufacturing and design services do not contain any part, product or design aspect which is defined as exclusive to Devon IT. Exclusive parts, products and design aspects, if any, will be defined in product Appendix A.

3.  Term

The term of this Agreement shall be for three (3) years commencing on the Effective Data ("Initial Term") unless sooner terminated as provided elsewhere in this Agreement. Thereafter this Agreement will be automatically renewed for additional one (1) year periods ("Additional Term"). The Initial Term and any Additional Term are collectively referred to in this Agreement as "Term". Either party may terminate this Agreement without cause at the end of the then current Term by giving the other party written notice of such termination by certified mail or overnight delivery service at least ninety (90) days prior to the end of the then current Term.

4.  Purchase Orders, Delivery and Shipment, and Rolling Forecast

4.1.    Devon IT shall purchase Products by submitting purchase orders ("Purchase Order") to Clientron.

4.2.    Clientron agrees to receive Purchase Orders for the Products defined in the detailed product Appendix A for Devon IT. Seven (7) weeks lead-time is required from the date of receipt of a Purchase Order to the requested delivery date of Products. Clientron will inform Devon IT in writing of the date the Product will be available for shipment ("Scheduled Shipment Date") for each order. Devon IT may request an improved Scheduled Shipment Date upon written approval by Clientron and Clientron will use commercially reasonable efforts to meet the requested improved Scheduled Shipment Date.

4.3.    Each Purchase Order shall include: (a) a description of the Products, including options and/or accessories; (b) the quantity of Products needed; (c) the name of the designated carrier; (d) the requested delivery date of Products to the designated

carrier; (e) the prices of Products ordered; (f) the delivery address of the designated location where the designated carrier will pick up the Products; and (g) the means of delivery (e.g., by air or sea). Clientron will provide either a written Performa Invoice or send e-mail to accept or reject such Purchase Order within three (3) business days of receipt of the Purchase Order. If a Purchase Order is rejected the written rejection from Clientron shall set forth in reasonable detail the reason(s) Clientron did not accept the Purchase Order. Clientron may reject a Purchase Order only if it does not comply with the terms and conditions of this Agreement. Purchase Orders placed by Devon IT shall be non-cancelable. Any other changes in the accepted Purchase Order must be agreed by Devon IT and Clientron before such changes become effective.

4.4.    Purchase Orders issued to Clientron may not vary the terms of this Agreement. This Agreement shall govern in case of a conflict with the terms of a Purchase Order. Additional terms and conditions on a Purchase Order shall be void unless agreed to in a writing other than the Purchase Order that is signed by authorized representatives of both parties.

4.5.    Delivery of Products to Devon IT, Devon IT's customer or other destination designated by Devon IT will be FOB, Xiamen, People's Republic of China according to Incoterms 2000. Title to each unit of Product passes to Devon IT at such delivery. Clientron will schedule the shipment of all Products with the carrier specified in Devon IT's Purchase Order.

4.6.    Clientron shall package, handle and label the Products so as to protect the Products from loss or damage, in conformity with good commercial practice.

4.7.    Devon IT will provide the next three (3) months rolling forecast on the First business day of every month ("Rolling Forecast") and the quantity stated therein for the first two (2) months of such three-month period respectively will be referred as the "First Month Forecast" and "Second Month Forecast". The First Month Forecast will be ensured by confirmed purchase orders. The Second Month Forecast will be at Devon IT's liability with the flexibility of a one (1) time delivery schedule adjustment in writing and confirmed by Clientron. Such adjustment of The Second Month Forecast quantity can be deferred only to the next month and the deferred forecast quantity remains Devon IT's liability. The quantities projected in the third month of each Rolling Forecast are for reference purposes only and do not represent a liability for either party. Devon IT may issue Purchase Orders for a quantity of Products above its forecast. Such Purchase Orders will be deemed to be requests for additional quantities subject to Clientron's acceptance. Clientron will make commercially reasonable efforts to satisfy such requests.

4.8.    Devon IT may up to three (3) weeks prior to the Schedule Shipment Date request a one-time deferral or reschedule of the Scheduled Shipment Date of a Purchase Order or any portion thereof upon written notice to Clientron, for not more than forty-five (45) days with no rescheduling charge imposed. However, if this Purchase Order is subsequently deferred, the original applicable rescheduling

charge, if any, will be due and payable. For more than forty-five (45) days rescheduling, the rescheduling charge will be one (1%) percent per day of total price value of affected Products until Devon IT takes delivery of the rescheduled units.   Devon IT must take delivery of the rescheduled Products no later than sixty (60) days after original Scheduled Shipment Date on confirmed Purchase Orders.

No rescheduling or alteration charges will be due if rescheduling or alteration occurs:

a)  due to an Engineering Change which the parties agree has materially and negatively affected Devon IT's usage of the Product; or

b) pursuant to Section 9 of the Agreement.

4.9.  Clientron shall notify Devon IT, as soon as reasonably possible, of any actual or potential manufacturing process and/or equipment failure or any other factor which may cause an interruption or reduction in the delivery of Products or any other deliverables hereunder.

Notwithstanding any other provisions of this Agreement, in the event that Clientron's ability to supply the Products or any of the components that comprise the Products is constrained for reasons which include, but are not limited to, component availability, and the Scheduled Shipment Date cannot be met, Clientron will reduce the quantities of such Products to be supplied to Devon IT by no more than the direct proportion to the reduction in quantities of such Products and other products containing the supply constrained components to be supplied to satisfy Clientron's requirements and customers other than Devon IT.

5.  Price; Payment Terms

5.1.  After delivering the Products to the carrier designated by Devon IT, Clientron shall invoice the prices as agreed upon in the then current Appendix A.

5.2.  Unless otherwise specified, the Prices set forth in this agreement do not include taxes, duties and freight charges and are FOB, Xiamen, People's Republic of China according to Incoterms 2000.   If applicable, taxes, duties and freight charges will appear as separate additional terms on Clientron's invoice, but failure to include any tax, duty or freight charge shall not affect Devon IT's responsibility for such.   Devon IT shall pay Clientron all payments under this Agreement by T/T remittance sixty (60) days after the Invoice Date in US Dollar.

5.3.  The parties may request at any time a meeting to discuss changes in market conditions (including, but not limited to, those changes caused by innovation or invention), product cost, special bid pricing, or volume consideration and the parties agree to meet as soon as practicable to negotiate in good faith Product price increases or decreases based upon such conditions. All price changes must be mutually agreed to by both parties in advance and will become effective immediately following such agreement.

5.4.   Clientron warrants to Devon IT that the prices (less any applicable discounts) for the Products and parts sold under this Agreement do not exceed the prices that are offered to any other reseller or Clientron end-user customer purchasing similar volumes of similar products with similar    warranty,       marketing       support, specifications, features and functions.   If during the term of this Agreement Clientron sells to other resellers or Clientron end-user customers such similar products for lower prices which are more favorable than those provided to Devon IT, Clientron will immediately offer those lower prices or discounts for such similar products to Devon IT effective the date they were made available by Clientron to its other reseller or end-user customer.

6.  Warranties, Service, Technical Support & Repairs

6.1.   Clientron agrees to provide a free of charge standard thirteen (13) months warranty from applicable Invoice Date that the Products will be:
a) free from any liens or other defects in title,
b) manufactured from new and serviceable used parts,
c) free from defects in material and workmanship for the applicable warranty period, and
d) in conformance with the Final PRD and Product Specification.

Additional warranty extension will be defined in detail in the Appendix B.

6.2.   Warranty claims by Devon IT shall state the specific nature of the defect, unit, part number, serial number and date the unit was discovered to be defective.   Products returned to Clientron under warranty shall be repaired or replaced at Clientron's option. Prior to return of any warranty materials Devon IT must contact Clientron to receive a Return of Materials Authorization (RMA) number.

