# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CLIENTRON CORP.,**<br><br>**Plaintiff**<br><br>**v.**<br><br>**DEVON IT, INC.,**<br><br>**Defendant** | **CIVIL ACTION**<br><br>**NO. 13-05634** |

**MEMORANDUM RE DEVON'S MOTION TO DISMISS CLIENTRON'S PETITION TO
ENFORCE ITS ARBIRATION AWARD/FOREIGN MONEY JUDGMENT**

**Baylson, J.**                                                              **August 8, 2014**

**TABLE OF CONTENTS**

I.      Introduction .................................................................................4

II.     The NY Convention ......................................................................5

        A.      An Argument Rejecting the Reciprocity Requirement ...................8

        B.      The Reciprocity Requirement Controls ......................................11

III.    Diversity Jurisdiction Exists for the Pennsylvania State Law Claim........................16

IV.     Legal Standard ...........................................................................17

        A.      Standard of Review .................................................................17

        B.      Pennsylvania's Uniform Foreign Money Judgment Recognition Act ..........18

V.      Discussion...................................................................................22

        A.      Does Clientron Possess a Foreign Judgment as Defined
                by the UFMJRA? ...................................................................22

        B.      Was the Proceeding Contrary to an Agreement Between the Parties? ........24

                1.      Legal Standard for Determining Foreign Law ...................25

                2.      Findings Regarding Taiwan Law ...................................26

                3.      The Contract at the Center of the Dispute ..........................30

                4.      Testimony at the Hearing............................................32

                        a.      Yun Cheng Liu ...........................................33

                        b.      Ming Yan Shieh ..........................................33

                        c.      Chung Tuh Lee...........................................35

                5.      Discussion...............................................................38

                        a.      There Is an Agreement to Arbitrate ..........................38

                        b.      The Arbitration Decision Is Final and Enforceable
                                in Taiwan ...................................................40

          **c.**      **The Disputed Products Are Not Within the Scope of the SPA** .......................................................**41**

              **i.**     **The Test of the SPA Contains a Mechanism for Incorporating New or Replacement Products** ......**42**

              **ii.**    **A Permissive Reading of the Agreement to Cover All Thin-Client Products Undermines the Agreement's Structure** ....................................................**43**

              **iii.**   **Clientron's Proffered Interpretation of the Words "Any Dispute" Is Overly Broad and Ignores How That Phrase Operates Within the Agreement as a Whole** ....................................................**43**

              **iv.**   **Devon's Request for Repair Warranties Provides Some Support for the Contention That Devon Intended the Disputed Products to Be Covered by the SPA** ........................................................**45**

              **v.**    **The Draft Release Agreement Is Not Probative of the Parties' Intent as to the Scope of the SPA** .........**45**

              **vi.**   **The Draft Supply Agreement Supports Devon's Contention That the Parties Did Not Intend the SPA to Cover the Disputed Products** ...........................**47**

**VI.**    **Summary and Conclusions** ..........................................................**49**

## I.    Introduction

Plaintiff Clientron Corp., a Taiwan company, seeks to enforce an arbitration award obtained in Taiwan against Defendant Devon IT, Inc., a Pennsylvania company.  On August 15, 2008, the parties entered into a Supply and Purchase Agreement ("SPA") for the manufacture and delivery of thin-client computer components. [1]  ECF 1 at 25.  According to Clientron, § 13.3 of the SPA contains an arbitration clause.  ECF 1 at 21.

Appendix A1 of the SPA indicates that the agreement covers only one type of product: TC2.  A dispute arose between the parties regarding Devon's failure to make payment for three products not mentioned in the Appendix of the SPA: TC2D, TC5c, and TC5d (hereinafter, "the disputed products" or "the disputed thin-client products").  Clientron responded by initiating arbitration proceedings in Taiwan through the Chinese Arbitration Association.  At the arbitration, Devon objected to the proceedings, arguing, among other things, that the SPA did not govern the purchase of TC2D, TC5c, and TC5d, and thus the arbitration panel lacked jurisdiction to hear the dispute.  Over the course of the arbitration, the panel issued an Interim Arbitration Award, ECF 38-1 at 4, which addressed Devon's procedural and jurisdictional objections, and a Final Arbitration Award, ECF 11-2 at 15, which addressed the merits of the dispute.

Clientron prevailed before the arbitration tribunal and now seeks to enforce its arbitration award for US$6,574,546.17 plus interest against Devon in Pennsylvania.  In addition to the enforcement proceeding in this Court, Clientron initiated an enforcement proceeding in Taiwan.  On March 28, 2014, the Taiwan enforcement court granted Clientron's petition to enforce its arbitral award.  ECF 43 at 5.  The parties are also engaged in a revocation proceeding initiated by

---

[1]  According to Clientron's complaint, a "thin client" is a computer or a computer program that depends heavily on some other computer (its server) to fulfill computational roles.  Thin clients are components of a broader computer infrastructure.  ECF 1 at 2.

Devon in Taiwan to set aside the award.  To this Court's knowledge, the Taiwan revocation court has not yet rendered a decision.

Clientron's Complaint in this Court has two counts.  Clientron seeks enforcement of its foreign arbitration award under (1) the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (commonly called the "NY Convention"), 21 U.S.T. 2517, 330 U.N.T.S. 3, incorporated under Chapter 2 of the Federal Arbitration Act ("FAA") and codified at 9 U.S.C. §§ 201-208, and under (2) Pennsylvania's Uniform Foreign Money Judgment Recognition Act ("UFMJRA"), 42 P.S. §§ 22001-22009.  The Court has original jurisdiction to enforce foreign arbitration awards falling under the NY Convention.  9 U.S.C. § 203.  The Complaint, however, only invokes this Court's diversity jurisdiction under 28 U.S.C. § 1332.

Devon has filed a Motion to Dismiss the Complaint for lack of subject matter jurisdiction and for failure to state a claim.  ECF 9.

## II.     The NY Convention

As an initial matter, Devon contends the Court lacks jurisdiction to enforce the arbitration award under the NY Convention because the award was rendered in Taiwan and Taiwan is not a signatory to the NY Convention.[2]  Specifically, Devon argues that in ratifying the NY Convention, the United States opted into a reciprocity requirement made available by Article I(3) of the treaty, which precludes enforcement of arbitration awards rendered in non-signatory countries.[3]  ECF 12 at 5-6.

---

[2] Although Taiwan is not recognized by the United States as an independent state, *see* 22 U.S.C. § 3301(a), the Court is required to consider Taiwan as a state for the purposes of applying Chapter 2 of the FAA to this case. *See* 22 U.S.C. § 3303(b)(1) ("Whenever the laws of the United States refer or relate to foreign countries, nations, states, governments, or similar entities, such terms shall include and such laws shall apply with respect to Taiwan.").

[3] This argument is better regarded as a failure to state a claim arising under the NY Convention. Nevertheless, because the argument concerns a threshold issue, the Court addresses it here.

Relying primarily on the NY Convention's implementing legislation, Clientron argues that Chapter 2 of the FAA—specifically 9 U.S.C. § 202 which defines whether an agreement or an award falls under the NY Convention—does not distinguish between signatory and non-signatory states.  Additionally, it notes that 9 U.S.C. § 207 provides "a court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."  The grounds of refusal or deferral in the convention do not refer to non-signatories.  *See* NY Convention, art. 5.  Finally, Clientron asserts that there is nothing in the NY Convention that limits the enforcement of arbitration awards to signatory countries.[4]  ECF 11 at 17.  The text of the treaty, however, seems to conflict with this last assertion.

Article I(3) of the NY Convention states

When signing, ratifying or acceding to this Convention, . . . any State may on the basis of reciprocity declare that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State.  It may also declare that it will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the State making such declaration.

If these optional restrictions are not selected, the NY Convention applies to an arbitration award rendered in any foreign state.  *See* art. I(1) ("This Convention shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought, and arising out of differences between persons, whether physical or legal.").

---

[4]  Clientron argues in its brief that U.S. courts have enforced arbitration awards when the petitioner was not a citizen of a signatory state.  ECF 11 at 17.  This point, however, is inapposite.  *See Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l*, 198 F.3d 88, 94 (2d Cir. 1999) ("The focus of . . . the Convention is not on the nationality of the party seeking to enforce an award but on the *situs of the arbitration*.  Indeed, arbitration awards rendered by panels sitting in contracting countries have been confirmed consistently when the plaintiff is a national of a country which has not acceded to the Convention." (emphasis in original) (internal quotation marks and citation omitted)).

When the Senate Committee on Foreign Relations considered the NY Convention, it recommended that the Senate consent to ratification and make two declarations relating to the treaty.

> [1] The United States of America will apply the Convention, on the basis of reciprocity, to the recognition and enforcement of only those awards made in the territory of another Contracting State.

> [2] The United States of America will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the United States.

SEN. EXEC. REP. NO. 10, 90th Cong., 2d. Sess. (Sept. 27, 1968). The United States Senate gave its consent to ratify the NY Convention with the two declarations on October 4, 1968, and President Nixon proclaimed the convention ratified on December 11, 1970. Proclamation of Accession of the United States, reprinted at 21 U.S.T. 2517, T.I.A.S. No. 6997 (1970).

Congress incorporated the NY Convention into domestic law by passing Chapter 2 of the FAA. 9 U.S.C. § 201 ("[The NY Convention] shall be enforced in United States courts in accordance with this chapter."). Section 202 of the chapter describes when an agreement or award falls under the NY Convention.

### § 202.  Agreement or award falling under the Convention

> An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.

9 U.S.C. § 202.

The first sentence of § 202 clearly mirrors the second declaration made by the Senate when it consented to the NY Convention. What is noticeably absent from § 202, however, is the

first declaration made by the Senate, namely that the NY Convention will only be applied to awards made in the territory of another contracting state.  This raises a question of statutory interpretation: are courts to follow the implementing legislation of the NY Convention alone or are they also to follow the declarations of the Senate?[5]

## A.    An Argument Rejecting the Reciprocity Requirement

An argument supporting the position that there is no reciprocity requirement proceeds as follows.  Because the NY Convention is not a self-executing treaty, it is governed exclusively by its implementing legislation, Chapter 2 of the FAA.  9 U.S.C. § 201 ("The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter.").  Accordingly, the Senate's reciprocity declaration does not carry the force of law because it was not incorporated into Chapter 2 of the FAA.  It therefore does not satisfy the requirements of bicameralism and presentment and thus cannot be applied to the parties by this Court.  U.S. CONST., art. 1, § 7.

This argument is premised on the NY Convention's status as a non-self-executing treaty.

> A treaty is in its nature a contract between two nations, not a legislative act. It does not generally effect, of itself, the object to be accomplished, especially so far as its operation is infra-territorial; but is carried into execution by the sovereign power of the respective parties to the instrument.