6.3.   Clientron RMA service policy is attached as Appendix B. Clientron agrees to repair the returned RMA units for the thirteen (13) month warranty period plus the additional warranty extension defined in detail in the Appendix B.   If the fault is caused by improper usage and has led to broken parts, Clientron has a right to charge the parts price. If the returned RMA units cannot be repaired within the standard thirteen (13) months warranty plus the additional warranty extension defined in detail in the Appendix B due to a shortage in components, the product will be replaced by an equal item.   Clientron will do its best effort to repair or replace the Products in its factory if the quantity is less than two hundred (200) units per month, and such repair or replacement activities shall be within thirty (30) business days following the warranty material's received by Clientron. Inclusive of the return delivery time, the entire process of the warranty claim is expected to be closed within three and one half (3.5) months if there is no other special issue.

6.4.   Devon IT carries the freight charges to Clientron and Clientron carries the freight costs back to Devon IT by sea delivery.

6.5.   Six (6) months before a product will be discontinued by Clientron, Clientron will inform Devon IT by written form. For Purchase Orders that Clientron has accepted

before the withdrawal date, Clientron will ship Products, unless Devon IT opts for Replacement Products pursuant to Section 6.6.   Clientron will accept Purchase Orders for Products to be withdrawn if a) the Shipment Date is scheduled during the first forty-five (45) days after the withdrawal date; b) Devon IT submits such Purchase Orders at least thirty (30) days before the withdrawal date; and c) the Purchase Order otherwise complies with this Agreement.   Notwithstanding Section 4.8, such Purchase Orders for post-withdrawal delivery may not be cancelled or altered, but may be rescheduled pursuant to Section 4.8. In addition to the foregoing, Devon IT may also purchase from Clientron any of the corresponding spare parts at their purchase prices, so that Devon IT can fulfill its guarantee obligations.

6.6.   If during the Agreement's Term Clientron announces product that is designated by Clientron as a replacement for Product ("Replacement Product") listed in Appendix A, Devon IT may request that Clientron substitute the Replacement Product for its on-order Products after a reasonable transition period to consume material prepared for Products.   Subject to negotiations of price, terms and conditions and availability of the Replacement Product during the remainder of the Term, Clientron will provide such Replacement Product for existing on-order Products, and for subsequent orders.

6.7.   Clientron will repair or replace, at no charge to Devon IT any epidemic defects found to exist in the Products at any time during a period comprised of the shorter of (a) the warranty period (thirteen (13) month initial warranty period plus any applicable additional warranty extension months) plus twelve (12) additional months, or (b) thirty-seven (37) months from a Product's shipping invoice date ("Epidemic Failure Period").   For purposes of this Agreement, epidemic defects shall mean a defect rate of five percent (5%) or more occurring with the same Product for the same cause as it is measured within the agreed Epidemic Failure Period ("Epidemic Defects").   In the event the Products' failure rate exceeds the Epidemic Defects for three (3) months continuously during the Epidemic Failure Period, the parties will based on the needs of Devon IT's end user customers agree on the most efficient and cost-saving solution from the options of having Clientron, at Clientron's expense: (i) sort, screen, repair and/or replace Devon IT's Product stock and units in the field, including stock contained in work in progress subject to such failure; (ii) conduct a thorough investigation into the failure's root cause or risk, and with Devon IT's concurrence, implement corrective action; (iii) reimburse Devon IT for the costs, if any, of Devon IT's service calls to Devon IT's customer locations; or (iv) accept the return of the affected Product(s) for a refund or a replacement of good similar Product(s) if it is jointly agreed that the problem can not be corrected.   With prior discussion and agreement with Clientron, if Devon IT recalls Product or takes other corrective action due to Epidemic Failures then in addition to other remedies stated in this Agreement, Clientron shall also reimburse Devon IT for Devon IT's expenses incurred in connection with the recall or other corrective action including, but not limited to, the cost of notifying customers, transporting and storing Products that have been recalled and their replacements, repair costs, concessions and other costs incurred by Devon IT to

address customer satisfaction.   Total expense related to epidemic defects shall not exceed one hundred and fifty percent (150%) of total price value of affected units of product (Price referred to Appendix A.)

6.8.   During the term of this Agreement plus the last warranty effective period, Clientron agrees to provide such Product support assistance as Devon IT may reasonably require.   The complete support requirements shall include, in addition to helping Devon IT resolve end-user problems, the ongoing validation and re-certification and/or alteration of the design of the Products. During the term of this Agreement plus the last warranty effective period Clientron further agrees to sell Parts to Devon IT and/or its authorized agents, and to make such Parts available at reasonable prices. In case any Parts are out of service under special condition, Clientron will provide three (3) month's prior written notification.

Clientron shall not make changes to the Product supplied under this Agreement without Devon IT's prior written consent.   Except for changes caused by material shortage situation, Clientron agrees to use its best efforts to provide Devon IT three (3) months' prior written notification if Clientron intends to make such material changes which will affect the Product's features or functionality defined by Final PRD.   The notification shall include a written description of the proposed change(s), including the reason for the change(s) and the expected effect of the change(s) on the Product, including incurred price change, if any. Clientron will send such change proposals to Devon IT's designated engineer, via mail, email, fax or as agreed between the parties.   Clientron shall provide to Devon IT, at no charge, evaluation units to evaluate proposed Product changes.

6.9.   Mandatory Engineering Changes

Mandatory Engineering Changes are defined as changes to the Products to:

Case A:   conform the Product to existing government standards (including any law, rule, regulation or other legal standard) which Devon IT has provided Clientron a detailed list of the required government standard(s) in advance.

Case B:   correct Product defects which do not comply with specifications mutually agreed by both parties in the Final PRD.

Case C:   fix Products that cause a generally and high potentially inoperative and hazardous condition(s) under end-users' normal and/or reasonable operations and usage.

Case D:   correct problems that through an end-user's normal and reasonable operation and usage of the Product compromises the integrity of the end-user's data.

As more specifically set forth below in the immediately following paragraph Clientron may in providing Mandatory Engineering Changes undertakes one or more of the following actions ("Action"):

Action 1:    Provide Devon IT with timely written notification of the Mandatory Engineering Change after Clientron knows of such change.

Action 2:    Provide Devon IT suggestions and proposals of required engineering changes following Devon IT's identification of additional government standard(s) that were not precisely defined and listed in the then current PRD.

Action 3:    Provide to Devon IT a reasonable quantity of units for evaluation and qualification.

Action 4:    Implement   the   Mandatory   Engineering   Change   for   all un-manufactured Products.

Action 5:    Provide Devon IT with field change kits for previously shipped products. Field change kits are defined as the installation instructions, parts, components, media and any unique tooling necessary for implementing the Mandatory Engineering Change. Installation instructions includes the method to conduct the engineering change and information on any special tools, equipment, media and other related requirements necessary to implement the Mandatory Engineering Change at Devon IT's or Devon IT's customer's locations.

Action 6: Provide Devon IT onsite technical support, which is agreed by Clientron in advance, for the requested mandatory engineering change.

For each of the defined Mandatory Engineering Change events Clientron will perform and bear the associated costs and expenses of the specific Action(s):
Case A:
    (i).   Clientron will do Actions 1), 3), 4), 5), and 6);
    (ii).   If the government standard(s) is not specified and listed in detail in the then current Final PRD, Clientron will do Action 2);
Case B:   Clientron will do Action 1), 3), 4), 5), and 6);
Case C:   Clientron will do Action 1), 3), 4), 5), and 6) ; and
Case D:   Clientron will do Action 1), 3) and 4)

In the event, except for foregoing scenario (ii) of Case A, the Mandatory Engineering Changes are incompatible with or adversely affect utilization of Products, and such Mandatory Engineering Changes are not made compatible with the Products and Devon IT is not provided with an acceptable remedy within sixty (60) days after Clientron receives notification, then Devon IT shall have the option to (a) cancel open Purchase Orders for specific influenced markets without penalty and/or (b) terminate this Agreement and place a single Purchase Order for a quantity of Product.