> In the United States a different principle is established. Our constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in courts of justice as equivalent to an act of the legislature, *whenever it operates of itself without the aid of any legislative provision*. But when the terms of the stipulation import a contract, when either of the parties engages to perform a

---

[5]  The leading case in this circuit on the enforcement of foreign arbitral awards under the NY Convention does not offer guidance on the threshold issues of jurisdiction and reciprocity.  *See China Minmetals Materials Import and Export Co. v. Chi Mei Corp.*, 334 F.3d 274 (3d Cir. 2003).  There, the Third Circuit determined that the NY Convention permitted a court to refuse to recognize a foreign arbitral award where there was never a valid agreement to arbitrate—even though this was not one of the bases enumerated in the convention's grounds for refusing recognition of a foreign award.  *Id.* at 286; *cf. Admart AG v. Stephen and Mary Birch Found., Inc.*, 457 F.3d 302, 307 (3d Cir. 2006) (observing that the grounds for refusing a foreign arbitral award that falls under the NY Convention are narrowly defined).  This decision, however, authorizes examination of the underlying arbitration agreement by a district court, rather than accepting the arbitrator's decision at face value.

particular act, the treaty addresses itself to the political, not the judicial
department; and the legislature must execute the contract before it can become a
rule for the Court.

*Foster v. Neilson*, 27 U.S. 253, 314 (1829) (emphasis added) overruled on other grounds by

*United States v. Percheman*, 32 U.S. 51 (1833).  Where "treaty stipulations are not self-executing

they can only be enforced pursuant to legislation to carry them into effect."  *Medellin v. Texas*,

552 U.S. 491, 505 (2008) (quoting *Whitney v. Robertson,* 124 U.S. 190, 194 (1888)).  "[W]hile

treaties may comprise international commitments . . . they are not domestic law unless Congress

has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-

executing' and is ratified on these terms."  *Id.*  (internal quotation marks and citation omitted).

Without implementing legislation, a treaty that is not self-executing is "a compact between

independent nations."  *Head Money Cases*, 112 U.S. 508, 598 (1884).  Any declarations or

commitments associated with that compact are therefore directed to the contracting nation-states.

"[I]t is obvious that with all this the judicial courts have nothing to do . . . ."  *Id.*

It is clear that the NY Convention is not self-executing.  As evidenced by the passage of

Chapter 2 of the FAA, the NY Convention does not operate "of itself without the aid of any

legislative provision."  *Foster*, 27 U.S. at 314; *see also Stephens v. Am. Int'l Ins. Co.*, 66 F.3d 41,

45 (2d Cir. 1995) (observing that the NY Convention is not self-executing because it "relies on

an Act of Congress for its implementation").  The legislative history of Chapter 2 of the FAA

accords with this view.  *See* SEN. EXEC. REP. NO. 10, 90th Cong., 2d. Sess. (Sept. 27, 1968)

("Changes in the Federal Arbitration Act . . .  will be required before the United States becomes

party to the convention."); *Hearing to Implement the Convention in the Recognition of Foreign

Arbitral Awards Before the Sen. Comm. on Foreign Relations*, 91st Cong. 32 (1970) (statement

of Richard D. Kearney, Chairman of the Sec. of State's Adv. Comm. on Private International

Law) ("The bill which is presently before you sets up the legal structure that is required to implement the Convention.").

As a treaty that is not self-executing, the NY Convention "can only be enforced pursuant to legislation to carry [it] into effect." *Medellin*, 552 U.S. at 505 (internal quotation marks and citation omitted). Therefore, because Chapter 2 of the FAA does not include a reciprocity requirement, the Court cannot apply one here, even though the Senate ratified the NY Convention on this basis. To do so would be to enforce the NY Convention pursuant to an authority other than an act of Congress.

Nor can the Court infer that Congress intended the Senate's declarations to be incorporated into Chapter 2 of the FAA. As previously discussed, Congress specifically included one of the Senate's declarations into § 202 when it defined what constitutes an agreement that falls under the NY Convention—it did not, however, include the reciprocity requirement.[6] Had Congress wanted to impose a reciprocity requirement, it could have included one in the implementing legislation. Indeed, this point is bolstered by comparing Chapter 2 of the FAA with Chapter 3 of the FAA, the implementing legislation for the Inter-American Convention on International Commercial Arbitration ("Inter-American Convention"). *See* Inter-American Convention on International Commercial Arbitration, January 30, 1975, O.A.S.T.S. No. 42, 1438 U.N.T.S. 245. The Inter-American Convention followed a similar, but different in one key respect, implementation process. When the Senate consented to the ratification of the Inter-American Convention in 1989, it did so with the reservation that it be applied on the basis

---

[6] The legislative history of Chapter 2 of the FAA makes repeated reference to the Senate's second declaration requiring an arbitration agreement or an award falling under this chapter to be of a commercial nature. The Court could not identify any mention of the reciprocity requirement. *See, e.g.*, 116 CONG. REC. H.22731-32 (July 6, 1970); 116 CONG. REC. S.3495-96 (Feb. 17, 1970); 115 CONG. REC. S.40140-41 (Dec. 19, 1969); *Hearing to Implement the Convention in the Recognition of Foreign Arbitral Awards Before the Sen. Comm. on Foreign Relations*, 91st Cong. 32 (1970).

of reciprocity—that the United States would only recognize foreign arbitral awards under the Inter-American Convention from countries that had also ratified it.  H.R. REP. NO. 101-501, at 5 (1990).  However, unlike Chapter 2 of the FAA, Chapter 3 of the FAA includes a provision that requires the Inter-American Convention be applied according to the principle of reciprocity.

> **§ 304.  Recognition and enforcement of foreign arbitral decisions and awards; reciprocity**
>
> Arbitral decisions or awards made in the territory of a foreign State shall, on the basis of reciprocity, be recognized and enforced under this chapter only if that State has ratified or acceded to the Inter-American Convention.

9 U.S.C. § 304.  Chapter 3 of the FAA underscores the notion that, when Congress intends to implement a declaration made by a ratifying Senate, it includes that declaration in the treaty's implementing legislation.

Thus, this argument attempts to establish that the text of Chapter 2 of the FAA is unequivocally clear and, by the terms of 9 U.S.C. § 201, no reciprocity requirement exists.

## B.        The Reciprocity Requirement Controls

The previous argument fails for at least two reasons: (1) it misapprehends what constitutes "the NY Convention" for the purpose of 9 U.S.C. § 201 and (2) a finding that there is no reciprocity requirement under the NY Convention as ratified by the United States would produce an absurd outcome.

First, the Senate's declarations, after receiving a two-thirds vote in the Senate and the President's signature, were incorporated into the NY Convention for the purposes of 9 U.S.C. § 201.  That is, Article I of the NY Convention provided the Senate's declarations legal force.  Article I(3) of the NY Convention functions as preemptive approval by all signatory states for any other signatory state to implement optional provisions made available in the convention, such as the reciprocity requirement.  These optional provisions are exercisable upon making a

declaration manifesting an intent to utilize them at the time of the convention's ratification.  NY Convention, art. I(3).  It is a well-established principle of treaty interpretation, and also of run-of-the-mill contract interpretation, that an amendment to an agreement that receives the consent of the contracting parties is incorporated into the original agreement.  This principle was enunciated by the Supreme Court as early as 1853 in *Doe v. Braden*, 57 U.S. 635 (1853).

In *Braden*, the Supreme Court heard an appeal in an action of ejectment stemming from a controversy over a treaty with Spain, by which Florida was ceded to the United States.  The plaintiff claimed title to lands in Florida under a grant from the King of Spain to the Duke of Alagon.  This grant, however, was obtained through underhanded means.  Negotiations for the cession of Florida began on January 24, 1818.  The grant to the Duke, which included almost all of the land that was under negotiation with the United States, was given on February 6, 1818.  Before the treaty was ratified, the United States became aware of Spain's chicanery.  It refused to sign the treaty until the King of Spain acceded to a declaration to be attached to the treaty that stated that all land grants made after January 24, 1818 were null and void.  The King eventually agreed, and the treaty was ratified.  In dismissing the plaintiff's claims regarding the legal effect of the declaration, the Supreme Court stated

> where one of the parties to a treaty, at the time of its ratification annexes a written declaration explaining ambiguous language in the instrument or adding a new and distinct stipulation, and the treaty is afterwards ratified by the other party with the declaration attached to it, and the ratifications duly exchanged—the declaration thus annexed is a part of the treaty and as binding and obligatory as if it were inserted in the body of the instrument. The intention of the parties is to be gathered from the whole instrument, as it stood when the ratifications were exchanged.

*Doe v. Braden*, 57 U.S. at 656.

The principle in *Braden* clearly applies to the ratification of the NY Convention.  Article I(3) functions as pre-clearance from the contracting states to two optional provisions: (1) a

reciprocity requirement and (2) a requirement that an arbitration agreement or award must be commercial in nature to fall under the NY Convention.  The Senate clearly exercised both of these options in its declarations, and these declarations were approved by the President.  The declarations thereby became "a part of the treaty" and are "as binding and obligatory as if [they] were inserted in the body of the instrument."  *Id.*  The fact that Congress codified the commercial transaction declaration and not the reciprocity declaration does not make a material difference.  Upon ratification and passage of Chapter 2 of the FAA, the provisions of the NY Convention, as ratified by the Senate and the President, became the law of the land.  Congress's decision to emphasize the commercial nature of agreements and awards that fall under the convention does not diminish the binding force of the Senate declarations upon this Court.

Second, holding that the NY Convention applies to arbitration awards rendered in all foreign states, regardless of whether they are signatories, would produce an absurd outcome. Namely, it would completely undermine the very purpose for ratifying the Inter-American Convention.  Congress intended Chapter 2 and Chapter 3 of the FAA to operate nearly identically, particularly with regards to reciprocity.  When ratifying the Inter-American Convention, the Senate did so with three reservations.  One of those reservations stated that the Inter-American Convention would be applied under "the same rule followed under the earlier New York Convention, that foreign arbitral awards, on the basis of reciprocity, will only be recognized from countries that have also ratified the Convention."  H.R. REP. 101-201, at 5 (1990).

The reason reciprocity, and indeed the entire Inter-American Convention, tracks so closely to the NY Convention is because the Inter-American Convention is a regional substitute for the NY Convention.  In other words, the Inter-American Convention was intended to

accommodate foreign arbitration awards within the Americas precisely because many nations in the Western hemisphere were not signatories to the NY Convention.  As the House Report explains,

> [Chapter 3 of the FAA] addresses a fundamental problem that has plagued the resolution of disputes arising in inter-American commercial transactions, namely the traditional wariness of Latin American nations to international conventions. These countries have shown less resistance to joining regionally based conventions.  For example, of the thirteen nations which have become parties to the Inter-American Convention, El Salvador, Honduras, Paraguay, and Venezuela are not parties to the New York Convention.

*Id.* at 4-5.

If the NY Convention applied to arbitration awards rendered in non-signatory states, it seems very unlikely that the United States would have gone through the trouble of ratifying an entirely different treaty to achieve the same, or at least a substantially similar, outcome.