In the event that a defect which results in a Mandatory Engineering Change is caused by any design or inaccurate instructions furnished by Devon IT to Clientron, Devon IT shall bear all costs and expenses relating to the change of Products, and Clientron will provide the field change kits to Devon IT at Devon IT's expenses.

6.10.    Other Engineering Changes

Devon IT may request, in writing, that Clientron evaluate free of charge a change to the method of packing, packaging, or evaluate an engineering change (other than a Mandatory Engineering Change) to the Products.   Such request will include a description of the proposed change sufficient to permit Clientron to evaluate its feasibility.   Clientron shall notify Devon IT in writing of Clientron's acceptance or non-acceptance of such proposed changes within ten (10) business days from the date of Clientron's receipt of such request from Devon IT. Clientron's written evaluation shall state all costs, if any, created by the changes and the date by which Clientron will be able to implement such changes. Clientron and Devon IT will negotiate in good faith to a mutually agreed upon course of action regarding the implementation of such change if it is accepted by Devon IT.   Such negotiations will include implementation schedule, and costs and Product price changes if any.   Devon IT must provide prior written approval to Clientron before the change can be implemented.

6.11. With respect to each Product supplied by Clientron under this Agreement, Devon IT shall attempt to resolve customer problems independently using the training and information provided by Clientron.   If a greater level of technical expertise is required, Devon IT may engage Clientron in resolving the customer's problem. Clientron shall make available via telephone (or pager), individuals sufficiently skilled to assist Devon IT in problem resolution during Clientron's normal office hours (9AM to 6PM (local time Taiwan), Monday to Friday except for national holidays of China and Taiwan). Clientron expertise shall be available as support assistance via telephone or pager within sixty (60) minutes. Non-office hour response time shall be within twenty-four (24) hours.

Devon IT will provide the primary interface to Devon IT's Product customers. Devon IT's will provide Level 1 and Level 2 support and Clientron agrees to participate with Devon IT in the problem solving at Level 3.   In the event Clientron is unable to resolve problems remotely then Clientron will, by Devon IT's request and at Clientron's acceptance, provide on-site technical support. Such on-site support will be considered a last resort and will be coordinated through Devon IT and with the full support of Devon IT. If Clientron solves a problem through an Engineering Change or software modification ("Fix(es)"), Clientron shall make these Fixes available at no charge to Devon IT via a means identified by Devon IT, and Clientron shall incorporate these Fixes into (a) Product inventory awaiting shipment and (b) new Product builds.

If Devon IT determines that a Product or Part is (a) experiencing unacceptable

failure rates or (b) the cause of a customer problem, Clientron agrees to perform detailed failure analysis on that Product or Part to Devon IT. The analysis and report is basically no charge at Devon IT unless it requires other third party's analysis service, in the case of requiring third party's analysis service, Clientron will submit the estimated expense caused for Devon IT's prior approval.   Such initial detailed failure analysis and a report of the initial failure analysis data shall be completed and supplied to Devon IT within fifteen (15) business days following receipt of the defective Product at Clientron's location.   Such detailed failure analysis shall be sufficient to accurately identify the specific defect(s) causing the failure and the corrective actions taken to prevent reoccurrence

7.  Right to Use Trademarks, Software and Proprietary Rights

7.1. For the manufacture, certification application and packeage purpose under this Agreement, Devon IT grants Clientron the rights to use Devon IT's trademarks or trade secrets, confidential and proprietary information or trade names.   Except as set forth in the preceding sentence neither party shall have any right, either expressed or implied, to use the trademarks, trade names, or trade dress of the other party for any purpose what-so-ever.

7.2. Clientron shall acquire and maintain all rights and licenses it needs to fulfill its responsibilities under this Agreement. Clientron warrants the Product does not violate any right or licenses of a third party. Subject to the terms and conditions of this Agreement, Clientron hereby grants to Devon IT, and its Affiliates, during the Term of this Agreement, a   nontransferable, nonexclusive, worldwide, royalty free (i) right to purchase the Product and license to use the Firmware and Product's hardware device drivers for integration by Devon IT into Devon IT solutions; and (ii) right to distribute (by resale, in the case of Products, and by sublicense in object code form only, in the case of Software) such Firmware and Product's hardware device drivers to End Users. The rights granted by Clientron to Devon IT will not include those rights Devon IT has to acquire and maintain by itself as well for its legal distribution and sale (for example, MacroVision, HDMI,... if appliable).

Devon IT may sub-license the right and license set forth in this Section 7.2 to other business entities authorized by Devon IT solely to market, distribute, and sell Products to end-user customers ("Resellers") provided that such Resellers are subject to the terms, conditions and restrictions set out herein.   Further Devon IT agrees that it will require Resellers to execute a written agreement containing the terms, conditions and restrictions set out in this Section 7.2.   Devon's Resellers are set forth in Appendix C, which the parties agree Devon may modify from time-to-time to reflect changes in its distribution channel.

For purposes of this Agreement "Affiliates" means entities that control, are controlled by, or are under common control with a party to this Agreement and listed in Appendix C.

8. Assignment

This Agreement and the rights hereunder are not transferable or assignable without the prior written consent of the parties hereto, except for rights to payment.

9. Termination

9.1. This Agreement may be terminated by either party if the other party materially breaches this Agreement and fails to cure the default within thirty (30) days after receipt of written notice of termination from the other party specifying the nature and extent of such breach or fails to reach agreement with the party providing notice within such thirty (30) day period to cure the breach in accordance with such agreement. If the default is such that it can not be reasonably cured within thirty (30) days then the defaulting party must commence cure within thirty (30) calendar days and proceed to cure with due diligence.

9.2. If either party (a) becomes insolvent or seeks protection under or becomes the subject of bankruptcy, receivership, creditor's arrangement or comparable proceeding or (b) ceases to do business or otherwise terminates its business operations, the other party may at its option by written notice, immediately terminate this Agreement.

9.3. Either party may terminate this Agreement by giving one hundred eighty (180) days prior written notice to the other.

9.4. In the event of termination of this Agreement

(a) by Devon IT due to Clientron's default, at Devon IT's option, Clientron will fulfill all accepted and outstanding Purchase Orders in accordance with the terms and conditions of this Agreement.   If Devon IT notifies Clientron in its default notice of its desire to cancel any or all such accepted and outstanding Purchase Orders, in which event such Purchase Orders shall be canceled without charge to Devon IT.

(b) by Clientron due to Devon IT's default or in accordance with Section 9.2, Clientron shall have the right to cancel all outstanding Purchase Orders. Cancellation charges will apply in addition to any other amounts then due.

(c) by either party, each party shall return all of the other's tangible Confidential Information, prototypes and loaned equipment provided in connection with this Agreement, except as set forth in Section 10, within thirty (30) calendar days. The provisions of the confidentiality agreement shall survive termination or cancellation of this Agreement.

(d) Notwithstanding any other provision of this Agreement, no termination or expiry of this Agreement shall:
    i)    affect Devon IT right to continue to distribute any Products contained in its inventory on the effective date of termination, or Products subsequently

received from Clientron;

    ii)   affect the rights of end-users to continue to use any Products;

    iii)  affect Devon IT's right to continue to provide technical or maintenance support to end-users;

    iv)  affect the rights of Devon IT to receive technical or maintenance support services from Clientron as described herein, for the duration of any end-user license; or

    v)   affect Clientron's right to receive payment for Products delivered.

## 10. Confidentiality

10.1. Except as set forth in Section 10.2, Clientron and Devon IT agree that all Information exchanged by the parties under this Agreement will be non-confidential. If the exchange of confidential information becomes necessary, any such exchange will be governed by the terms and conditions of a separately executed Confidential Disclosure Agreement(s).