Furthermore, the presence of a reciprocity requirement in the Inter-American Convention's implementing legislation does not support the contention that there is no such requirement under the NY Convention because that requirement does not appear in the NY Convention's implementing legislation.  The reciprocity requirement under the NY Convention appears in Article I(3) of the NY Convention: "When signing, ratifying or acceding to this Convention, or notifying extension under article X hereof, any State may on the basis of reciprocity declare that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State."  As discussed above, once the Senate and President ratified the treaty with the declaration authorizing the reciprocity requirement, the NY Convention's implementing legislation incorporated that version of the treaty into U.S. law.  By contrast, the Inter-American Convention does not contain a provision authorizing all contracting states to institute a reciprocity requirement.  *See generally* Inter-

14

American Convention, O.A.S.T.S. No. 42. Therefore, according to *Braden*, ratification of the Inter-American Convention with a declaration that it will be applied according to the principle of reciprocity would not have the effect of incorporating that declaration into the treaty because that declaration would not have been ratified by all the contracting states. It follows that, in order to have the reciprocity requirement incorporated into U.S. law, Congress had to specifically provide a reciprocity requirement in the Inter-American Convention's implementing legislation. *See* 9 U.S.C. § 304. A reciprocity requirement in a treaty's implementing legislation is as applicable as a reciprocity requirement in a ratified treaty that has been incorporated into U.S. law through implementing legislation. The United States Constitution does not distinguish between the two. U.S. CONST., art. 6, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land . . . .").

Accordingly, the NY Convention as ratified under the authority of the United States includes a reciprocity requirement. Because Taiwan is not a signatory to the NY Convention, Clientron's arbitration award is not enforceable under it.[7] *See Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974) ("The goal of the Convention . . . was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitration are observed and arbitral awards are enforced in the signatory countries.").

Clientron cites the Treaty of Friendship, Commerce and Navigation Between the United States of America and the Republic of China, art. 6(4), Nov. 4, 1946, T.I.A.S. No. 1871, 25

---

[7] Every case identified by this Court that has addressed this issue has held that the NY Convention contains a reciprocity requirement. *See, e.g.*, *Nat'l Iranian Oil Co. v. Ashland Oil, Inc.*, 817 F.2d 326, 335 (5th Cir. 1987); *Ledee v. Ceramiche Ragno*, 684 F.2d 184, 186-87 (1st Cir. 1982); *Seed Holdings, Inc. v. Jiffy Int'l AS*, Case No. 13-cv-2284 JGK, 2014 WL 1141717 (S.D.N.Y. Mar. 21, 2014); *Cavalier Const. Co., Ltd. (Bahamas) v. Bay Hotel & Resort, Ltd.*, Case No. 97-3833-CIV-Moore, 1998 WL 961281 (S.D. Fla. July 13, 1998).

U.N.T.S. 69, for the proposition that U.S. courts recognize arbitral awards made in Taiwan, and thus this Court should recognize Clientron's award under the NY Convention:

> In the case of any controversy susceptible of settlement by arbitration, which involves nationals, corporations or associations of both High Contracting Parties and is covered by a written agreement for arbitration, such agreement shall be accorded full faith and credit by the High Contracting Party, and the award or decision of the arbitrators shall be accorded full faith and credit by the courts within the territories of the High Contracting Party in which it was rendered, provided the arbitration proceedings were conducted in good faith and in conformity with the agreement for arbitration.

The NY Convention was agreed to and ratified after the Treaty of Friendship, and it is more specific in its application to the present factual situation. Clientron has not cited, and the Court has not found, any judicial interpretation or enforcement of the Treaty of Friendship and is not prepared to hold that it supersedes the NY Convention. The issue is whether an arbitration award rendered in Taiwan falls under the NY Convention. Taiwan is not a signatory to that convention. It therefore cannot benefit from its provisions. Nor does this Court's conclusion that the NY Convention does not apply to Clientron's award preclude Clientron from enforcing that award in the United States. As discussed *infra*, Clientron can still enforce its arbitral award pursuant to state law. *See* RESTATEMENT (THIRD) OF THE U.S. LAW OF INTERNATIONAL COMMERCIAL ARBITRATION § 4-26 cmt. (e).

Count I of the Complaint will therefore be dismissed with prejudice.

## III.   Diversity Jurisdiction Exists for the Pennsylvania State Law Claim

The inapplicability of the NY Convention is not fatal to Clientron's cause. In the absence of a federal statute or treaty, recognition of foreign awards or judgments may be obtained in federal courts under state law, provided that there is a basis for federal jurisdiction. Clientron has adequately asserted this Court's diversity jurisdiction: the amount in controversy exceeds $75,000, and the parties consist of a citizen of Pennsylvania and a citizen of a foreign state. 28

U.S.C. § 1332.  Accordingly, the Court has jurisdiction to hear Clientron's claim under Pennsylvania's UFMJRA.

## IV.    Legal Standard

### A.    Standard of Review

Typically, when considering a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a court assumes as true all well-pleaded facts in the complaint and draws any inferences in the light most favorable to the non-movant.  When, however, "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  FED. R. CIV. P. 12(d).  This Court has considered several matters outside of the pleadings, including interpretations of the SPA and evidence on Taiwan law produced under Rule 44.1.  Accordingly, the Court will treat the Motion to Dismiss as a motion for summary judgment under Federal Rule of Civil Procedure 56.

This memorandum and the accompanying order constitute notice to the parties of the motion's conversion under Rule 12(d).  The parties will have an opportunity to present any further material they deem pertinent to deciding this case on summary judgment.  In view of the great volume of information already submitted, the Court will detail its conclusions from the evidence as the record currently stands.  The Court's findings described below refer exclusively to Count II of the Complaint and are subject to revision pending the filing of a final memorandum and order.  The parties shall be permitted to supplement the record as to the points discussed in this memorandum or provide evidence as to additional points not yet brought to the Court's attention.

A motion for summary judgment will be granted if, drawing all inferences in favor of the nonmoving party, there is no genuine issue of material fact in the record and the moving party is

entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts; it will be defeated when there is a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986).  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.* at 249.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be some evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.

### B.   Pennsylvania's Uniform Foreign Money Judgment Recognition Act

Clientron seeks recognition of its arbitral award under Pennsylvania's Uniform Foreign Money Judgment Recognition Act, 42 P.S. §§ 22001-22009.  "Pennsylvania distinguishes between judgments obtained in the courts of her sister states, which are entitled to full faith and credit, and those of foreign courts, which are subject to principles of comity."  *Louis Dreyfus Commodities Suisse SA v. Financial Software Sys., Inc.,* — A.3d —, 2104 WL 3721370, at * 3 (Pa. Super. Ct. July 29, 2014) (quoting *Somportex Ltd. v. Phila. Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir. 1971)).  "'Comity' . . . is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws."  *Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895).  *Hilton*'s model of general respect and deference toward foreign judgments was later incorporated into Pennsylvania common law:

> When the action is brought in a court of this country by a citizen of a foreign country against one of our own citizens . . . and the foreign judgment appears to

have been rendered by a competent court, having jurisdiction of the cause and of
the parties and upon due allegations and proofs, and opportunity to defend against
them, and its proceedings are according to the course of a civilized jurisprudence,
and are stated in a clear and formal record, the judgment is *prima facie* evidence,
at least, of the truth of the matter adjudged; and it should be held conclusive upon
the merits tried in the foreign court, unless some special ground is shown for
impeaching the judgment, as by showing that it was affected by fraud or
prejudice, or that by the principles of international law, and by the comity of our
own country, it should not be given full credit and effect.

*In re Chirstoff's Estate*, 192 A.2d 737, 739 (Pa. 1963) (quoting *Hilton*, 159 U.S. at 205).  "While

the comity doctrine does not reach the force of obligation, it creates a strong presumption in

favor of recognizing foreign judicial decrees."  *United States ex rel Saroop v. Garcia*, 109 F.3d

165, 169 (3d Cir. 1997).

The UFMJRA "was an attempt to codify common law principles related to recognition of

foreign judgments."  *Society of Lloyd's v. Mullin*, 255 F. Supp. 2d 468, 475 (E.D. Pa. 2003).  The

Pennsylvania legislature's adoption of the UFMJRA in 1990 clarified several aspects of the

State's foreign judgment jurisprudence: (1) a foreign judgment is entitled to recognition if it is

final, conclusive, and enforceable where rendered, 42 P.S. § 22009, (2) unless the defendant,

bearing the burden of proof, *Third Nat. Bank of Nashville v. Tagnani*, 18 Pa. D. & C. 4th 92, 95

(Ct. Com. Pleas 1993), (3) can establish one of several grounds for nonrecognition, 42 P.S. §

22004.

Adoption of the UFMJRA also had procedural consequences in recognition proceedings.

Pennsylvania common law treated foreign judgments, "in the first instance, not as judgments, but

as rights of action.  Historically, obligees were required to commence a civil action on the

existing foreign judgment, consummating in a Pennsylvania judgment, before enforcement could

be had in the Commonwealth."  *Morrissey v. Morrissey*, 713 A.2d 614, 616 (Pa. 1998).  The

cause of action to recognize a foreign judgment was originally asserted as an action in debt or

assumpsit.  The action differed from ordinary civil actions in that the defenses were limited to

those that would destroy the full faith and credit otherwise attaching to the foreign judgment. *Id.* at 616 n.5. The UFMJRA, however, "implemented streamlined procedures for domesticating . . . international judgments." *Hilkmann v. Hilkmann*, 858 A.2d 58, 68 (Pa. 2004). Under the Act, although recognition of a foreign judgment must still be initiated in the form of a civil action, *see Society of Lloyd's*, 255 F. Supp. 2d at 479 (granting summary judgment to recognize a foreign judgment under Pennsylvania's UFMJRA); *Erbe Elektromedizin GMBH v. Canady*, 545 F. Supp. 2d 491, 498 (W.D. Pa. 2008) (same), the defenses available to oppose recognition are limited to those enumerated in 42 P.S. § 22004; *cf. Olympus Corp. v. Canady*, Case No. 3036, 2007 WL 5479475, at *1 (Pa. Ct. Com. Pleas Aug. 21, 2007) ("Pennsylvania's courts must accord even greater deference to foreign judgments under the Recognition Act than it did under the principle of comity [because the Act] limited the grounds on which a court may strike an award.").

With that background in mind, the provisions of that Act relevant to this case are as follows:

### § 22002. Definitions

The following words and phrases when used in this act shall have the meanings given to them in this section unless the context clearly indicates otherwise:

**"Foreign government."** Any governmental unit other than the United States, or any state, district, Commonwealth, territory or insular possession thereof, or the Panama Canal Zone, the Trust Territory of the Pacific Islands or the Ryukyu Islands.

**"Foreign judgment."** Any judgment of a foreign government granting or denying recovery of a sum of money, other than a judgment for taxes, a fine or other penalty, or a judgment in matrimonial or family matters.

### § 22003. Recognition and enforcement

Except as provided in sections 4 and 5, a foreign judgment meeting the requirements of section 9 is conclusive between the parties to the extent that it grants or denies recovery of a sum of money. The foreign judgment is enforceable

in the same manner as the judgment of another state which is entitled to full faith and credit.