10.2. All written and oral information and data exchanged between the parties for the purpose of enabling Clientron to manufacture and deliver the Products under this Agreement and the terms or existence of this Agreement shall be deemed to be confidential information.   The party that receives such confidential information agrees not to disclose it directly or indirectly to any third party, or use it for any purpose other than a required under this Agreement without the prior written consent of the disclosing party, unless the party is required to disclose the confidential information pursuant to an applicable regulatory provision or court order. If confidential information is to be disclosed pursuant to a lawful requirement or the request of a Government Agency, the recipient shall provide the discloser sufficient prior notice to contest such order, obtain a protective order or other injunctive relief. Confidential information disclosed pursuant to this Agreement shall be maintained as confidential during the Term and for a period of three (3) years thereafter. Each party has the right to disclose the existence of this Agreement and its terms to its attorneys, accountants, banking institutions when seeking financial services and its auditors.

10.3. Clientron acknowledges that Devon IT's customer lists, ship to addresses, and Devon IT-supplied forecasts are confidential information of Devon IT, and shall be used solely at the direction and for the benefit of Devon IT, and further agrees to take all reasonable precautions to protect the confidentiality of such information, including but not limited to; (1) causing all employees to execute Clientron's Employee Non-Disclosure Agreement; (2) making such information available only to its employees having a need to know; (3) taking special steps to ensure that Products being readied for shipment are not labeled for shipment destinations until the last practicable moment before being picked up by the common carrier; and (4) not divulging such information to Clientron's Affiliates, other customers, or any other entity or person.   Clientron further agrees that upon termination of this Agreement and upon Devon IT's written request, it shall either destroy or return Devon IT's confidential information.

11. Indemnification

11.1. General Indemnification:   Clientron agrees, during the term of this Agreement, to defend, hold harmless and indemnify Devon IT, Devon IT Affiliates (as set forth in Appendix C) Devon IT's directors, officers, employees, agents (as set forth in Appendix C), representatives (as set forth in Appendix C, and Customers for any and all claims and liabilities arising out of this Agreement including, but not limited to, following actual:

a) breach of any Clientron's representations and/or warranties under this Agreement;

b) unauthorized alteration, reproduction, or distribution of any portion of the code or documentation which belongs or is exclusive to Devon IT;

c) damage to property, personal injury, death or any other damage or loss by whomever suffered, directly resulting in whole from any actual defect in Products or services, including the failure of Products to comply with the Final PRD and/or Specifications;

d) unlawful, unfair, or deceptive trade practices attributable to Clientron and its factory: Clientron Technology (Xiamen) Co., LTD.;

e) failure of Clientron, Products, services, or other deliverables provided by Clientron to comply with any governmental law, statute, ordinance, administrative order, rule or regulation of any country where Products are manufactured, distributed, sold or used, to the extent, Clientron has been advised by Devon IT, with precise and specified requirements of foregoing law, rule or regulation, in advance of any such breach or non-compliances;

f) Devon IT's damage caused directly due to Clientron's failure to deliver Products on time; or

g) Damage to property, personal injury, death or any other damage or loss by whomever suffered, resulting or claiming to result in whole or in part from operations under this Agreement to the extent that such injuries, deaths or damage are caused by Clientron employees' unlawful and willful conducts.

Clientron shall pay any and all damages, expenses (including attorney fees), settlement payments, costs or fines awarded as a final judgment by a court of competent jurisdiction, and the cost of Devon IT's internal resources handling such matters.

11.2. Intellectual Property Indemnification:   Clientron, during the term of this Agreement, at its expense, shall defend any claim or proceeding brought against Devon IT, its Affiliates and Resellers which is asserted on the basis that any Product furnished hereunder constitutes an infringement of any patent or copyright of any

third party, provided that Devon IT notifies Clientron in writing promptly upon its awareness of any such suit, proceeding or claim, and gives all available assistance, information, and authority to Clientron and further provided that Clientron shall have sole control of the defense of any such claim or proceeding and all negotiations for its settlement or compromise.   If such Product is held to be infringing and its use is enjoined, Clientron shall, by its own election and at its own expense, either (a) procure for Devon IT the right to continue using such Product; or (b) modify it so that it becomes non-infringing, or (c) reimburse Devon IT for the total price paid for the units of product sold and found to be infringing.   Clientron will have no obligation to indemnify Devon IT for claims that Clientron's Products infringe the intellectual property rights of a third party to the extent such claims arise as a result of (i) Devon IT's combination of Products with other products or services not provided by Clientron; (ii) Clientron's implementation of a Devon IT originated design or under Devon IT's instruction or agreement; or (iii) Devon IT's modification of the Products without Clientron's prior approval.

11.3.  Either party shall perform under this Agreement. Any damage due to either party's failure to perform under this Agreement can be claimed by the other party.

## 12. Limitation of Liability

NEITHER PARTY, THEIR AFFILIATES, EMPLOYEES, AGENTS, OFFICERS OR DIRECTORS, SHALL BE LIABLE IN ANY WAY WHATSOEVER, FOR ANY INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES, OR FOR LOST PROFITS OR BUSINESS REVENUE, LOST BUSINESS, FAILURE TO REALIZE EXPECTED SAVINGS OR OTHER COMMERCIAL OR ECONOMIC LOSS OF ANY KIND WHATSOEVER, WHETHER OR NOT SUCH DAMAGES ARE FORESEEABLE OR EITHER PARTY, THEIR EMPLOYEES, AGENTS, OFFICERS OR DIRECTORS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

EXCEPT FOR LIABILITIES UNDER SECTION 4.8, 5.2 AND FOR CLAIMS ARISING FROM EITHER PARTY'S BREACHES OF ITS CONFIDENTIALITY OBLIGATIONS UNDER SECTION 10, IN NO EVENT SHALL THE TOTAL LIABILITY OF EITHER PARTY, THEIR AFFILIATES, EMPLOYEES, AGENTS, OFFICERS OR DIRECTORS, FOR ALL ACTUAL, DIRECT DAMAGES ARISING OUT OF THIS AGREEMENT, EXCEED THE TOTAL CUMULATIVE AMOUNT THAT PAID BY DEVON IT TO CLIENTRON FOR PRODUCT THAT SOLD TO DEVON IT IN THE TWELVE (12) MONTH PERIOD PRIOR TO THE DATE OF THE CLAIM GIVING RISE TO THE LIABILITY. THE FOREGOING PROVISION SHALL APPLY REGARDLESS OF THE FORM OR CAUSE OF ACTION, WHETHER IN CONTRACT OR TORT OR OTHERWISE.

THE REMEDIES SET FORTH IN THIS AGREEMENT ARE BOTH PARTIES' SOLE AND EXCLUSIVE REMEDIES.

13. General

    13.1. Amendment: Waiver

        Except as otherwise expressly provided herein, any provision of this Agreement may be amended and the observance of any provision if this Agreement may be waived (either generally or any particular instance and either retroactively or prospectively) only with the written consent of the other party. However, it is the intention of the parties that this Agreement is controlling over additional or different terms of any order, confirmation, invoice or similar document.

    13.2. Governing law

        This Agreement shall be governed by and construed under the laws of Taiwan.

    13.3. Dispute Resolution

        Parties intend that any dispute be resolved informally through good faith negotiations. Any party may initiate negotiations by written notice to the other stating the dispute details. Parties will jointly define the dispute and propose a remedy. If this process does not resolve the dispute, then either party may escalate the problem to senior management.

        Any dispute remaining after resolution efforts above relating to this Agreement shall be resolved in the Taiwan trade arbitration council and if this still not resolves the dispute then the problem finally has to be escalated to an appropriate court of law in Taipei, Taiwan for final determination.

    13.4. Freedom of Action

        Nothing in this Agreement shall be construed as: (1) prohibiting or restricting either party (and their affiliates) to, without infringing the intellectual property rights of the other, develop, have developed, manufacture, have manufactured product and/or market products or services for itself or any third party, directly or indirectly, now or in the future, which may be competitive with those that are offered by the other party; or (2) affecting the price either party charges for its products, other than the price that Devon IT will pay for Products supplied by Clientron.