### § 22004. Grounds for nonrecognition

A foreign judgment need not be recognized if:
. . . .
(5) the proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be settled otherwise than by proceedings in that court

### § 22005. Nonconclusive judgments

A foreign judgment is not conclusive if:
. . . .
(3) the foreign court did not have jurisdiction over the subject matter.

### § 22009. Applicability

This act shall apply to any foreign judgment that is final and conclusive and enforceable where rendered, even though an appeal therefrom is pending or it is subject to appeal.

42 P.S. §§ 22002-05, 22009.

In sum, Clientron will state a prima facie case for recognition of its arbitral award if this Court finds that it (1) qualifies as a foreign judgment; (2) is for a sum of money; (3) is final and conclusive; and (4) is enforceable where it was rendered.  However, the Court need not recognize a foreign money judgment if any of the nonrecognition conditions of 42 P.S. § 22004 exist.  The only nonrecognition condition relevant here is § 22004(5): "if the proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be settled otherwise than by proceedings in that court."  The party challenging the validity of the judgment has the burden of proving a condition enumerated in § 22004.  *See Tagnani*, 19 Pa. D & C 4th at 95 (stating that the burden of proof to show grounds for nonrecognition under the UFMJRA resides with the party challenging the validity of the judgment).

## V.      Discussion

### A.      Does Clientron Possess a Foreign Judgment as Defined by the UFMJRA?

The first element of Pennsylvania's UFMJRA requires that the award seeking to be enforced be a judgment of a foreign court.  Clientron argues that this element is satisfied because Taiwan law considers an arbitral award as equivalent to a foreign judgment.  *See* ECF 11 at 14; Arb. Law of the Republic of China, art. 37 ("The award shall be binding on the parties and have the same force as a final judgment of a court.").  Although Taiwan law governs the interpretation of the SPA, it does not govern the application of the UFMJRA.  *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in a [diversity] case is the law of the state.").

Pennsylvania law clearly defines what constitutes a foreign judgment: "[a]ny judgment of a foreign government . . . ."  42 P.S. § 22002.  A foreign government is defined as "[a]ny governmental unit other than the United States, or any state, district, Commonwealth, territory or insular possession thereof, or the Panama Canal Zone, the Trust Territory of the Pacific Islands or the Ryukyu Islands."  *Id.*  A panel convened by the Chinese Arbitration Association issued Clientron's award.  The Chinese Arbitration Association is a private organization and is therefore not a "governmental unit."  Accordingly, an arbitral award issued by this entity does not qualify as a foreign judgment under Pennsylvania law.  *See Pirito v. Penn Eng'g World Holdings*, 833 F. Supp. 2d 455, 474-75 (E.D. Pa. 2011) (recognizing the distinction between a judgment rendered by a court of a foreign country and an award rendered by a private tribunal that happens to convene in a foreign country).

That being said, Clientron does have a foreign judgment enforcing its arbitral award.  In a supplemental filing, Clientron provided a certified copy of a money judgment from the Taiwan

Shilin District Court, enforcing Clientron's arbitral award and entering a judgment for US$6,574,546.17 plus interest.  ECF 43 at 5.  This judgment was rendered by a foreign government, is for a sum of money, and is enforceable where it was rendered.  *See Comm'ns Imp. Exp. S.A. v. Republic of the Congo*, — F.3d —, Case No. 13-7004, 2014 WL 3377337, at *11 (D.C. Cir. July 11, 2014) (holding that the District of Columbia Uniform Foreign Country Money Judgments Recognition Act was applicable to an English court judgment enforcing the appellant's arbitration award); *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala,* 29 F.3d 79, 82 (2d Cir. 1994) (treating an order of a Paris Court of Appeals refusing to annul an arbitration award as a foreign judgment and enforcing that judgment under the New York Uniform Foreign Money Judgment Recognition Act).

The Court could grant Clientron leave to file an amended complaint basing its UFMJRA claim on the judgment of the Taiwan Shilin District Court.  This, however, would sacrifice the parties' time and judicial resources for the sake of formality.  Devon has already briefed its position on why the Taiwan court's enforcement judgment is invalid, ECF 53 at 19-21, and Clientron has responded to these arguments, ECF 56 at 4-6.  Therefore, whatever pleading deficiency existed in Count II at the time the Complaint was filed, it has been cured by Clientron filing the Taiwan court's enforcement judgment.

### B.     Was the Proceeding Contrary to an Agreement Between the Parties?

The Court now considers whether the judgment satisfies the elements of the Pennsylvania statute.[8]  The proceeding in the Taiwan court was for enforcement of an arbitration award

---

[8]  In its post-hearing briefing, Devon argues that Pennsylvania's UFMJRA is preempted by Chapter 2 of the FAA and the NY Convention.  This argument is meritless.  *See Island Territory of Curacao v. Solitron Devices, Inc.*, 489 F.2d 1313, 1318 (2d Cir. 1973) ("The Convention on Recognition in no way purports to prevent states from enforcing foreign money judgments, whether those judgments are rendered in the enforcement of an arbitration

rendered by the Chinese Arbitration Association.  Clientron has demonstrated that the judgment was final and enforceable—the Taiwan court's order enabled Clientron to enforce its arbitral award on any assets Devon had in Taiwan.  *See* ECF 43 at 5.

Two issues still remain.  The first is whether the enforcement judgment was conclusive.  A foreign judgment is not conclusive if the foreign court did not have jurisdiction over the subject matter.  42 P.S. § 22005.  If there was no agreement to arbitrate in the SPA, then Clientron's arbitration award would have been improperly granted, which would mean the Taiwan enforcement court would not have had subject matter jurisdiction to enforce it.  Second, if the parties did agree to arbitrate, but the arbitration award was based on issues beyond the scope of the arbitration agreement, then the Taiwan court's enforcement judgment would be contrary to an agreement between the parties.  This would be grounds for nonrecognition.  *See* 42 P.S. § 22004; *cf. Bel–Ray Co., Inc. v. Chemrite (Pty) Ltd.,* 181 F.3d 435, 444 (3d Cir.1999) ("[A] court may only compel a party to arbitrate where that party has entered into a written agreement to arbitrate that covers the dispute.").

Devon levies three main arguments why the arbitration panel, and by extension the Taiwan enforcement court, did not have the authority to enter an award for Clientron: (1) the arbitration panel—and thus the Taiwan enforcement court—had no jurisdiction to enter an award because § 13.1 of the SPA does not contain an agreement to arbitrate; (2) even if § 13.1 requires the parties to submit their dispute to an arbitration panel, the provision indicates that any decision of the panel would not be final[9]; and (3) even if § 13.1 calls for binding arbitration, the

---

award or otherwise."); 9 U.S.C. § 9 (distinguishing between arbitral awards and court judgments enforcing those awards); *id.* § 202 (indicating that a foreign arbitral award, not a judgment, falls under the NY Convention).

[9]  As explained below, this argument is essentially identical the Devon's first argument, though couched in slightly different terms.  This argument also does not address or contest the finality of the Taiwan enforcement proceeding, which is the only proceeding where finality is relevant under Pennsylvania's UFMJRA.

arbitration panel had no jurisdiction to enter an award because the SPA does not cover the dispute submitted to the panel, specifically the SPA does not cover disputes over the TC2D, TC5c, and TC5d products.

In order to determine whether the parties agreed to arbitrate, and the scope of such an agreement, the Court must interpret the provisions of the SPA. The SPA is governed by Taiwan law. ECF 1 at 21 § 13.2. Therefore, the Court must interpret the language of the SPA according to Taiwan contract interpretation principles. This, of course, requires the Court to apply foreign law. Before the Court can apply the relevant foreign law, it must determine what that foreign law is.

### 1.      Legal Standard for Determining Foreign Law

"In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law." FED. R. CIV. P. 44.1. "This rule provides courts with broad authority to conduct their own independent research to determine foreign law but imposes no duty upon them to do so." *Bel-Ray v. Chemrite Ltd.*, 181 F.3d 435, 440 (3d Cir. 1990); s*ee also Weiss v. La Suisse, Societe d'Assurances sur la Vie*, 313 F. Supp. 2d 241, 244 (S.D.N.Y. 2004) ("It is the province of the court to decide what foreign law is, and a district judge is given wide latitude in determining what evidence to take on the subject, and in what form.") Courts may rely upon their own research and any submissions from the parties, they may seek the aid of expert witnesses; and they may even consider material that would be inadmissible at trial. *Nat'l Grp. for Commc'ns & Computers, Ltd. v. Lucent Technologies Int'l, Inc.*, 331 F. Supp. 2d 290, 294 (D.N.J. 2004). "[F]ederal judges may reject even the uncontradicted conclusions of an expert witness and reach

their own decisions on the basis of independent examination of foreign legal authorities." *Curtis v. Beatrice Foods, Co.*, 481 F. Supp. 1275, 1285 (S.D.N.Y. 1980).  Ultimately, "[t]he parties . . . carry the burden of proving foreign law; where they do not do so, we will ordinarily apply the forum's law."  *Ferrostaal, Inc. v. M/V Sea Phoenix*, 447 F.3d 212, 216 (3d Cir. 2006) (internal quotation marks and citation omitted).

The Court permitted the parties to file expert reports regarding Taiwan arbitration law and contract interpretation principles.  ECF 29.  After the parties submitted their expert reports, in a letter dated May 16, 2014, the Court asked the parties additional questions about Taiwan law.  The parties submitted supplemental briefing to address these questions.  ECF 47, 48.  On June 5, 2014, the Court held a hearing concerning how Taiwan law should be applied to the issues of the case.  Clientron's expert testified in person; Devon's expert testified via videoconference from Taiwan.  The parties submitted an additional round of briefing after the hearing.  ECF 53, 54.

### 2.    Findings Regarding Taiwan Law

Taiwan is a civil law country.  Accordingly, the primary source of law is statute.  Taiwan courts do not engage in the incremental accretion of precedent as do common law systems.  A corollary to this structure is that superior courts in Taiwan do not bind inferior courts in future cases.  However, in cases where the Taiwan Supreme Court considers a decision to be of particular importance, it can designate the decision a "Precedent," which renders the decision binding on all future decisions in all courts.  Under this structure, the influence of non-precedential decisions of the Taiwan Supreme Court and the decisions of inferior courts is limited.  The Court therefore looks primarily to Taiwan statutes and Precedents in reaching its judgment.

The following are Taiwan statutes that the Court finds govern this case:

[An] arbitration agreement shall be in writing.

Written documents, documentary instruments, correspondence, facsimiles, telegrams or any other similar types of communications between the parties evincing prima facie arbitration agreement shall be deemed to establish an arbitration agreement.

Arb. Law of Republic of China, art. 1.

[An arbitration] award shall, insofar as relevant, be binding on the parties and have the same force as a final judgment of a court.

An [arbitration] award may not be enforceable unless a competent court has, on application of a concerned party, granted an enforcement order.

Arb. Law of Republic of China, art. 37.

The court shall reject an application for enforcement in any of the following circumstances where:

(1) The arbitral award concerns a dispute not contemplated by the terms of the arbitration agreement, or exceeds the scope of the arbitration agreement, unless the offending portion of the award may be severed and the severance will not affect the remainder of the award . . . .