    13.5. Notice

        Any notice consents, waivers or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered:

        (a) upon receipt, when delivered personally,

        (b) two (2) business days after deposit with a internationally recognized overnight courier or

(c) upon receipt by e-mail, so long as such notice is followed within three (3) business days with notice delivered by one of the methods described in subsections 13.5 (a)-(b) herein.

The addresses for such communications shall be the addresses first set forth herein or as amended by notice pursuant to this section.

| | |
|---|---|
| For Devon IT: | Devon IT, Inc. |
| | 1100 First Avenue |
| | King of Prussia, PA   19406 |
| | Attn:   Joe Makoid, President |
| | |
| For Clientron: | Clientron Corp. |
| | 3Fl., No.75, Sec.1, Shintai 5th Road |
| | Shijhih City, Taipei, Taiwan 221, R.O.C. |
| | Attn:   Robert Chin, CEO |

13.6. Entire Agreement

This Agreement, including the Appendix which Devon IT and Clientron shall further agree, constitutes the entire Agreement between the parties for the subject matter of this Agreement.   This Agreement supersedes all proposals, oral or written, all negotiations, conversations, or discussions between or among parties relating to the subject matter of this Agreement.

13.7. Successors and Assignment

This Agreement shall be binding upon and insure to the benefit of the parties hereto and their respective successors and permitted assigns.   Neither party shall have the right to assign or otherwise transfer this Agreement or its rights or obligations under this Agreement without the prior written consent of the other party, such consent not to be unreasonably withheld or delayed.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed as of the date first above written.

Authorized Signature                         Authorized Signature

_____

Name:                                              Name: *Robert Chin*
Title:                                               Title: *Chairman, President & CEO*
Devon IT, Inc.                                  Clientron Corp.

(c) upon receipt by e-mail, so long as such notice is followed within three (3) business days with notice delivered by one of the methods described in subsections 13.5 (a)-(b) herein.

The addresses for such communications shall be the addresses first set forth herein or as amended by notice pursuant to this section.

| | |
|---|---|
| For Devon IT: | Devon IT, Inc.<br>1100 First Avenue<br>King of Prussia, PA   19406<br>Attn:   Joe Makoid, President |
| For Clientron: | Clientron Corp.<br>3Fl., No.75, Sec.1, Shintai 5th Road<br>Shijhih City, Taipei, Taiwan 221, R.O.C.<br>Attn:   Robert Chin, CEO |

### 13.6. Entire Agreement

This Agreement, including the Appendix which Devon IT and Clientron shall further agree, constitutes the entire Agreement between the parties for the subject matter of this Agreement.   This Agreement supersedes all proposals, oral or written, all negotiations, conversations, or discussions between or among parties relating to the subject matter of this Agreement.

### 13.7. Successors and Assignment

This Agreement shall be binding upon and insure to the benefit of the parties hereto and their respective successors and permitted assigns.   Neither party shall have the right to assign or otherwise transfer this Agreement or its rights or obligations under this Agreement without the prior written consent of the other party, such consent not to be unreasonably withhold or delayed.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed as of the date first above written.

Authorized Signature

Name: JOSEPH MAKOID
Title: PRESIDENT
Devon IT, Inc.

AUGUST 15, 2008

Authorized Signature

Name: Robert Chin
Title: Chairman, President & CEO
Clientron Corp.

2 008-15

# Appendix A

Product Appendix Registered as Attached Below

# Appendix A1

## 1.0    TC2 Product Requirements

General Performance Requirements

### 1.1    Data integrity

1.1.1 Data, once stored or in the process of being stored, has not been altered in an unauthorized way by any operation of the device.

### 1.2    Must not support flame or combustion.

## 2.0  Power Adapter Requirements

The following requirements are for the TC2 Power Adapter;

| Power Adapter | |
|---|---|
| **Input** | |
| Nominal Voltage | 100Vac ~ 240Vac |
| Input Voltage Range | 90Vac ~ 264Vac |
| Rated Frequency | 50Hz ~ 60Hz |
| Input Frequency Range | 47Hz ~ 63Hz |
| Input Current Range | 1.2A (Max) at 100Vac input voltage |
| Inrush Current | There should be no component damage at 240Vac input and its max rush current will be less than 200A at cold start condition. |
| Efficiency | >80.73% (Min) at normal input voltage, maximum load and measured at the end of DC cable. |
| | Greater than 80.73% of average efficiency at 25%, 50%, 75% and 100% load tested at 115Vac and 230Vac. |
| **Output** | |
| Rated Voltage | 12V |
| Output Voltage Range | 11.4-12.6V when the load is 0A ~ 2A steadily. |
| Output Current Range | 0 - 2A (Max) in above voltage range |
| **Power Consumption** | |
| No load | <0.5W (Max) at 115Vac/60Hz and 230Vac/50Hz |
| **Ripple And Noise** | |
| <350mV (Max) at 90 - 264Vac with 20MHz frequency.    It is measured at the end of DC cable with 10uF and a 0.1uF capacitor added across output connector terminals. | |
| **Start-up Time (Turn On Delay Time)** | |
| ≤2.5sec. (Max) at 100Vac input voltage. | |
| **Rise Time** | |

| From 10%-90% of DC output voltage, <40mS (Max) at normal line and maximum load. | |
|---|---|
| **Hold up Time** | |
| Adapter shall continue to supply the rated output voltage or current for no less than 6mS at 100Vac/full load after loss of AC input voltage. | |
| **Surge Load** | |
| 110% of maximum load for 1mS | |
| **Load Transient Response** | |
| The adapter shall remain within regulation when applied a step load from 0% to 50% and 50% to 100% load at 0.5A/us slew rate and 10mS time period. The output voltage will be maintained at 11.4~12.6V | |
| **Protection** | |
| Short Circuit Protection | Output can be shorted indefinitely without damage. The adapter shall automatically recover and operate within normal limits following the removal of fault condition. |
| Over Voltage Protection | The output voltage shall not exceed 20V, under any conditions.   Reset ≤2 minutes. AC reset triggers the return to the normal state. |
| Over Current Protection | The maximum constant current shall be less than 5A. The adapter shall be auto-recovery. |
| Over Temperature Protection | No deformation and no discoloration on case. |
| **Safety Requirement** | |
| Safety Agency Approval | CB , TUV-GS , UL-cUL , CCC , CE , PSB.   At Devon IT expense. |
| Dielectric Withstand Voltage (HI-POT) | 3000Vac for 1 second between AC input terminals and output terminals. |
| Leakage Current | ≤160μA at input 254Vac/50Hz. |
| Insulation Resistance | >30M ohms (Max) at 500Vdc/10mA for 1 minute. |
| **EMC Requirement** | |
| EMI | The adapter shall comply in all cases with the following national standards: (a) FCC Class B (b) CISPR22 Class B (c) VCCI Class B |
| Lightning Surge Immunity | Compliance to IEC-1000-4-5 Level 3 requirements. L-N 1KV/1.2 * 50uS times No function error. L-FG 2KV/1.2* 50uS 5 times No damage. |
| Electric Fast Transients (EFT) | Compliance to IEC-1000-4-4/1995 (EN 61000-4-4) Level 3 requirements. |
| Electrostatic Discharge (ESD) | +/-8KV air discharge, +/-4KV contact discharge. Unit shall work normally after ESD test. |
| **Environmental and Reliability Requirements** | |
| Operating Temperature | 0 ~ +40 ℃ |
| Shipping/Storage Temperature | -20 ~ +70 ℃ |
| Surface Temperature Rise | Output 24W and ambient 35℃+/-3℃; Input voltage 100Vac/240Vac case |

| | |
|---|---|
| | temperature rise ≦ 45°C. |
| Operating Humidity | 10 ~ 90% relative humidity, non-condensing |
| Shipping/Storage Humidity | 10 ~ 95% relative humidity, non-condensing. |
| MTBF Calculation | 50,000 hours of continuous operation at 25°C, maximum load and normal voltage. |
| MTBF Verification | 25°C ambient temperature, sea level, both normal line voltage ranges (110Vac or 220Vac) and a minimum load of 75% of the maximum load. |