Arb. Law of Republic of China, art. 38.

A party may apply to a court to set aside the arbitral award in any of the following circumstances:

(1) The existence of any circumstances stated in Article 38.

(2) The arbitration is nullified, invalid or has yet to come into effect or has become invalid prior to the conclusion of the arbitral proceedings.

Arb. Law of Republic of China, art. 40.

In the interpretation of an expression of intent, the real intention of the parties must be sought rather than the literal meaning of the words.

Republic of China Civil Code, art. 98.

Devon also cited, and Clientron did not oppose, the following Taiwan Supreme Court

Precedents:

> Contract interpretation requires exploration of the parties' true intent at the time of execution; it is inappropriate to adhere blindly to the language employed under the contract.  However, if the contract language already reflects the true intent of the parties and no additional facts need to be ascertained in that regard, the language may not be disregarded and otherwise distorted to reach a different interpretation.

Case No. 17-Shang-Zi-1118 (January 1, 1928).

> In interpreting the contract between the parties, [the court] shall take into account the whole contract, as well as the circumstances at the time when the contract was executed, so as not losing the true intent of the parties.

Case No. 18-Shang-Zi-1727 (January 1, 1929).

> In interpreting the parties' true intent in a document agreed to between the parties, the then [the time of the execution of the document] surrounding circumstances and all other evidence shall serve as the basis of determination.  The inquiry shall not blindly adhere to the literal language or be overly or arbitrarily focused on one or two words so as losing the true intent of the parties.

Case No. 19-Shang-Zi-28 (January 1, 1930).

The parties have also presented cases from lower courts that are not binding but

nonetheless provide useful guidance for the Court, as these cases represent the judgment

of Taiwan courts interpreting Taiwan statutes and binding precedent.  Accordingly, the

following principles from these cases will guide the Court's analysis.

> The existence of an arbitration agreement between the parties is a condition precedent for an arbitration award to be rendered.

*Yuan-Sen Internet Tech. Co. v. Keelung Harbor Bureau, Ministry of Transp. & Commc'ns*, 93-Chong-Shang-Zi 65 (Taiwan High Ct. May 25, 2004).

> Taiwanese contract law recognizes the principle of "contra proferentem," under which any ambiguities in a contract are to be interpreted against the drafter.

*See Waxlink Int'l Co. v. Lin-Lian Mech. & Elec. Eng'g Corp.*, 94 Shang-Zi-418 (Taiwan High Ct. May 4, 2007).

28

> Silence is simply not to act and cannot be interpreted as an indirect expression of intent.  Unless otherwise provided under law or contract, it has no legal effect.

Case No. 86-Tai-Shang-Zi-3609.

There is no dispute that this is the relevant law governing the case.  There is a dispute, however, about whether there is a presumption in favor of the validity of arbitration clauses in Taiwan.  Clientron only cites its expert's opinion to support this proposition.  Clientron has not identified any case or any statute that supports this characterization of Taiwan law.  *See* ECF 54 at 6.

Clientron has also argued throughout this litigation that the Court should not consider Devon's arguments because Devon has already had the opportunity to fully and fairly present them before the arbitration panel.  This argument is unavailing.  Under Taiwan law, although an arbitration panel first answers questions of arbitrability itself, Arb. Law of Republic of China, art. 22, the panel's determination can be reviewed in a revocation proceeding by a Taiwan court or in an enforcement proceeding in the jurisdiction where the award is sought to be enforced, *id.* arts. 38, 40.  In the enforcement proceeding context, Taiwan law permits a court to refuse to enforce the award if it concerns a dispute not contemplated by the terms of the arbitration agreement or exceeds the scope of the arbitration agreement.  *Id.* art. 38.  Devon's arguments fall precisely along the lines set out under Article 38.  Accordingly, the fact that Devon objected to the arbitration panel's jurisdiction at the arbitration does not foreclose it from raising those same arguments here.[10]

---

[10] Taiwan law differs somewhat from U.S. law on this matter.  In Taiwan, a panel's decision about a dispute's arbitrability is reviewable in a revocation or enforcement proceeding.  Arb. Law of Republic of China, arts. 38, 40.  In the U.S., under the FAA, it is presumed that parties to an arbitration agreement intend courts to decide questions of arbitrability, unless the parties clearly and unmistakably provide otherwise.  *See BG Group, PLC v.*

### 3.      The Contract at the Center of the Dispute

Armed with these principles, the Court must apply them to interpret the SPA and

determine the intent of the parties as to what form of dispute resolution was contemplated under

the agreement.  The following portions of the SPA are material to the Court's judgment.

> WHEREAS, Devon IT and Clientron desire to establish the terms and conditions
> that will apply to Devon IT's purchase of new products and related spare parts
> from Clientron.

ECF 1 at 7.

> During the Term, Devon IT may provide a draft Product Requirements Document
> for new products ("PRD").  Clientron will review and propose changes, if any, to
> the PRD.  The final draft PRD ("Final PRD") shall be mutually agreed by Devon
> IT and Clientron.

ECF 1 at 7 § 1.1.

> Clientron agrees to supply and sell the Products defined in the detailed product
> Appendix A to Devon IT, and Devon IT agrees to purchase the Products defined
> in Appendix A from Clientron, in accordance with the terms and conditions of
> this Agreement.
>
> A new Product defined by a new Final [Product Requirements Document] shall be
> further attached in Appendix A as a supplement to the Agreement, and could be
> registered as Appendix A1, A2, . . . etc.

ECF 1 at 8 § 2.1.

> After delivering the Products to the carrier designated by Devon IT, Clientron
> shall invoice the prices as agreed upon in the then current Appendix A.

ECF 1 at 10 § 5.1.

---

*Republic of Argentina*, 134 S. Ct. 1198, 1206-07 (2014).  Because the parties elected to have Taiwan law govern the agreement, they opted for a system that permits courts to review an arbitration panel's decision regarding arbitrability.  Accordingly, under federal law, the selection of Taiwan law to govern an arbitration agreement would not constitute a clear and unmistakable decision to preclude a court from addressing arbitrability issues.  Similarly, under Pennsylvania law, in an action to recognize a foreign money judgment, courts are given the authority to review whether the proceeding that rendered the judgment was contrary to an agreement between the parties.  In this case, Pennsylvania law would permit a court to review whether a Taiwan court exercised jurisdiction based on an arbitration award that was rendered contrary to an agreement by the parties.  Thus, either under federal law, Pennsylvania law, or Taiwan law, this Court has the ability to review the arbitration panel's decision on arbitrability.

The parties may request at any time a meeting to discuss changes in market conditions (including, but not limited to, those changes caused by innovation or invention), product cost, special bid pricing, or volume consideration and the parties agree to meet as soon as practicable to negotiate in good faith Product price increases or decreases based upon such conditions.  All price changes must be mutually agreed to by both parties in advance and will become effect [sic] immediately following such agreement.

ECF 1 at 10 § 5.3.

If during the Agreement's Term Clientron announces product that is designated by Clientron as a replacement for Product ("Replacement Product") listed in Appendix A, Devon IT may request that Clientron substitute the Replacement Product for its on-order Products after a reasonable transition period to consume material prepared for Products.  Subject to negotiations of price, terms and conditions and availability of the Replacement Product during the remainder of the Term, Clientron will provide such Replacement Product for existing on-order Products, and for subsequent orders.

ECF 1 at 12 § 6.6.

Clientron shall not make changes to the Product supplied under this Agreement without Devon IT's prior written consent.

ECF 1 at 13 § 6.8.

Except as expressly provided herein, any provision of this Agreement may be amended and the observance of any provision of this Agreement may not be waived (either generally or any particular instance and either retroactively or prospectively) only with the written consent of the other party.  However, it is the intention of the parties that this Agreement is controlling over additional or different terms of any order, confirmation, invoice or similar document.

ECF 1 at 21 § 13.1.

Dispute Resolution

Parties intend that any dispute be resolved informally through good faith negotiations.  Any party may initiate negotiations by written notice to the other stating the dispute details.  Any party may initiate negotiations by written notice to the other stating the dispute details.  Parties will jointly define the dispute and propose a remedy.  If this process does not resolve the dispute, then either party may escalate the problem to senior management.

Any dispute remaining after resolution efforts above relating to this Agreement shall be resolved in the *Taiwan trade arbitration council* and this still [sic] not

31

resolves [sic] the dispute then the problem finally has to be escalated to an appropriate court of law in Taipei, Taiwan for final determination.

ECF 1 at 21 § 13.3 (emphasis added).

Appendix A to the SPA is also critical to the case. ECF 1 at 25. The appendix defines what "Products" fall under the agreement. *See* ECF 1 at 8 § 2.1. The Appendix lists only one product, TC2, with two models, TC2b and TC2c. TC2 is also known as U700.

The outstanding invoices at the center of this dispute concern the following products, which are not listed in Appendix A: TC2D (also known as U720 or FX130), TC5c (also known as U800 or FX 170), and TC5v (also known as E710). The "FX" designation was apparently added to TC2D and TC5c at the request of Devon and Clientron's downstream purchaser, Dell, Inc. The following chart illustrates the various products at issue.

| Clientron's Model No. | Devon's Model No. | Dell's Model No. |
|---|---|---|
| U700 | TC2 (TC2b & TC2c) | - |
| U720 | TC2D | FX130 |
| U800 | TC5c | FX170 |
| E710 | TC5v | - |

Whether the disputed products fall under the scope of the SPA is a central question of this case.

### 4.    Testimony at the Hearing

Unsurprisingly, the parties disagree about how Taiwan legal principles should be applied to the SPA. The Court has received extensive briefing and held a hearing on June 5, 2014 regarding how Taiwan courts would apply these principles to the agreement. The following summary of the testimony at the hearing provides the best illustration of the positions of the parties.

### a.    Yun Cheng Liu

Clientron first called Yun Cheng Liu to provide factual testimony related to the underlying dispute.  Mr. Liu represented Clientron before the arbitration panel and currently represents Clientron in an ongoing court proceeding in Taiwan to set aside the arbitration award.  Mr. Liu testified that his firm wrote a letter to Devon dated May 7, 2012, requesting payment for outstanding invoices Devon owed to Clientron.  The letter stated that if no payment was made Clientron would initiate arbitration in Taiwan according to the SPA.  ECF 51 at 14.  Mr. Liu stated that Devon never indicated any opposition to arbitration because Devon never responded to Clientron's letter.  ECF 51 at 33.  Devon, however, did voice an objection to the arbitration before the arbitration panel.  ECF 51 at 33.

Liu also testified that Clientron drafted the SPA, including § 13.3.  ECF 51 at 30.  He noted that Devon never objected to the dispute resolution clause, § 13.3 of the SPA, when drafts were circulated before the agreement's signing.  ECF 51 at 40.  He acknowledged that no additional appendices (other than the original Appendix A) or amendments were made to the SPA.  ECF 51 at 38.  He also testified that the disputed invoices are for products that are not contained in Appendix A of the SPA.  ECF 51 at 38.