## 3.0  Certification Requirements.

### 3.1     Regulations and Standards

At a minimum the product must be qualified for all standards in order to be sold in the following countries:

- Japan
- USA/Canada
- European Union
- Taiwan
- China
- India
- Korea
- Australia
- Russia
- Mexico
- Singapore
- Argentina
- South Africa
- Israel

### 3.2     Electro Magnetic Compatibility (EMC)

The product will be certified to the emission and immunity requirements for a CE mark, FCC Class B.

| Country | Regulation | Standard | Comments |
|---------|-----------|----------|----------|
| US | FCC | FCC 47 CFR Part 15, Subpart B, Class B<br>ANSI C63.4 (2003) | |
| EU | CE | EN 55022 (2006), Class B<br>EN 61000-3-2(2000) + A2(2005)<br>EN 61000-3-3(1995) + A1(2001)<br>EN 55024:1998 + A1(2001) + A2(2003)<br>CISPR-22 (2004) | |
| Australia | C-Tick | AS/NZS CISPR 22:2004, Class B | |
| Japan | VCCI | VCCI April 2007, Class B | |
| Taiwan | BSMI | CNS 13438 (2006), Class B | |
| China | CCC | GB 9254-1998, Class B<br>GB17625.1-2003<br>GB 17625.2:1999 | |
| Russia | GOST | Gost-R 51318.22-99, | |

|  |  | Class B | |
|  |  | Gost-R 51318.24-99 | |
|  |  | Gost-R 51317.3.2-99 | |
|  |  | Gost-R 51317.3.3-99 | |
| Korea | MIC | KN22:2005-12 with Amd:2006-11-17, Class B | |
|  |  | KN24:2005-12 | |
| Germany | GS |  | |

## 3.3    Safety

| Country | Regulation | Standard | Comments |
|---|---|---|---|
| US/Canada | UL/cUL | UL 60950-1 | |
|  |  | CAN/CSA-C22.2 No.60950-1 | |
| EU | CB | IEC60950-1 + EN60950-1 deviations | |
| Taiwan | BSMI | CNS14336 | |
| China | CCC | GB4943 | |
| Germany | TUV-GS | | |
| Korea | KETI | | |
| Singapore | PSB | | |
| Mexico | NOM | | |
| South Africa | SABS | | |
| Argentina | IRAM S-Mark | | |
| Isreal | SII | | |
| Russia | GOST | | |
| Japan | PSE | | |

## 4.0  Power Test Results.

### 4.1    DC-DC Test,   ( Board level )

1. Ripple & Noise Test.
2. Inrush Current
3. Power Consumption

4. Power on / off sequence
5. Load/Line Regulation Test
6. Dynamic transient response Test
7. Efficiency ( Full Loading )
8. Over Current/Short Protect Test

### 4.2   AC-DC (Adapter) Test, ( Power adapter level )

1. Power consumption at no load
2. Input range margin
3. Power On/Off cycling by AC input
4. AC Inrush Current
5. Power Factor
6. Power line disturbance (PLD)
7. Load /Line regulation
8. Output Over / Under shoot
9. Timing
10. Ripple & Noise
11. Power Efficiency
12. Dynamic / Step transient response
13. Over current protection
14. Short circuit at operation /plug-in
15. Burn In

## 5.0  Reliability Results

### 5.1   Reliability Test

Low Temperature Startup Test

0 (2 times+ hold 30 minutes)*3.
**Turn unit on, then off, then on and then leave on for 30
minutes.   Repeat this process 3 times.**

Low Temperature Operation Test

0°C.6Hr

High Temperature Operation Test

35°C .6Hr

High Temperature /High Humidity Operation Test

    35℃.85%, 6Hr

Low Temperature Storage Test

    -20℃, 120 Hr

High Temperature Storage Test

    55℃, 120 Hr

High Temperature /High Humidity Storage Test

    55℃, 90%, 120Hr

Thermal Shock Test

    -15℃~55℃ (1 hour -15℃+1 hour 55℃)*5cycles

-15℃~55 rise time: One minute ( 60 seconds ).

Power ON/OFF Test
    The power cycle, conduct power on AC supply for 5 seconds and
        then power off 5 seconds . There are total 100 cycles testing.
Package Dropping Test
    90cm /1 corner 3edges 6 faces, 1 Carton
Vibration Package Shipping Test
    10~150HZ , 1.04G , 1hour /axis, X ,Y, Z , 1 Carton

## 5.2   MTBF

The system will be operated at 25℃ at 50 percent electrical stress.

The main board shall have a minimum MTBF of 50,000 hours for the standard configuration.

## 6.0  Mechanical Test Results

### 6.1   Thermal profile ( Declined )

Test condition Requirement: 3000 ft@35℃

Stressing program: N/A

Environment: Room temperature, sea level 35°C

Pass/Fail Criteria: No component temperature exceeds the specified temperature.

## 6.2    Vibration

Operating vibration:
Test condition
Random vibration: 5~500Hz, 0.27Grms, duration 30minutes, 1 axe
Stress program: N/A

Pass/Fail Criteria:
1. No function error by program
2. No mechanical failure of structure
3. No disengagement of connectors or components

Non-operating vibration:
Test condition
Random vibration: 2~200Hz, 1.04Grms, duration 15minutes, six faces.   ( 1 Axe ).
Stress program: N/A

Pass/Fail Criteria:
1. No function error by program
2. No mechanical failure of structure
3. No disengagement of connectors or components

## 6.3    Shock Test Results ( Declined )

Operating shock
Test condition
   • Shock wave: Half – sine wave.
   • Acceleration: Horizontal 15G, vertical 30G
   • Duration: 3ms
   • Number of shock: one shock per side

Pass/Fail Criteria: No function error by program

Non-operating shock

Test condition
- Shock wave: trapezoidal wave
- Acceleration:50G
- Duration: 9ms
- Number of shock: one shock per side(top, right, bottom, left, front, and rear face, total 6 faces)

Pass/Fail Criteria:
1. No function error by program
2. No mechanical failure of structure
3. No disengagement of connectors or components

## Devon IT TC2 project – Clientron U700 Specification

### 1. System Specification

#### A. System

| Component | Main Chip(Part) | Remark |
|---|---|---|
| CPU | VIA EDEN 400MHz | |
| North Bridge | VIA CN700 with Integrated 8x AGP Graphics Core | |
| South Bridge | VIA VT8237R plus | |
| VGA | Integrated in CN700 internal AGP 8x 2D/3D/Video Accelerator<br>- Resolution up to 1600x1200x 24bit color<br>- 8/16/32/64MB frame buffer using system memory<br>- DB15-pin male CRT port support | |
| Audio | VIA VT1612A<br>- AC97 codec<br>- Build in 1W speaker<br>- Line-out and Mic-in support | |
| Network Controller | Integrated in 8237R plus Fast Ethernet Controller with VIA VT6103PHY chip<br>- 10/100Mbps Ethernet(RJ-45 connector)<br>- Support WOL<br>- Support PXE boot ROM | |
| DDR | DDR2 SO-DIMM 200pins *1 support DDR2 533 | 256MB~1G |
| BIOS | 4Mb Flash ROM Award PnP. | |
| Storage | One 2*22 pin IDE port for DOM | |
| | CF Card + Card Reader | Option |
| External Connector & Slot | 1*RJ45 for 10/100Mbps LAN | |
| | 1*2 Layers USB 2.0 | |
| | PS2 *1 (K/B) | Y Cable Option |
| | 1*15pins for VGA | |
| Internal Connector | One 2*22pin for IDE | |
| Front View | Power button/LED support | |
| | Audio port (Line-out/ Mic ) | |
| | 2*USB 2.0 | |

| | LAN LED support | |
|---|---|---|
| Power | 24W Adapter DC in 12V *2A | |

## B.   Chassis:

| Case Type | VESA mount bracket and Main case (No plastic front panel) | |
|---|---|---|
| Case dimension | 15.5 cm x 12.2 cm x 3.6 cm | 13 cm x 11 cm (PCB) |
| Weight | TBD | |
| Case Security | Kensington lock slot | |
| Front View | Power Button/LED support | |
| | 2*USB 2.0 | |
| | Audio ports (Line out / Mic ) | |
| | LAN LED support | |
| Back Panel connectors | 2*USB 2.0 | |
| | PS2 *1 (K/B) | Y Cable Option |
| | 1*15pins for VGA | |
| | 1*LAN port RJ45 | |
| Cables | AC Power cord to Adapter | |
| Other | VESA Bracket | Option |