### b.    Ming Yan Shieh

Clientron next called its Taiwan law expert, Dean Ming Yan Shieh.  Dean Shieh is the dean of Taiwan National University College of Law.  Dean Shieh testified that Taiwan law does not require any magic words to establish an agreement to arbitrate; all that is required is that the agreement be in writing.  ECF 51 at 54.  He also testified that, if the intent of the parties is not clear from the wording of a contested arbitration clause, a court can determine the existence of an agreement to arbitrate by examining other parts of the contract.  ECF 51 at 54.  In other

words, an arbitration agreement need not be absolutely clear and unambiguous.  ECF 51 at 71.

According to Dean Shieh, it is of particular importance to determine the purpose of the entire

agreement—not just the purpose of a dispute resolution provision, including the recitals section

of an agreement.  ECF 51 at 56.

Dean Shieh testified that three things are needed to enforce an arbitration award: (1) the

parties must have agreed to arbitrate; (2) the subject matter of the arbitration must fall within the

agreement to arbitrate; and (3) the arbitration panel must reach a final decision.  ECF 51 at 77.

According to Dean Shieh, the SPA contains a valid arbitration clause.  He testified that in

his opinion the words "resolved in Taiwan trade arbitration council" indicate that there is an

agreement to arbitrate.  ECF 51 at 98.  The Court finds Dean Shieh credible on this opinion, even

though he cited no specific authority.

Dean Shieh also stated that the arbitration panel properly rejected Devon's argument that

the contract dispute was beyond the subject of the SPA.  He concurred with the panel that taking

all the provisions of the contract together it was clear that the SPA covered the products at

issue—that is, that the SPA is properly read to cover products related to the SPA although they

are not expressly mentioned in it.  ECF 51 at 63, 66.  Specifically, Dean Shieh testified that the

phrase "any dispute" appearing in § 13.3 of the SPA can be broadly interpreted and is not limited

to only those disputes over the products listed in Appendix A of the agreement.  ECF 51 at 83.

Aside from the language "any dispute," Dean Shieh relied on the recitals in the Agreement, *see*

ECF 1 at 7, to support the broad coverage of the dispute resolution clause.  ECF 51 at 83.  For

the reasons stated below, the Court does not accept Dean Shieh's opinion on this issue.

It was also Dean Shieh's opinion that the parties agreed that the decision of an arbitration

panel would be final because all arbitration awards in Taiwan have the same effect as a final

34

judgment.  He noted that the words "final determination"—which are the words used in the final

clause of § 13.3 and reference litigation before a Taiwan court—refer only to those instances

when an arbitration panel fails to make an award, such as the exceptional case where the panel

does not make a decision within nine months or the award is revoked by a court.  Only then

would the parties be able to go to a court for final determination of the dispute.  ECF 51 at 98.

Dean Shieh supported this view by citation to Article 1 of the Arbitration Law of the Republic of

China, noting that an arbitration is as binding as a court judgment, except when the arbitration

panel's award is set aside or when the arbitration panel fails to render a decision.  ECF 51 at 99.

Dean Shieh acknowledged that this interpretation was his opinion as to the intent of the parties

based on the language of the agreement alone.  He testified that he had no discussions with the

drafters and consulted no other documents that indicated his interpretation of the agreement was

the intention of the parties at the time of their drafting the agreement.  ECF 51 at 102.

Dean Shieh's cross-examination was also illuminating.  Although he previously testified

that all product orders "related" to the SPA were governed by the SPA—without explanation for

how a reader of the agreement is to determine that—Dean Shieh also testified that individual

Purchase Orders could themselves be independent contracts under Taiwan law.  ECF 51 at 90.

### c.     Chung Teh Lee

Devon then called its proposed expert, Dr. Chung Teh Lee.  The Court expressed

concerns about Devon using Dr. Lee as an expert witness because he was counsel for Devon

during the arbitration in Taiwan and currently represents Devon in an ongoing suit in Taiwan to

set aside the arbitration award.  The Court noted that Federal Rule of Civil Procedure 44.1 is

broader than Federal Rule of Evidence 702, and therefore is not limited to expert opinions.[11]

---

[11]  "[T]he ordinary rules of evidence are often inapposite to the problem of determining foreign law and
have in the past prevented examination of material which could have provided a proper basis for the determination.

Nevertheless, the Court expressed reluctance about allowing Dr. Lee to give expert opinions on the same topic on which he was an advocate.  The potential for bias in these assessments is considerable.  Ultimately, the Court permitted Dr. Lee to testify as to how he believes the Arbitration law of Taiwan operates based on his experience in practice.  However, given Dr. Lee's relationship with Plaintiff, the weight that this Court affords his testimony is diminished.

Dr. Lee described the two primary arguments that he raised before the arbitration panel. Devon's first argument was that the products that were the subject of the dispute were not listed in the Appendix of the SPA and therefore were not subject to the SPA or its arbitration provision. Dr. Lee noted that the Appendix only refers to one product offered by Clientron, the TC2 product—a product that was not involved in the payment dispute presented to the arbitration panel.  ECF 51 at 138.

Dr. Lee stated that the parties tried to negotiate a separate agreement to cover the products related to the payment dispute but never were able to finalize an understanding.  Dr. Lee suggested that these negotiations are evidence that the parties never intended the SPA to cover the disputed products.  ECF 51 at 139.

According to Dr. Lee, Devon's second argument before the panel was that, even if the contested products were subject to the agreement, the SPA does not contain a valid arbitration clause.  Dr. Lee stated that § 13.3 makes very clear that litigation in a court is the mechanism for reaching a final determination of a dispute.[12]  He noted that arbitration and litigation are mutually exclusive—they cannot both occur as they are both mechanisms for finally resolving a dispute.  Dr. Lee's testimony is supported by statute and Taiwan case law.  *See* Arb. Law of

---

The new rule permits consideration by the court of any relevant material, including testimony, without regard to its admissibility under Rule 43."  FED. R. CIV. P. 44.1, adv. com. note.

[12]  Here, Dr. Lee is referring to the last sentence of § 13.3: "the problem finally has to be escalated to an appropriate court of law in Taipei, Taiwan for final determination."  ECF 1 at 21.

Republic of China, art. 37 (arbitration award is equivalent to a final judgment of a court);
*Sanchong City Office, Taipei County v. Senior Techinique Eng'g. Constr. Co.*, No. 94-Chong-
Shang-Zi-176 (Taiwan High Court July 7, 2005) ("An arbitration agreement is an agreement to
eliminate court jurisdiction . . . ."). Dr. Lee then testified that in his experience Taiwan courts,
when interpreting an agreement, identify the clear parts of an agreement and then deal with the
unclear part. ECF 51 at 142. Based on this methodology, Dr. Lee testified that a Taiwan court
would look at § 13.3 and observe that the first part—discussing internal, good-faith
negotiations—is clear and that the final part—discussing litigation in a court as the final
mechanism for resolving a dispute—is also clear. Dr. Lee opined that a Taiwan court would
only identify the middle phrase—"refer to Taiwan trade arbitration council"—as unclear. He
went on to add that, when interpreting the unclear part of a contract, a court would not change or
destroy the clear parts of the agreement. Thus, according to Dr. Lee, the dispute resolution
clause could not be an arbitration agreement because such an interpretation would change or
destroy the plain meaning of the final phrase of § 13.3. Dr. Lee also supported his conclusion
by noting that the agreement does not say that the parties agreed to resolve disputes by
arbitration with the Taiwan Trade Arbitration Council;[13]  § 13.3 only says "Any dispute
remaining after resolution efforts above relating to this Agreement shall be resolved in the
Taiwan trade arbitration council." ECF 1 at 21.

   Dr. Lee further testified that in his experience he has never seen a binding arbitration
agreement where there was an express agreement to seek final determination in a court of law.

---

[13]  The testimony of both parties' witnesses made clear that the "Taiwan Trade Arbitration Council" is not
the name of any arbitration organization in Taiwan. Its inclusion in the SPA seems to have either been scrivener or
translation error, though the Court cannot say for sure. In any event, this has no bearing on the Court's ruling.
Determining whether an agreement to arbitrate exists is a threshold question that precedes who will conduct the
arbitration. If there is any deficiency in naming an arbitrator, Taiwan arbitration law provides statutory gap-fillers to
compensate. Arb. Law of Republic of China, arts. 5, 9. The arbitration panel was convened by the Chinese
Arbitration Association in Taiwan.

ECF 51 at 146.  He also testified that referring disputes to an arbitration association does not exclude mediation.  According to Dr. Lee, when a party submits a case to an arbitration organization, the party will indicate whether it is asking for arbitration or mediation.  ECF 51 at 146.  Dr. Lee stated that he argued before the arbitration panel that § 13.3 only talks about referring a problem to the Taiwan Trade Arbitration Council, but it does not say what the Council should do.

On cross examination, Dr. Lee reiterated that the arbitration panel rejected these arguments.

### 5.  Discussion

#### a.  There Is an Agreement to Arbitrate

It is fair to say, from a Court accustomed to reviewing whether the clauses of a contract require arbitration, that § 13.3 of the SPA is not a paragon of contract drafting.  Nevertheless, its phrasing is not so encumbered as to render it indecipherable or unenforceable.  Based on this Court's findings relating to Taiwan law, a court may find an arbitration agreement when (1) the agreement to arbitrate is in writing and (2) it was the intent of the parties to agree to arbitrate.  Arb. Law of Republic of China, art. 1; Case No. 17-Shang-Zi-1118 (January 1, 1928).  When making this determination, Taiwan law does not prohibit consideration of parol evidence.  *See* Arb. Law of Republic of China, art. 1 ("Written documents, documentary instruments, correspondence, facsimiles, telegrams or any other similar types of communications between the parties evincing prima facie arbitration agreement shall be deemed to establish an arbitration agreement.").  If the language of the agreement is clear, however, and "no additional facts need to be ascertained in that regard, the language may not be disregarded and otherwise distorted to reach a different interpretation."  Case No. 17-Shang-Zi-1118 (January 1, 1928).  Moreover, the

Court's inquiry "shall not blindly adhere to the literal language or be overly or arbitrarily focused on one or two words so as losing the true intent of the parties."  Case No. 19-Shang-Zi-28 (January 1, 1930).  As stated above, the Court credits Dean Shieh on this point.

Based on these principles, § 13.3 of the SPA constitutes an agreement to arbitrate based on the phrase "shall be resolved in the Taiwan trade arbitration counsel."  Although the provision does not contain the words "the parties agree to arbitrate," and is otherwise oddly phrased, Taiwan law does not require a clear statement to find an agreement to arbitrate.  *See* Arb. Law of Republic of China, art. 1 (permitting consultation of materials beyond the text of the agreement to determine the intent of the parties).  The Court bases its conclusion on the fact that reference to a "Taiwan trade arbitration counsel" implies that the parties wish to use the titular function of that counsel, which is to say, the parties intended to utilize arbitration to resolve their disputes.