## Product Unit Price:

### TC2b
Barebone: $88.5
Memory Configuration: 256MB RAM/ 512MB DOM
With 13 Months Standard Warranty, Foot Stand and AC Adapter
Without Power Cord

### TC2c
Barebone: $103
Memory Configuration: 512MB RAM/ 1GB DOM
With 24 Months Extended Warranty (Total 37 Months), Foot Stand, VESA Mount Bracket
and AC Adapter
Without Power Cord

Accessory Price:
Option Y Cable: $1.5
Option VESA Mount Bracket: $6.5
DRAM and DOM: Due to price fluctuation, will update price bi-weekly based on memory market situation.
Barebone price includes Gift box, Nameplate, QSG, Warranty Flyer and ROHS Flyer
The accessory price is not applicable for spare parts price.

## TC2 program quantity defined in Final PRD

First year    : 100,000* units
Second year: 250,000* units
Third year    : 500,000* units
(* Note program quantities are good faith forecast projections provided of anticipated requirements for Products for the periods indicated on current market condition and are provided for planning purposes only.   Above Product forecasts do not constitute commits to purchase or sell any fixed quantity of Products.

IN WITNESS WHEREOF, the undersigned have caused this Appendix A1 to be duly executed as of the date first above written.

Authorized Signature                          Authorized Signature

Name:  Jos MAkoid                    Name: Robert Chin
Title:  President                          Title: Chairman, President & CEO
Devon IT, Inc.                              Clientron Corp.
Date:   9/23/08                          Date:

**Appendix B**

# Clientron RMA Service Policy
# For Devon IT

**Date: July 10th, 2008**

## General Information

1. **Warranty Period:** Clientron offers Devon IT ("customer")13 months manufacture warranty. The warranty period starts from the date the product shipping invoice is issued.

2. **Service:**
   A) General RMA: Applies to In/Out warranty return item/units that are not involved with out of stock/manufacturer discontinue replacements.
   B) Un-serviceable RMA: RMA return items/units in which replacements are out of stock/vendor discontinue. .In Warranty units will be replaced with upgrade models, similar class or series. Un-serviceable Out Of Warranty units will be returned to the customer.

3. **Out Of Warranty (OOW):** OOW units are subject to OOW charge with shipping fee at the customer's expense. The OOW charge is listed under " Non Warranty RMA Service Charge " Section. OOW units and quantity information will be notified to the customer. If OOW units repair service is declined when Clientron has received the units, and issued the quote to the customer, the units are returned to the customer un-repaired with the inspection and shipping fee charged at the customer's expense. Any OOW Custom declaration fee and tax incurred by People's Republic of China government will be at customer's cost.

4. **Customer Induced Damage ( CID ):** CID units are subject to CID charge with shipping fee at the customer's expense. CID charge is the same as OOW charge and it applies to both under and out of warranty units. CID units and quantity information will be notified to the customer. If CID unit repair service is declined when Clientron has received the units and issued the quote to the customer, the units are returned to the customer un-repaired with inspection and shipping fee charge at the customer's expense.

5. **NTF ( No Trouble Found ):** NTF units and quantity information will be notified to the customer. NTF units are returned to the customer with inspection fee charged at the customer's expense.

6. **Turn-Around Time:**

    A) ***RMA Completion Turn-Around***:   This is the duration time for Clientron to complete the RMA repair service.   Turn-around time is approximately thirty (30) working days from the date when RMA return items arrive at Clientron's RMA facility.   The turn around time varies according to the RMA return quantity received at Clientron's RMA facility.

    B) ***RMA Number Turn-Around***:   This is the duration of time for the customer to submit Clientron shipping documentation.   The turn-around time starts when Clientron issues the RMA number to the customer. RMA number is valid for the period of two months prior to the expiration.   The customer has two (2) months to submit Clientron shipping documentation from the date of receiving the issued RMA number, before the specific RMA number expires.

7. **Shipping Charge:**
A)   Incoming RMA to Clientron is charged at customer's expense.
B)   Outbound RMA to the customer is charged at Clientron expense.
C)   All RMA shipments are transit by ocean delivery.
D)   Shall the customer request air delivery, shipping fee is charged at the customer's expense.

8. **Service Support Levels:**
    A. Level 1:   The service provided by Devon IT in response to the initial phone call by an end-user, which identified and documents an error in the Product.   This includes problem source identification assistance, problem analysis, recreating the problem, problem resolution (if possible), installation planning information and preventive and corrective service information.
    B. Level 2:   The service provided by Devon IT for problem determination and replication to deliver such problem with failure analysis data and test cases whtat will enable Clientron to recreate the reported defect.   In addition, Level 2 Support includes searching problem databases for known problems and providing existing corrections to end-users.
    C. Level 3:   The service provided by Clientron to address problems that can not be resolved by Level 1 and Level 2 Service.   This service will be provided for defects that Clientron can reproduce on a Clientron manufactured product running an unmodified, currently supported program.

## Service Terms and Conditions

### 1. Warranty Description:

Clientron warrants all products, parts, components, and the manufacturing process are compliant to the specification standard according to the specification approval sheet and are free from defects in material and workmanship under normal use and service under the warranty period. Should there are defects present on products, parts, components, and the manufacturing process, Clientron is responsible for repair or replacements under the warranty period.

### 2. Limited Warranty

**(A) Warranty Period :**

Warranty period takes effects from the date when the shipping invoice is issued.

**(B). Non-Coverage Areas:**

I.   All units must be returned with a valid Return Merchandise Authorization ("RMA") number.   Clientron reserves the rights to decline the repair service on units returned without a valid RMA number.

II.   Clientron reserves the rights to decline the repair service, and/or charge the repair service fee at the customer expense when the following conditions are presented:

      A. Natural disasters, unexpected inrush current and voltage occurrences, and environmental abnormalities.

      B.   Improper product usage, maintenance, and assemble/dissemble methods. Cosmetic damage such as scratches and cracks will not be fixed.

      C. Software installation and settings

      D. Use unauthorized serial number label and unauthorized change on serial number from the label

      E. Computer Virus

## 3.  Non-Warranty RMA Service Charge

| Type | Unit | Locale | Inspection | Repair | Parts | Custom | Shipping |
|---|---|---|---|---|---|---|---|
| Thin Client | System | Overseas | USD: 15 | Motherboard: USD 30 Power Supply: USD 18 | Customer Expense | Customer Expense | Customer Expense |

Inspection:    RMA units failure diagnosis.

Repair:        RMA units repair.

Parts:         RMA units parts replacement.

Custom:        RMA units custom clearance.

Shipping:      RMA units freight.

## 4. Extended Warranty.

The extended of warranty will be defined as a part of product definition in Appendix A. It will be combined as a part of product total price with mutual agreement of both parties.

| Package | Unit Price |
|---|---|
| 1st Year Extended | USD 4.00 |
| 2nd Year Extended | USD 6.00 |

IN WITNESS WHEREOF, the undersigned have caused this Appendix B to be duly executed as of the date first above written.