Devon resists this conclusion.  It contends that under Taiwan law arbitration and litigation are mutually exclusive.  It is impossible to have both.  It then proceeds to note that most arbitration associations, including the Chinese Arbitration Association which conducted the parties' arbitration, also provide mediation services.  According to Devon, because § 13.3 states that "final determination" of a dispute must be escalated "to an appropriate court of law in Taipei, Taiwan," the Court should construe the provision's reference to the Taiwan trade arbitration counsel as directing the parties to mediation conducted by this counsel.  This, claims Devon, gives effect to the unambiguous language of § 13.3's reference to a Taiwan court while giving a sensible reading to the phrase "shall be resolved in the Taiwan trade arbitration counsel."

The Court is unpersuaded by this argument.  Under Taiwan law, arbitration and litigation are not mutually exclusive in every circumstance.  Litigation can proceed after arbitration has

commenced if (1) the arbitration panel has failed to issue an award within nine months or (2) an arbitral award is revoked by a Taiwan court.  Arb. Law of Republic of China, arts. 21, 43.  Given these possibilities, there is no reason to rend the phrase "Taiwan trade arbitration counsel" to mean mediation.  Such a tortured interpretation would amount to "distort[ion] to reach a different interpretation."  Case No. 17-Shang-Zi-1118 (January 1, 1928).  The Court refuses to do so, for "the contract language already reflects the true intent of the parties."  *Id.*  Admittedly, in the event that arbitration and litigation were always mutually exclusive, the force of the Court's conclusion would be diminished.  Because that is not the case under Taiwan law, and absent any other persuasive argument, there is no reason to read the reference to arbitration in § 13.3 as meaning anything other than arbitration.  As for the last clause in § 13.3, the better reading of "a court of law in Taipei, Taiwan for final determination" is as a contingency in the event that the arbitration panel fails to render an award or if such an award is revoked by a Taiwan court.

Because there was an agreement to arbitrate, the Taiwan enforcement court had subject matter jurisdiction when it issued its enforcement order.  Accordingly, Clientron has established that the enforcement order was conclusive under 42 P.S. §§ 22005 and 22009 and has thereby stated a prima facie case for recognition of its foreign money judgment.

### b.      The Arbitration Decision Is Final and Enforceable in Taiwan

Devon next argues that the Taiwan enforcement court erred when it granted Clientron's petition to enforce the arbitral award because the arbitration award was not binding.  Devon rests this argument on the contention that the agreement did not "clearly provide for binding arbitration" because the agreement calls for final determination of disputes in a Taiwan court.  ECF 53 at 29.  This is effectively the same argument that Devon advanced above.  The Arbitration Law of Taiwan does not indicate that there are binding arbitrations and non-binding

arbitrations.  Rather, it states concisely that "an [arbitration] award shall, insofar as relevant, be binding on the parties and have the same force as a final judgment of a court."  Arb. Law of Republic of China, art. 1.  Nor has Devon presented the Court with any evidence suggesting that this statutory provision is subject to revision or alteration by a contractual agreement between parties.  As such, the Court considers Article 1 to apply to all arbitration awards rendered in Taiwan.  Accordingly, the arbitration award is final and binding under Taiwan law.

### c.      The Disputed Products Are Not Within the Scope of the SPA

The Court must now consider whether the arbitration panel rendered its decision on matters outside the scope of the parties' agreement to arbitrate.  The Taiwan enforcement court's power to enforce Clientron's award was premised on the arbitration panel rendering an award pursuant to an agreement between the parties.  Arb. Law of Republic of China, art. 28.  If the panel acted beyond its scope, then the subject of the enforcement proceeding—the arbitration award—and the enforcement proceeding itself would be "contrary to an agreement between the parties under which the dispute in question was to be settled."  42 P.S. § 22004.  Because this is a ground for nonrecognition of a foreign judgment under Pennsylvania's UFMJRA, Devon bears the burden of proving that this ground applies.  *See Tagnani*, 19 Pa. D & C 4th at 95 (stating that the burden of proof to show grounds for nonrecognition under the UFMJRA resides with the party challenging the validity of the judgment).

Devon contends that it has sustained its burden of proof to show that the products underlying this dispute are not covered by the SPA.  The Court concludes for the following reasons that Devon has a strong argument to bolster this position.

### i.      The Text of the SPA Contains a Mechanism for Incorporating New or Replacement Products

The SPA clearly indicates that it is intended to cover products listed in its appendices. ECF 1 at 8 § 2.1. It also provides for a mechanism to add additional products as time goes on. ECF 1 at 8 §§ 2.1 and 6.6. Clientron, however, points to language in the agreement that suggests that the SPA applies to "any dispute" and that the terms and conditions of the SPA apply to any product orders relating to thin-client products whether or not that product is listed in an appendix of the SPA. ECF 11 at 10.

Looking to the contract alone, Devon has the stronger argument. If the Court adopts the reading of the agreement proposed by Clientron, there would be no way to determine what is covered by the agreement and what is not. Yes, there is broad language, such as "any dispute," as well as language that suggests that the agreement extends to future products, *see* ECF 1 at 12 § 6.6 (referring to "Replacement Products"), but this language is tethered to future products and provisions that specify certain procedures. *See* ECF 1 at 12 § 6.6 ("All price changes must be mutually agreed to by both parties in advance and will become effect [sic] immediately following such agreement."); ECF 1 at 13 § 6.8. ("Clientron shall not make changes to the Product supplied under this Agreement without Devon IT's prior written consent."); ECF 1 at 21 § 13.1 ("Except as expressly provided herein, any provision of this Agreement may be amended and the observance of any provision of this Agreement may not be waived (either generally or any particular instance and either retroactively or prospectively) only with the written consent of the other party.").

> ii. **A Broad Reading of the Agreement to Cover All Thin-Client Products Undermines the Agreement's Structure**

The incorporation of new products requires the submission of detailed specifications that are subject to Devon's approval. *See* ECF 1 at 7 § 1.1. To say that "any" products purchased by

Devon that are not listed in the Appendix of the SPA are nevertheless covered by the SPA would read into the agreement an end-run around the provisions that require Clientron to provide detailed specifications to Devon and that require both parties' approval of new products in writing. Such an interpretation would mean Clientron would never again have to provide detailed specifications for additional products sold to Devon. It would be contrary to logic to think the parties would draw out such a detailed mechanism for incorporating new products into the Appendix while simultaneously intending that the SPA would cover any and all new products whether or not these new products complied with the SPA's incorporation procedures.

### iii. Clientron's Proffered Interpretation of the Words "Any Dispute" Is Overly Broad and Ignores How that Phrase Operates Within the Agreement as a Whole

Clientron asserts that the phrase "any dispute" unequivocally vindicates its position. But it is not clear why the Court should interpret the phrase "any dispute" in the first paragraph of § 13.3 of the SPA to necessarily mean that the SPA extends to "any dispute" whatsoever between Devon and Clientron. Clientron has suggested, as has its expert, that this language extends only to thin-client products, but they offer no explanation for why the definition of "any dispute" should be so limited. *See, e.g.*, ECF 38 at 5.

The more natural reading is that "any dispute" should be read within the context of the agreement—and thus refers only to disputes arising under the agreement. In fact, this reading is confirmed in the second paragraph of § 13.3, which deals specifically with arbitration: "any dispute remaining after resolution efforts above *relating to this agreement* shall be resolved in the Taiwan trade arbitration council," ECF 1 at 21 (emphasis added). The agreement itself instructs the reader as to which products "relate to" the SPA—they are those products that comply with the procedures set forth in the agreement and attached as appendices to it.

Accordingly, Clientron's reliance on the language in § 13.1—"it is the intention of the parties that this Agreement is controlling over additional or different terms of any order, confirmation, invoice or similar document"—does not support its expansive reading of the SPA.  Instead, that provision ensures that any terms in product orders that vary from the terms of the SPA are not controlling *as to products covered by the SPA*.

When the contract is considered as a whole, when the language of Clientron's favored provisions is viewed undivorced from its context, it is clear that the SPA only makes sense when viewed as covering only those products listed in the appendices of the SPA.  Clientron's attempt to cherry pick certain phrases is unpersuasive and contrary to Taiwan's contract interpretation principles.  *See* Case No. 19-Shang-Zi-28 (January 1, 1930) ("In interpreting the parties' true intent in a document agreed to between the parties, . . . [t]he inquiry shall not blindly adhere to the literal language or be overly or arbitrarily focused on one or two words so as losing the true intent of the parties."); Case No. 18-Shang-Zi-1727 (January 1, 1929) ("In interpreting the contract between the parties, [the court] shall take into account the whole contract . . . ."); Republic of China Civil Code, art. 98 ("In the interpretation of an expression of intent, the real intention of the parties must be sought rather than the literal meaning of the words.").

### iv. Devon's Request for Repair Warranties Provides Some Support for the Contention That Devon Intended the Disputed Products to Be Covered by the SPA

Clientron has also raised another argument—relating to activity external to the SPA—that suggests Devon intended the disputed thin-client products to be covered by the SPA.  Specifically, Clientron argues that Devon's request for repair warranties when purchasing the disputed products demonstrates that Devon intended that the disputed products would be covered by the SPA.  For instance, § 6 of the SPA includes a repair warranty provision.  The purchase

orders for the disputed products do not contain similar repair warranties.  Nevertheless, Devon

asked for repair warranties for these orders.  Clientron argues that this request is evidence that

Devon believed that these products were covered by the SPA.  ECF 48 at 1.  The Court agrees

that this lends some support to Clientron's position.

**v.      The Draft Release Agreement Is Not Probative of the
Parties' Intent as to the Scope of the SPA**

Clientron attempts to bolster its position by pointing to the reasoning of the arbitration

panel's decision.  It cites the arbitration panel's Final Arbitration Award for the proposition that

Devon was aware that the disputed products were going to be introduced and gave consent for

the disputed products to be incorporated into the SPA by placing orders for them.  ECF 48 at 1-2.

Specifically, Clientron recites the following quotation in its briefing: "Respondent [Devon IT]

knew very well that TC2/U700 would soon be phased out and U720 could be used as a

replacement," ECF 48 at 1 (quoting ECF 11-2 at 42).  The Court notes that this quotation is not a

statement of the arbitration panel or a basis for its judgment.  The quotation is from the panel's

summary of Clientron's argument before the panel—that section's heading is titled "On the Part

of the Applicant" and is followed by a section titled "Respondent," which is then followed by a

section titled "Reasons," wherein the panel provided the basis for its decision.  The actual basis

for the arbitration panel's decision—as opposed to its recitation of the parties' arguments—did

not even discuss whether the SPA encompassed the disputed products.  Rather, it noted that its

Interim Arbitration Award addressed these issues, and it would therefore not consider those

issues in its Final Arbitration Award.  ECF 11-2 at 121.

A review of the arbitration panel's Interim Arbitration Award indicates that the panel's

conclusion that Devon believed the disputed products were covered by the SPA, in fact, had

nothing to do with Devon's purchasing behavior or its knowledge about upcoming upgrades or

45

product replacements.  Instead, the panel rested its decision on inferences it drew from a draft

Settlement and Release Agreement ("Release Agreement") that Devon circulated to Clientron.