Authorized Signature                          Authorized Signature

Name:  Jos MAKoid                      Name:  Robert Chin
Title:  President                              Title:  Chairman, President & CEO
Devon IT, Inc.                                 Clientron Corp.
Date:  9/25/08                                 Date:

# Appendix C

Affiliates, Resellers, Sales Agents and Other Representatives

The following sets forth the Affiliates, Resellers and other representatives for the parties that are referenced in this Agreement.   Each party may modify its identified Affiliates, Resellers, Sales Agents and other Associations with prior written notification to the other party.   The revision date of Appendix C, such revision including add and/or delete any entity on the list of this Appendix C, would be considered as starting date of transaction and business activity with such Affiliates, Resellers, Sales Agents and other Associations.

**Affiliates:**

| | |
|---|---|
| Clientron: | Clientron Technology (Xiamen) Co., LTD |
| Devon IT: | Devon AD Tech, Inc. |
| | Devon IT (Europe) LTD |

**Resellers & Sales Agents:**

| | |
|---|---|
| Devon IT: | International Business Machines Corporation |
| | Tech Data Product Management, Inc. (US |
| | King Tech (Japan) |
| | Misco (Europe) |
| | Ingrammicro (Hong Kong) |
| | Modern Tech Ltd. Co. (China) |
| | Arian/Tech Data (Europe) |
| | Reddington Pvt. Ltd. (India) |
| | Team Computer Inc. (India) |

IN WITNESS WHEREOF, the undersigned have caused this Appendix C to be duly executed as of the date first above written.

Authorized Signature

Name: Jos MAkoid
Title: President
Devon IT, Inc.
Date: 9/25/0 8

Authorized Signature

Name: Robert Chin
Title: Chairman, President & CEO
Clientron Corp.
 Date:

**EXHIBIT B**

**The Chinese Arbitration Association, Taipei**

**Arbitration Judgment**

[Seal of the Chinese Arbitration Association, Taipei]

**Chinese Arbitration Association, Taipei Arbitration Judgment  2012 Arbitration Hearing No. 061**

| Title | Name or Appellation | Place of Business and Address |
|---|---|---|
| Plaintiff | Clientron Corporation | Hsintai 5th Rd, Section 1, No. 75, 3rd Floor, Suite 2, Hsichih District, New Taipei City |
| Legal Representative Representatives | Jin Yingbai | As above |
| | Attorney Chen Cheguang | Dunhuapei Rd. No. 205, 12th Floor, Taipei |
| | Attorney Luo Shuwei | As above |
| | Attorney Liu Yuncheng | As above |
| Defendant | Devon IT, Inc. | 1100 First Avenue, Suite 100 King of Prussia, PA 19406 U.S.A. |
| Legal Representative Representatives | John A. Bennett | As above |
| | Attorney Li Zongde | Dunhuanan Rd. Section 2, No. 2018, 9th Floor, Taipei |
| | Attorney Chen Hsinguang | As above |
| | Attorney Chen Siling | As above |

In the arbitration issue where payment of fees , etc., has been demanded between the above two parties, the judgment of the arbitral tribunal is as follows:

**Summary**

1. The defendant shall pay the plaintiff the demand for $6,574,546.17 USD, and the interest shall be calculated at 5 percent from the date at which interest

calculation shall start shown in the appendix until [text obscured by stamp (Arbitration Association of the Republic of China)].

2. The arbitration fees shall be borne by the defendant.

**Facts**

Chief Arbitrator Huang Taifeng

Arbitrator    Lu Ronghai

Arbitrator    Li Jiaying


This is to certify that this document does not differ from the original [Seal of the Chinese Arbitration Association, Taipei ]

August 28, 2013



**communicaid**
LANGUAGE SOLUTIONS

# Declaration 65593

Monday, September 09, 2013

### Declaration of Accuracy for WHGC Law - Translation Services

**WHGC Law**
Attn. Jennifer Shih
2570 West El Camino Real
Mountain View          CA     94040
USA

**Communicaid Inc.**
2077 Gateway Place, Suite 220
San Jose, CA 95110
Tel: (408) 287-8853
Fax: (408) 516-5266
Fed Tax ID # 26-0014244

---

1. I, Martha Quintero, declare that I am over the age of twenty-one years.

2. I am the Project Manager of Communicaid, Inc., with a principal place of business at 2077 Gateway Place, Suite 220, San Jose, CA 95110. Communicaid, Inc., employs professional translators and interpreters who have a degree in linguistics/translation and have a thorough knowledge of the languages involved.

3. The professional translators of Communicaid, Inc., have reviewed the documentation mentioned herein and have prepared, to the best of their knowledge, a true and correct translation from the original Chinese into English.

The document(s) so translated is/are: Chinese Arbitration Association: Final Arbitration Award Document

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on 9/9/2013 in San Jose, California.

Martha Quintero
Project Manager
Communicaid, Inc.

STATE OF CALIFORNIA

County of Santa Clara

JOSEPHINE S. SCHOOLER
Commission # 1982616
Notary Public - California
Santa Clara County
My Comm. Expires Dec 6, 2015

see attachment

**CALIFORNIA JURAT WITH AFFIANT STATEMENT**

State of California

County of _SANTA CLARA_ } ss.

☒ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

_____    _____
Signature of Document Signer No. 1        Signature of Document Signer No. 2 (if any)

Subscribed and sworn to (or affirmed) before me on this

_10th_ day of _SEPTEMBER_ , _2013_ by
   Date              Month              Year

(1) _MARTHA M QUINTERO_,
                Name of Signer

☐ Personally known to me
☒ Proved to me on the basis of satisfactory evidence
   to be the person who appeared before me (.) (,)
                              (and

(2) _____ ,
                Name of Signer

☐ Personally known to me
☐ Proved to me on the basis of satisfactory evidence
   to be the person who appeared before me.)

_____
Signature of Notary Public

**JOSEPHINE S. SCHOOLER**
Commission # 1962815
Notary Public - California
Santa Clara County
My Comm. Expires Dec 6, 2015

Place Notary Seal Above

**OPTIONAL**

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Further Description of Any Attached Document**

Title or Type of Document: _DECLARATION OF ACCURACY FOR WHQC LAW - TRANSLATION SERVICES_

Document Date: _9 / 9 / 13_    Number of Pages: _2_

Signer(s) Other Than Named Above: _____

RIGHT THUMBPRINT OF SIGNER #1
Top of thumb here

RIGHT THUMBPRINT OF SIGNER #2
Top of thumb here

©2004 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5910   Reorder: Call Toll-Free 1-800-876-6827





中華民國仲裁協會

仲裁判斷書



### 中華民國仲裁協會仲裁判斷書　101 年仲聲和字第 061 號

| 稱　　謂 | 名　稱　或　姓　名 | 營　業　所　或　住　居　所 |
|---|---|---|
| 聲　請　人 | 公信電子股份有限公司 | 新北市汐止區新台五路 1 段 75 號 3 樓之 2 |
| 法定代理人 | 金慶柏 | 同上 |
| 代　理　人 | 陳哲宏律師 | 臺北市敦化北路 205 號 12 樓 |
| | 羅淑瑋律師 | 同上 |
| | 劉允正律師 | 同上 |
| | | |
| 相　對　人 | Devon IT, Inc. | 1100 First Avenue, Suite 100 King of Prussia, PA 19406 U.S.A. |
| 法定代理人 | John A. Bennett | 同上 |
| 代　理　人 | 李宗德律師 | 臺北市敦化南路二段 218 號 9 樓 |
| | 陳信宏律師 | 同上 |
| | 陳姿伶律師 | 同上 |

1　　就上述當事人間請求給付貨款等仲裁事件，本仲裁庭判斷如下：

2　　　主　文

3　一、相對人應給付聲請人美金 6,574,546.17 元，及自附表所示利息起

4　　　算日起至清償日止按年息百分之五計算之利息。

5　二、仲裁費用由相對人負擔。

6　　　事　實

-1-

主任仲裁人　黃台芬

仲　裁　人　呂榮海

仲　裁　人　李家慶

上開正本證明與原本無異



宣萍

維婷

中　華　民　國　　　　　　年　8　月　2　8　日