The panel explicitly stated that no other evidence or argument, other than this draft Release

Agreement, influenced its decision that the disputed products were covered by the SPA.  *See*

ECF 38-2 at 5 ("The other claims and evidence made and presented by the two parties about this

issue do not have any impact on the basis of judgment and therefore are not stated here.").

     Although the Release Agreement was the basis for the arbitration panel's decision

regarding the scope of the SPA, Clientron hardly mentions this basis in its briefing.  In a single

sentence, Clientron cites the draft Release Agreement.  In that sentence it asserts that, because

the Release Agreement lists all outstanding invoices Devon owed to Clientron, including the

disputed products, it is evidence that Devon acknowledged that the disputed products fell under

the SPA.  ECF 48 at 2; ECF 48-1 at 77.

     After reviewing the draft Release Agreement, it is clear why Clientron only vaguely

alluded to it—it hardly supports the conclusion that the parties intended the SPA to cover the

disputed products.  At the outset, it should be noted that the Release Agreement was, of course,

never signed by the parties.  The draft agreement itself is straightforward.  The recitals indicate

that Devon and Clientron entered into a Supply and Purchase Agreement for certain products

(these products are never named); Clientron forwarded invoices to Devon totaling

$6,574,546.17; Devon did not agree that it owed the amount set forth in the invoices; and the

parties seek to reach an agreement to resolve the dispute.  ECF 48-1 at 77.  The outstanding

invoice sum listed in the agreement is the same amount Clientron claims it is owed for Devon's

purchase of the disputed products.

An offer of settlement does not shed any light as to what the parties intended the SPA to cover.  *Cf.* FED. R. EVID. 408.  The SPA was the only master purchasing agreement that the parties had executed.  This, however, does not mean that the parties believed any and all purchases were subject to that agreement—or that any and all purchases covered by the Release Agreement were covered by the SPA.  The furthest permissible inference from the Release Agreement's mention of the SPA is that the parties had created a framework agreement for purchasing "certain products," that a dispute had arisen about overdue invoices, and that SPA was somehow related to the dispute.  The Release Agreement does not mention that Clientron and Devon believe the SPA covers the disputed products.  It makes absolutely no suggestion about coverage.  At most, the Release Agreement's mention of the SPA can be read as an attempt to communicate the basis of the parties' dispute.  It is not probative of the parties' intent.

Moreover, the recital of $6,574,546.17, which is the price of the disputed thin-client product orders, does nothing more than indicate what amount of money is at issue.  That Clientron argues the products that account for that that sum fall under the SPA, and that Devon argues they do not, does not change the fact that $6,574,546.17 is the number over which the parties attempted to settle a dispute.  Again, this has little to no probative value regarding intended scope of the SPA.

> **vi.    The Draft Supply Agreement Supports Devon's Contention that the Parties Did Not Intend the SPA to Cover the Disputed Products**

Another draft document, however, provides more insight into the parties' intentions.  The SPA was executed on August 15, 2008.  According to the declarations of both parties' experts, Devon began placing product orders for the disputed thin-client products beginning in April 2011.  *See* ECF 36 at 4; ECF 38 at 4.  Clientron's Account Receivable Summary indicates that

Devon's first disputed product order was not shipped until October 6, 2011.  ECF 48-1 at 6.

Devon argues that the disputed products were never intended to be covered by the SPA.  Instead,

the disputed products were supposed to be covered by a new agreement that would amend the

SPA.  Devon has presented the draft agreement along with Clientron and Devon's comments on

the draft.  ECF 36-6 at 2-43.  The document is entitled "Supply Agreement."  The agreement lays

out the terms and conditions of certain thin-client computer products, price, product forecasts,

order management, supply and availability, engineering changes, and product servicing.  ECF

26-6 at 19-30.  Attached as Exhibit A to the draft agreement is a "Schedule of Products" that lists

the disputed thin-client products.  ECF 36-6 at 38 (listing FX 170 (also known as TC5c/U800)

and TC2D (also known as FX130/U720)).  Exhibit B of the draft agreement provides a price

schedule for the disputed thin-client products as well.  ECF 36-6 at 39.  Finally, the draft

agreement lists as its contemplated (though ultimately unexecuted) date to be "___ day of July

2011."  ECF 36-6 at 19.

These pieces of evidence are telling.  They suggest that, only a few months after Devon

started placing orders for the disputed products, the parties began negotiating an agreement to

cover future purchases of those products.  The draft agreement's discussion of price, availability,

and other terms and conditions comport with the type of negotiations contemplated by § 6.6 of

the SPA, which details the process for amending the SPA's appendices to provide for

replacement products.  ECF 1 at 12.  Given that the negotiations are consistent with the SPA, the

proper inference from this draft agreement is that the parties were attempting to amend the SPA

to replace the products listed in its Appendix A.  This is consistent with the testimony of

Clientron's expert, in which he stated that the parties were attempting to modify the SPA once

Devon began ordering products after April 2011.  ECF 38 at 4.

It follows that if this draft agreement had been executed, there would be a strong argument that it had complied with the terms of the SPA and would thus be incorporated into it as a replacement product agreement. The draft agreement, however, was never executed. Clientron argues that discussion of modifying the SPA does not change the fact that the SPA covered all thin-client products. *See* ECF 54 at 14. This contention is difficult to fathom and is not supported by the record. It makes little sense to think that the products in an agreement that would have been incorporated into the SPA had it been executed were already covered by the SPA at the outset.

## VI.    Summary and Conclusions

It is Devon's burden to prove that the Taiwan enforcement proceeding was contrary to an agreement between the parties. At the heart of the question is whether the parties intended the SPA to cover the disputed products. Devon has established the following points in its favor:

• The SPA's "new product" and "replacement product" incorporation mechanisms support the view that the disputed products were not covered by the SPA;

• A broad reading of the SPA to cover all thin-client products would undermine the purpose of the incorporation mechanisms in the SPA;

• The phrase "any dispute" does not suggest the SPA has sweeping coverage over all thin-client purchases—its meaning is much narrower when read within the context of the entire agreement;

• The draft Release Agreement is not probative of the intended scope of the SPA;

• The draft Supply Agreement suggests that the parties were working to amend the SPA to include the disputed products, which implies that the disputed products were not already covered by the SPA.

On the other side, Clientron has presented the following points in its favor:

• Devon bears the burden to establish a ground for nonrecognition of a foreign money judgment—thus a failure to carry this burden requires a decision in favor of Clientron;

• The Court credits Clientron's expert, Dean Shieh, as more credible than Devon's expert and therefore affords Dean Shieh's testimony on Taiwan law more weight;

• Devon's request for repair warranties on its orders of the disputed products is consistent with the repair warranties provided for products covered by the SPA.

• Although Dean Shieh's opinion deserves weight, it does not as to the issue of whether the disputed products were properly the subject matter of the arbitration because he failed to address in any detail the specific arguments made by Devon about the scope of the SPA discussed above; this tends to support Devon's arguments.[14]

By establishing that the Taiwan enforcement court's order was final, conclusive, and enforceable, Clientron has successfully established a prima facie case for recognition of its foreign money judgment.  42 P.S. § 22009; *see also In re Chirstoff's Estate*, 192 A.2d at 739 (describing a prima facie case for recognition of a foreign judgment).  This shifts the burden to Devon to establish that the judgment should not be recognized based on the grounds enumerated in 42 P.S. § 22004.  *See Tagnani*, 19 Pa. D & C 4th at 95 (stating that the burden of proof to

---

[14]  As discussed *supra* note 10, Clientron cannot claim that this Court should defer to the decision of the arbitration panel because Taiwan law does not afford such deference.  *See* Arb. Law of Republic of China, arts. 38, 40.  Were this Court to conclude that the parties had insufficiently proven the arbitration law of Taiwan, under Rule 44.1 the Court could elect to apply the law of the forum to determine issues regarding deference to an arbitration panel's decision.  *Ferrostaal, Inc. v. M/V Sea Phoenix*, 447 F.3d at 216.  Were this case governed by the FAA, federal law would not permit a reviewing court to defer to the arbitration panel's decision regarding the arbitrability of issues relating to the disputed products.  Under federal law, although the "decision of the arbitrator on matters agreed to be submitted to him is given considerable deference by the courts," this deference will not be afforded to an arbitration panel's decision on arbitrability unless the parties clearly indicate that this question was for the arbitrator, and not a court, to decide.  Because Taiwan law contemplates both an arbitration panel and a court to review arbitrability questions independently, deference is not warranted.  This conclusion comports with the principle the Supreme Court enunciated in *First Options of Chicago, Inc. v. Kaplan*,

> Given the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration, one can understand why courts might hesitate to interpret silence or ambiguity on the "who should decide arbitrability" point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide.

514 U.S. 938, 945 (1995).

Similarly, under Pennsylvania law, the grounds for nonrecognition in the UFMJRA contemplate that a recognition court will independently review whether a foreign proceeding was contrary to an agreement between the parties—which impliedly empowers the court to review the scope of the agreement that was the basis for that proceeding.  *See* 42 P.S. § 22004.  Thus, in either a federal or state forum, deference to the arbitration panel's decision about the scope of the SPA would not be warranted here.

show grounds for nonrecognition under the UFMJRA resides with the party challenging the validity of the judgment).

After reviewing the SPA and all other writings so far presented that shed light on the intent of the parties, the Court is of the view that Devon has met its burden of proof thus far. The Court is unable to conclude from the evidence submitted that the disputed thin-client products are covered by the SPA. The only specific support that Clientron has successfully marshalled for its position is Devon's request for repair warranties.

In the absence of dispositive authority of the procedure that a court should follow in cases under the UFMJRA, however, a decision on the merits on Devon's pending Rule 12 motion would be improper. Therefore, that motion will be denied without prejudice and converted into a Rule 56 motion. Compared with the weight of the evidence in Devon's favor, Clientron's evidence, without more, cannot defeat summary judgment. *See Anderson,* 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be some evidence on which the jury could reasonably find for the plaintiff.").

These observations regarding the scope of the SPA are merely a snapshot of the record as it currently stands. Under Rule 12(d), before a motion to dismiss is converted into a motion for summary judgment under Rule 56, the Court must afford the parties an opportunity to conduct discovery and submit additional evidence into the record to support their claims. Based on the above discussion, the issues before the parties have been significantly narrowed. If Clientron is correct that Devon has received the goods it ordered, and has resold them to a third party, Dell, but has not paid Clientron, this Court will consider this dispute to the extent it has jurisdiction. The status conference scheduled for August 12, 2014 will discuss further discovery and briefing details.

\*　　　\*　　　\*

Because Taiwan is not a signatory to the NY Convention, Clientron's arbitration award cannot be recognized under it.  Clientron therefore has failed to state a claim under Chapter 2 of the FAA.  Devon's Motion to Dismiss shall be granted as to Count I of the Complaint, which will be dismissed with prejudice.  The Court will deny without prejudice Devon's Motion to Dismiss Count II of the Complaint.  Going forward, the Court will consider Devon's papers as a motion for summary judgment under Rule 56.

An appropriate order follows.