**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CLIENTRON CORP.,**<br><br><div align="center">**Plaintiff**</div><br><div align="center">**v.**</div><br>**DEVON IT, INC., JOHN BENNETT, and NANCE DIROCCO,**<br><br><div align="center">**Defendants**</div> | **CIVIL ACTION**<br><br>**NO. 13-05634** |

**MEMORANDUM RE PIERCING THE CORPORATE VEIL
AND DEVON IT'S COUNTERCLAIMS**

Baylson, J.                                                                December 22, 2015

## I.      Introduction

This case concerns long-running contractual and tort disputes, spanning multiyear litigation and arbitration across two continents, between Plaintiff Clientron Corporation and Defendants Devon IT and its two owners, Dr. John Bennett and his wife, Nance DiRocco.[1] Briefly summarized, Clientron is a Taiwan-based company which manufactures computer related equipment and Devon IT is an information technology company.  From August 2008 until 2012, Devon IT purchased equipment from Clientron.  Clientron alleges that Devon IT has failed to pay for millions of dollars' worth of goods, including products custom-made by Clientron for Devon IT, and defrauded Clientron by promising that payment would be forthcoming.  In

---

[1] For prior rulings from this Court, see Memoranda at ECF 30, 61, 105, 167, 169; see also ECF 8 (E.D. Pa. No. 14-1396) (ruling on Devon IT's motion to dismiss Clientron's fraud and breach of contract claims); Clientron Corp. v. Devon IT, Inc., 35 F. Supp. 3d 665, 669 (E.D. Pa. 2014) (addressing potential enforceability of Taiwanese arbitration award under the New York Convention and Pennsylvania's Uniform Money Judgment Recognition Act); Clientron Corp. v. Devon IT, Inc., Civil Action No. 13-05634, 2014 WL 940406, at *1 (E.D. Pa. Mar. 10, 2014) (denying Devon IT's motion to stay); Clientron Corp. v. Devon IT, Inc., Civil Action No. 13-05634, 2015 WL 70921 (E.D. Pa. Jan. 5, 2015) (granting Clientron leave to file a Second Amended Complaint naming DiRocco as a defendant);  Clientron Corp. v. Devon IT, Inc., Civil Action No. 13-05634, 2015 WL 5092868, at *1 (E.D. Pa. Aug. 28, 2015) (granting Clientron summary judgment on the enforceability of the Taiwanese arbitration award as confirmed by Taiwanese courts;  Clientron Corp. v. Devon IT, Inc., CIVIL ACTION No. 13-5634, 2015 WL 5093084, at *2 (E.D. Pa. Aug. 28, 2015) (granting Clientron sanctions for Devon IT's discovery misconduct).

response, Devon IT alleges it had good reasons not to pay and has asserted counterclaims against Clientron.

Presently before the Court are:

(1) The parties' Cross-Motions for Summary Judgment on the issue of piercing Devon IT's corporate veil to hold Bennett and/or DiRocco liable for Devon IT's debts; and

(2) Clientron's Motion for Summary Judgment on Devon IT's fraud and breach of contract counterclaims.[2]

As explained below, both Motions on veil piercing shall be denied without prejudice to raise the issue at trial, and Clientron's Motion on the counterclaims shall be granted in part and denied in part.

## II.     Piercing the Corporate Veil

### A. Parties' Contentions

Devon IT moved for summary judgment against piercing the corporate veil as to DiRocco only.[3]  Devon IT argues that piercing as to DiRocco is inappropriate because she was a passive shareholder who was not actively engaged in running the company.  ECF 184 at 1-2.

---

[2] A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."  Id.  Under Rule 56, the Court must view the evidence presented in the light most favorable to the non-moving party.  Id. at 255.  "[A] hearsay statement that is not capable of being admissible at trial should not be considered on a summary judgment motion."  Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999).

[3] If Devon IT succeeds in defeating veil piercing against DiRocco, piercing against Bennett would provide cold comfort to Clientron.  Bennett and DiRocco are the sole shareholders of Devon IT and own all shares of the company as tenants by the entirety.  ECF 186-2 ¶ 6.  Under Pennsylvania law, property (including stock) held as tenants by the entirety "may not be accessed by the creditors of only one spouse."  In re Brannon, 476 F.3d 170, 173 (3d Cir. 2007).  Piercing the corporate veil against Bennett only would leave Clientron with "a presently unenforceable lien upon that spouse's expectancy of survivorship - a lien that becomes enforceable only when the other spouse dies."  Napotnik v. Equibank & Parkvale Sav. Ass'n, 679 F.2d 316, 319 (3d Cir. 1982)).  If DiRocco survives Bennett, or if the couple jointly transfers their stock in Devon IT, the lien would dissipate entirely.  In re DelCorso, 382 B.R. 240, 251-52 (Bankr. E.D. Pa. 2007).

Clientron contends that piercing is appropriate as to both Bennett and DiRocco because both have "exploited Devon IT's corporate form to their own benefit and for their own personal interests, without regard for corporate formalities in order to avoid Devon IT's legal obligations." ECF 186-1 at 1. Clientron primarily highlights Devon IT's insolvency and what Clientron characterizes as suspicious financial transactions to argue that Devon IT was Bennett and DiRocco's alter ego.

### B.  Undisputed Facts

Bennett and DiRocco are the sole shareholders of Devon IT and own all shares of the company as tenants by the entirety. ECF 186-2 ¶ 6. They also own several other companies, many of which bear names as some variation of Devon. Although it may not appear immediately relevant to these Motions, Clientron notes that at least two Devon entities controlled by Bennett and DiRocco filed for bankruptcy protection in 2013. ECF 186-2 ¶¶ 61-63/ECF 192 ¶¶ 71-73.

Devon IT was initially incorporated in October 1999. ECF 198-12 (Def. Opp'n Ex. L). Neither party has submitted evidence regarding Devon IT's initial capitalization or the reasonableness thereof. From 2010-2013, Devon IT's liabilities exceeded the value of its assets such that the company was insolvent. ECF 186-2 ¶¶ 12, 29; ECF 192 and 202-1 ¶ 56. From 2009 onward, there was no change in capital stock or paid-in capital to Devon IT. ECF 200 ¶ 69; ECF 192 and 202-1 ¶ 57.[4] Devon IT's assets totaled approximately $7.5 million in 2011 but just $760,000 in 2012. ECF 186-5 (Pl. Ex. J) at p. 13; ECF 191-2 (Pl. Opp'n Ex. G) ¶ 52. Although the precise timing is unclear from the deposition excerpts provided, both sides agree that Bennett

---

[4] Without disputing this fact, Defendants refer to Def. Opp'n Ex. F (ECF 198-6), a document labeled Devon IT General Ledger prepared on December 5, 2014 that purportedly documents $21 million of "Additional paid in capital" deposited in the company's accounts on an unspecified date. Defendants characterize this contribution as being "over the lifetime of Devon IT." ECF 200 ¶ 69.

testified that Devon IT would spend approximately $400,000-500,000 (allegedly on operating expenses) each month.  ECF 200 ¶ 36.

Devon IT disregarded several corporate formalities, which is usual in many husband-wife owned businesses. ECF 192 and ECF 202-1 ¶ 61.  The company did not have any formal/annual shareholder meetings from 2010-2014, instead holding them on an as-needed/informal basis. ECF 200 ¶ 38; ECF 192 and 202-1 ¶ 59; ECF 184-8 (Def. Ex. H) ¶ 48; see also ECF 192 ¶ 22 and ECF 184-4 (Def. Ex. D, DiRocco Dep) at 222 (in reference to when Bennett would tell DiRocco when things were "good" at Devon IT, DiRocco said, "[T]hese are conversations in the course of a dinner. I mean it's not like we sat down on a certain day at a certain time for a certain event. That's not how we operate our lives.").  The company also did not record minutes of any shareholder meetings from 2010-2013.  ECF 200 ¶ 38; ECF 192 and 202-1 ¶¶ 18, 59.  Devon IT also failed to have any officer elections from 2010-2013, presumably because the officers are appointed and not elected.   ECF 200 ¶ 39; ECF 186-4 (Pl. Ex. I, DiRocco Interrogatory Responses) ¶¶ 40-43.  The company further did not have any board of director elections for 2010-2013, presumably because Bennett is the sole member of the board and no election is required.  ECF 186-4 (Pl. Ex. I, DiRocco Interrogatory Responses) ¶¶ 36-39; ECF 186-2 ¶ 14. Bennett did not know if Devon has a CEO or if he is that person.  ECF 200 ¶ 42; ECF 192 ¶ 62. Bennett and DiRocco also admitted that they used a Devon entity employee (Bennett's secretary/personal assistant, ECF 186-4 (Pl. Ex. G) ¶ 45) to manage payment of their personal bills.  ECF 186-2 ¶¶ 83, 84.    Bennett testified that he would sometimes use his own money to pay Devon IT expenses and Devon IT's CFO likely had the authority to write checks on Bennett's personal accounts.  ECF 186-2 ¶¶ 82, 85.

However, Devon IT also engaged in many corporate formalities.  For example, the company had monthly executive meetings between Bennett and Joseph Makoid, Devon IT's President (though the parties dispute whether Bennett was the true dominant force behind the company).  ECF 200 ¶ 38; ECF 192 ¶ 10; ECF 198-1 (Def. Opp'n Ex. A, Makoid Dep.)/ECF 184-6 (Def. Ex. F, same Makoid Dep.) at 35; ECF 198-10 (Def. Opp'n Ex. J) (listing executive meetings).[5]  Devon IT also filed its own taxes and had its own bank accounts.  ECF 200 ¶ 38; ECF 192 ¶¶ 11-12.  Defendants assert that Devon IT produced a number of corporate documents in this litigation, including stock certificates, a Shareholder Agreement, Bylaws, Resolutions of the Board of Directors ratifying Devon IT's transactions, and General Ledger Detail Reports from 2010-2015.  ECF 200 ¶ 38; ECF 192 ¶¶ 18.  While Clientron does not appear to dispute that these documents were produced, these documents have not been provided with any of the parties' submissions for verification.  Devon IT also had somewhere between 30-40 employees. See ECF 192 ¶ 14. And despite the fact that many other Devon entities and Bennett have offices near each other, Devon IT had its own offices separate from any other Devon entity with signage denoting Devon IT's space.  ECF 192 ¶ 15.

In general, DiRocco had little to do with running Devon IT and knows next to nothing about the company's dispute with Clientron.  ECF 186-2 ¶¶ 43-45 ("DiRocco knows essentially nothing about any corporate records or official meetings"); ECF 192 ¶¶ 20, 27-34, 37-42. DiRocco did not serve as a director or officer of Devon IT or any other Devon entity.  ECF 192 ¶ 19.  DiRocco received information on the goings-on of Devon IT from her husband on an informal basis, mostly limited to whether business was "good" or "bad."  ECF 192 ¶¶ 22, 51.

---

[5] In 2012 these meetings became less regular roughly around when Devon IT ceased making payments to Clientron; only three meetings occurred between December 2011 and August 2012.  ECF 198-10 (Def. Opp'n Ex. J).

Her presence on site at Devon IT was limited to when the company needed a paint color or when she needed to sign something, approximately 3-5 times per year.  ECF 186-2 ¶ 45.

### C.  Standard for Piercing the Corporate Veil

Because this is a diversity jurisdiction case, Pennsylvania law applies.  "[T]here is a strong presumption in Pennsylvania against piercing the corporate veil."  Lumax Indus., Inc. v. Aultman, 669 A.2d 893, 895 (Pa. 1995).[6]  The Third Circuit has held that

> [f]actors considered under Pennsylvania law, for example, with respect to the alter ego theory include, but are not limited to, the following: the failure to observe corporate formalities; non-payment of dividends; insolvency of debtor corporation; siphoning the funds from [the] corporation by dominant shareholders; non-functioning of other officers and directors; absence of corporate records; whether the corporation is a mere facade for the operations of a common shareholder or shareholders; and gross undercapitalization.

E. Minerals & Chems. Co. v. Mahan, 225 F.3d 330, 333 n.7 (3d Cir. 2000) (citations omitted).  "Pennsylvania . . . does not allow recovery unless the party seeking to pierce the corporate veil on an alter ego theory establishes that the controlling corporation wholly ignored the separate status of the controlled corporation and so dominated and controlled its affairs that its separate existence was a mere sham."  Id. at 333 n.6.  "In other words, both Pennsylvania and New Jersey require a threshold showing that the controlled corporation acted robot- or puppet-like in mechanical response to the controller's tugs on its strings or pressure on its buttons."  Id.

Neither party cites In re Blatstein, 192 F.3d 88, 101 (3d Cir. 1999), a Third Circuit bankruptcy case that affirmed the refusal to pierce the corporate veil (albeit in reverse, i.e. imputing the corporation's assets to the owner's debt) against a husband who owned a

---

[6] Case law is somewhat muddled on the burden of proof for piercing the corporate veil.  One option is preponderance of the evidence.  Plastipak Packaging, Inc. v. DePasquale, Nos. 02-2670, 02-2935 and 02-326275, 75 F. App'x. 86, 90 (3d Cir. Sept. 12, 2003) (citing Zubik v. Zubik, 384 F.2d 267, 271 n.2 (3d Cir.1967)) ("[W]hen applying Pennsylvania law, an alter ego claim must be demonstrated by a preponderance of the evidence.").  The other, though arising in cases under federal law, is clear and convincing evidence.  Trs. of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk, 332 F.3d 188, 194 (3d Cir. 2003) (citing Kaplan v. First Options of Chi., Inc., 19 F.3d 1503, 1522 (3d Cir. 1994)) (holding in a case that is likely applying federal law that "[b]ecause alter ego is akin to and has elements of fraud, we think it too must be shown by clear and convincing evidence.").

corporation as a tenant by the entirety with his wife.  Blatstein noted that several factors

weighing in favor of piercing the corporate veil were present, including that the corporations

paid the Blatsteins' personal expenses and gave them interest-free loans.  Id. at 99.  Even more

surprising, the wife in Blatstein did not know that she was a joint owner of the corporations.  Id.

at 96.  The Third Circuit nevertheless held that "Blatstein did not hide any of his personal assets

in the corporations, nor did he commingle his assets with the corporations' assets so that

separation would be impossible."  Id. at 101.

### D.  Disputed Issues of Fact Regarding Bennett and DiRocco's Relationship to Devon IT's Corporate Structure Preclude Granting Summary Judgment

The core facts of this issue concern several multimillion-dollar transactions on the books

of Devon IT showing large loans and litigation settlements paid to Bennett, DiRocco, and/or

related entities that they control, the disposition of which is disputed or unclear.  Numerous

factual questions relating to these transactions exist which must be resolved before deciding if

veil piercing is appropriate.  These include, but are not limited to, the following:

1. Whether there is a valid explanation for $24 million worth of purported net transfers from Devon IT to other Devon entities Bennett and DiRocco control, including whether Devon IT paid for consulting services to a Devon entity that did not provide them;

2. Whether settlement money Devon IT received from Dell (to the tune of approximately $6.5 million) and IBM (a substantial, though currently confidential, amount) was siphoned off to benefit Bennett and DiRocco;

3. Whether a purported $3.5 million loan from Devon IT to "shareholder" (which would have to be either Bennett or DiRocco) documented in Devon IT's records is a mistaken entry or a reflection of money being transferred;[7]

---

[7] Defendants argue that while records do show "a 'loan to shareholder' in the amount of $3.5 million, [] Ms. DiRocco was advised that was incorrectly characterized as a loan because these funds were never loaned to shareholders."  ECF 200 ¶ 35; ECF 191-2 (Pl. Opp'n Ex. G) at ¶ 44.  The loan was characterized as "eliminated" on December 31, 2011, ECF 198 (Def. Opp'n Ex. I) at MAS 200_007540, but Defendants fail to explain what "eliminated" means.

4.  Whether there is a justifiable reason for the dramatic fluctuations in rent payments Devon IT paid to another company that Bennett and DiRocco own;[8]

5.  Whether Bennett and/or DiRocco received a salary from Devon IT;[9] and

6.  Whether Devon IT paid dividends to Bennett and DiRocco.[10]

If Clientron can prove at trial that one or more of these events ignored or abused the Devon IT corporate form, Clientron may be entitled to a favorable result on its alter ego claim. Consequently, the Court will deny both Motions for Summary Judgment.

### E.  Procedure by Which Veil Piercing Shall Be Decided at Trial

There is no definitive Supreme Court or Third Circuit authority as to whether the question of piercing the corporate veil is one for the Court or the finder of fact.[11]

The Third Circuit has summarily affirmed a ruling that the question is for the Court.  U.S. v. Golden Acres, Inc., 702 F. Supp. 1097, 1107 (D. Del. 1988), aff'd sub nom., Golden Acres, Inc. v. Sutton Place Corp., 879 F.2d 857 (3d Cir. 1989).  In a prior opinion in the case, the district court granted a motion to strike the defendants' jury trial demand and held: "Actions that sound in equity do not carry a right to trial by jury.  Piercing the corporate veil is an action that sounds in equity."  U.S. v. Golden Acres, Inc., 684 F. Supp. 96, 103 (D. Del. 1988).

In contrast, several opinions applying Pennsylvania law have held that the "'weight of authority' favors submitting the question of corporate disregard to the jury."  Peltz Boxing Promotions, Inc. v. Big Fights, Inc., No. 02-2062, 2004 WL 2137823, at *1 n.1 (E.D. Pa. Sept.

---

[8] Bennett and DiRocco own JABMD LLC, a company that owns the building housing Devon IT and several other entities Bennett and DiRocco control.  ECF 186-2 ¶ 7; ECF 192 ¶¶ 3, 45, 67.  Devon IT's rent and common area maintenance payments fell from $459,003 in 2012 to $256,845 in 2013.  ECF 186-5 (Pl. Ex. J) Exs. 9, 10.

[9] Bennett and DiRocco's joint tax return from 2010-2012 lists total wages of approximately $88,000 on average from Devon IT.  ECF 186-5 (Pl. Ex. J), Attachment 21.  It is unclear whose wages this figure represents.  Both Bennett and DiRocco also claimed Devon IT meal and entertainment expenses on their tax returns.  ECF 192 and 202-1 ¶ 48; ECF 191-2 (Pl. Opp'n Ex. I) at 204-05 (documenting $9,277 in claimed expenses each).

[10] When asked via interrogatories about shareholder distributions in 2010, 2011, and 2012, DiRocco responded, "Denied.  Devon IT did not make distributions to shareholders in [year]."  ECF 186-4 (Pl. Ex. I) at ¶¶ 27-29.  When asked about 2013, however, DiRocco simply said "Denied."  Id. at ¶ 30.

[11] In this case, that finder of fact will likely be a jury per Clientron's demand for a jury trial.  ECF 83.

23, 2004); <u>Cantiere DiPortovenere Piesse S.p.A. v. Kerwin</u>, 739 F. Supp. 231, 236 (E.D. Pa. 1990). <u>See also</u> <u>Regent Nat'l Bank v. Dealers Choice Automotive Plan., Inc.</u>, No. CIV. A. 96-7930, 1999 WL 357364, at *6 (E.D. Pa. June 2, 1999) ("A finding of alter-ego liability is a factual determination that must be supported by the record.  Thus, whether there are facts sufficient to support the piercing of the corporate veil is an issue that may be decided by a jury.").

    This Court must follow <u>Golden Acres</u>, even though the Third Circuit did not issue an opinion in that case, and therefore holds that there is no Seventh Amendment right to a jury trial on piercing the corporate veil.[12]  This result also accords with Pennsylvania procedure, <u>see Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio, LLC</u>, 846 A.2d 1264, 1277 (Pa. Super. Ct. 2004) (holding there is no right to a jury trial for veil-piercing claims under the Pennsylvania Constitution), although "the right to a jury trial in the federal courts is to be determined as a matter of federal law in diversity as well as other actions."  <u>Simler v. Conner</u>, 372 U.S. 221, 222 (1963).  Nevertheless, pursuant to Federal Rule of Civil Procedure 39(c), the Court has the discretion to try the issue of veil piercing with an advisory jury.  To the extent a jury is empaneled to hear the facts of this case, the Court reserves the right to submit an advisory interrogatory on whether veil piercing is appropriate.

### III.    The Parties' Current Claims Against Each Other

#### A.  Clientron's Claims Against Devon IT

---

[12] As regards Bennett, the Court additionally has the right to determine whether piercing is appropriate as a discovery sanction.  At the time the Court issued its opinion sanctioning Devon IT for discovery abuses, Bennett was under the protection of a bankruptcy stay.  ECF 169 at 15; <u>see also</u> ECF 181 (reserving the right to supplement sanctions order against Bennett upon lifting of the stay).  The stay has since been lifted, ECF 188, 189.  The Court declines at this time to resolve the question of whether to pierce as a sanction in view of the factual issues set forth above, but reserves further decision pending trial.

In August 2015, this Court granted Clientron partial summary judgment and held that a Taiwanese court order enforcing an arbitration award Clientron obtained against Devon IT is confirmable under Pennsylvania's Uniform Foreign Money Judgment Recognition Act, 42 Pa. Cons. Stat. §§ 22001-22009 (2015).  ECF 167.  Judgment has been entered for Clientron against Devon IT for $6,943,817.13.  ECF 182.[13]

In light of that ruling, Clientron's remaining causes of action against Devon IT are for fraud and breach of contract.  ECF 83.  Clientron predicates these claims on products Clientron manufactured pursuant to non-cancellable Purchase Orders ("P.O. products"); these claims were never subject to arbitration in Taiwan, although Clientron claims that the P.O. products and the products dealt with in arbitration are both governed by the same contract (the Supply and Purchase Agreement, "SPA").

In an early holding in this case, the Court stated that Taiwanese law governs Clientron's breach of contract claim against Devon IT regarding the P.O. products and assumed that Pennsylvania law governs Clientron's fraud claim.  ECF 8 at 3 (E.D. Pa. No. 14-1396).  The Court now clarifies this holding: Taiwanese law will govern Clientron's breach of contract claim to the extent the P.O. products are subject to the SPA, as the SPA specifies that it is governed by Taiwanese law.  The issue of whether the SPA applies is a mixed question of fact and law to be further developed at trial; to the extent the SPA does not govern the P.O. products,[14] further choice of law analysis may be required.

---

[13] The Court increased this award to $6,988.137.53 after Devon IT refused to pay a sanction of $44,320.40 for discovery misconduct.  ECF 196.

[14] Throughout this litigation, Clientron has contended that the SPA governs the P.O. products while Devon IT has argued that it does not.  See, e.g., ECF 213 at 7-8 (documenting Clientron's assertions that the SPA governs); ECF 107 ¶ 39 (Devon IT denying that the P.O. products are subject to the SPA).  The point has also been the subject of inconsistent testimony from Clientron's Taiwanese law expert.  ECF 61 at 35 ("Although he previously testified that all product orders 'related' to the SPA were governed by the SPA—without explanation for how a reader of the agreement is to determine that—Dean Shieh also testified that individual Purchase Orders could themselves be independent contracts under Taiwan law.").  As discussed infra, however, the parties may find themselves reversing

**B.  Devon IT's Counterclaims Against Clientron**

Devon IT asserts counterclaims against Clientron.  ECF 107.  Although Devon IT pleads its counterclaims as two counts predicated on the same facts (one for fraud and one for breach of contract), the claims are best analyzed in three groups according to the harm Devon IT alleges it suffered:

1.  **JPMC Claims.**  According to Devon IT, certain actions by Clientron (whether fraudulent or in breach of Clientron's contractual duties to Devon IT) caused nonparty J.P. Morgan Chase ("JPMC") to cancel a contract it had with Devon IT in March 2012. ECF 201 at 2-6; ECF 185-2 ¶ 40.

2.  **Dell Claims.**  Similarly, Devon IT alleges that Clientron's actions (again pled as both fraud and breach of contract) caused nonparty Dell Inc. in April 2012 to prematurely cancel a three-year November 2010 contract Dell had with Devon IT, and/or to acquire Devon IT's competitor Wyse instead of Devon IT, by damaging Devon IT's relationship with Dell.  ECF 201 at 2-6; ECF 185-2 ¶¶ 26, 29; ECF 107 ¶ 116.[15]

3.  **BOM +10% Overcharge Claims.**  In contrast to the JPMC and Dell claims, Devon IT also alleges direct damage to itself in the form of approximately $3.3 million in price overcharges.[16]  Specifically, according to Devon IT Clientron orally promised it would charge Devon IT the cost of bill of materials ("BOM") plus 10% for certain products

---

roles on this issue: Devon IT recently argued that res judicata (aka claim preclusion) should bar Clientron's breach of contract claim if the SPA governs the P.O. products because (according to Devon IT) Clientron should have brought all SPA-related claims during the Taiwanese arbitration proceeding.  ECF 213.

[15] According to Devon IT, Clientron's actions include: (1) promising it could produce both a dual DVI device and a "certain processor" for a computer product, only to renege after Devon IT had quoted those devices in its initial bid on the Dell contract; (2) promising it would charge Devon IT the cost of bill of materials ("BOM") plus 10%, for materials under the Dell contract only to secretly charge more and refuse to share the BOM, which purportedly strained Devon IT and Dell's relationship in addition to harming Devon IT directly; (3) delivering an initial shipment of thin clients products to Dell with unreadable bar codes; and (4) manufacturing several units with defective power buttons.  ECF 201 at 2-6.

[16] Devon IT's counterclaims do not mention this purported damage, see ECF 107, but Devon IT's Opposition to Clientron's Motion for Summary Judgment does, see ECF 185-1 at 5.

Clientron was providing only to secretly charge more later (either as fraud or in breach

of contractual duties).  Devon IT alleges the price guarantee was oral and never

memorialized.  ECF 201-2 Def. Ex. B (Makoid Dep.) at 152.

## IV.   Issues of Claim and Issue Preclusion

### A.  Procedural Background and Parties' Contentions

On September 15, 2015, Clientron moved for summary judgment on Devon IT's

Counterclaims.  ECF 185-1.  Defendants filed an Opposition on October 16, ECF 201, and

Clientron filed a Reply on October 26, ECF 205.  In the Reply, Clientron raised a new argument:

"res judicata," which is actually an argument for collateral estoppel (aka issue preclusion).[17]

According to Clientron, the facts Devon IT asserts in this action in support of its

counterclaims were already raised during the Taiwanese arbitration proceeding.  ECF 205 at 10.

Devon IT sought a setoff of damages in that proceeding based on Clientron's alleged conduct,

and the arbitration panel denied Devon IT's request.  As noted in this Court's prior opinions in

more detail, see ECF 167, the arbitration award in favor of Clientron has now been finally and

permanently affirmed by Taiwanese courts.[18]

On November 18, the Court asked via letter for supplemental briefing on what if any

preclusive effect a foreign arbitration can have in this case.  Both parties submitted briefs on

December 2.  ECF 213, 214.

---

[17] As the Third Circuit noted, in modern use "[c]laim preclusion replaces 'res judicata' and encompasses both merger and bar principles in giving dispositive effect in a later action to a prior judgment. Issue preclusion now substitutes for 'collateral estoppel.'  This preclusive device is somewhat more limited than claim preclusion because it bars relitigation only of an issue identical to that adjudicated in the prior action." Gregory v. Chehi, 843 F.2d 111, 116 (3d Cir. 1988).  The primary distinction is that claim preclusion bars a party from claims that could have been raised during a prior action, whereas issue preclusion only forecloses reexamination of a matter actually litigated and essential to a prior decision.  Id.

[18] First, in March 2014 Clientron obtained a writ of execution for the Taiwanese arbitration award from a Taiwanese court.  ECF 43 in 13-cv-5634.  Then, in response to a separate Taiwanese suit by Devon IT to set the award aside (ECF 9-1 in 13-cv-5634 at 4), a different Taiwanese court dismissed Devon IT's complaint on January 12, 2015.  ECF 167 at 4.  Devon IT did not appeal the January 2015 decision, which became permanent on February 26.  Id.

Clientron argued that the Taiwanese arbitration award, as affirmed by Taiwanese courts, rejected Devon IT's Dell and BOM +10% claims in ruling that there was no basis for Devon IT to assert a setoff defense.  ECF 214.  Clientron also maintains that Devon IT had a full and fair opportunity to make its case for setoff during the arbitration.  Id.

Unsurprisingly, Devon IT paints a very different picture and vigorously argues that the panel did not seriously consider its setoff defense allegations.  ECF 213.  Devon IT also raises two new arguments: 1) claim preclusion should bar Clientron's breach of contract claim for the P.O. products because Clientron chose not to raise that issue at the arbitration; and 2) if claim preclusion does not bar Clientron's P.O. products claims, but the items at issue are also subject to the SPA, then this Court lacks jurisdiction to adjudicate because of the SPA's mandatory arbitration provision.  ECF 213 at 7-10.

### B.  Devon IT Incorrectly Asserts that This Court Lacks Jurisdiction Assuming the SPA Governs the P.O. Products

The Court can quickly dispose of Devon IT's subject matter jurisdiction argument assuming the P.O. products are covered by the SPA's arbitration provision.  An arbitration clause does not divest this Court of subject matter jurisdiction.  Nationwide Ins. Co. of Columbus, Ohio v. Patterson, 953 F.2d 44, 45 n.1 (3d Cir. 1991).

Furthermore, Devon IT's failure to raise the argument constitutes a waiver.  Devon IT has litigated this case in this Court for almost two years since Clientron first asserted the breach of contract claim.  See ECF 1 in 14-cv-1396. [19]  Never once in that time has Devon IT moved to compel arbitration under the SPA or even argued that the SPA's arbitration provision could prevent Clientron from arguing its breach of contract claim here.  Hoxworth v. Blinder,

---

[19] This litigation began as two separate actions: one by Clientron to confirm the Taiwanese arbitration award, 13-cv-5634, and another by Clientron for fraud and breach of contract regarding the P.O. products, 14-cv-1396.  On September 24, 2014, this Court sua sponte consolidated the two actions under docket number 13-cv-5634.  ECF 73 in 13-cv-5634; ECF 28 in 14-cv-1396.

Robinson & Co., Inc., 980 F.2d 912, 925 (3d Cir. 1992) ("[W]e conclude that the defendants have waived whatever right they may have had to arbitration by actively litigating this case for almost a year prior to filing their motion to compel arbitration.").

### C.  Standards Governing Claim and Issue Preclusion

The Court now turns to preclusion.  Clientron in essence has asserted Devon IT is estopped under the doctrine of issue preclusion from re-raising allegations about the Dell contract and BOM +10% overcharge.  This allegation sounds primarily in issue preclusion, as it relates to the factual validity of Devon IT's allegations against Clientron, but it is admittedly close to claim preclusion as well because Clientron arguably is saying that Devon IT asserted comparable legal claims in the arbitration stemming from its attempt to assert setoff.  Devon IT, by contrast, is squarely arguing claim preclusion in alleging that Clientron cannot sue Devon IT for claims related to the P.O. products after having failed to raise those claims in the Taiwanese arbitration.

### a.  Choice of Law Analysis

Neither party has addressed a threshold inquiry: whether Taiwanese or Pennsylvania law applies to evaluating issue or claim preclusion.  Preclusion arose once previously in this litigation when Clientron argued that Devon IT could not contend that the Taiwanese arbitration exceeded the scope of the SPA because Devon IT raised that argument during arbitration itself.  See ECF 61 in 13-cv-5634.  This Court, applying Taiwanese law, rejected Clientron's contention because an arbitration panel's determination of its own jurisdiction is subject to review by a Taiwanese court in the enforcement or revocation context.  Id. at 29 of 52.  That application of Taiwanese law, however, came from a choice of law clause in the SPA and followed briefing by both parties pursuant to Federal Rule of Civil Procedure 44.1.  See id. at 22.

14

In cases of claim and issue preclusion from past state court decisions, "[a] federal court looks to the law of the adjudicating state to determine its preclusive effect." Del. River Port Auth. v. Fraternal Order of Police, 290 F.3d 567, 573 (3d Cir. 2002); see also 28 U.S.C. 1738 (2015). In cases arising from past federal court decisions, federal common law controls (and in diversity cases, federal courts must follow the law that would be applied by state courts in the state where the federal court sits). Taylor v. Sturgell, 553 U.S. 880, 891 (2008); Semtek Int'l. Inc. v. Lockheed Martin Corp., 531 U.S. 497, 509 (2001). In these pending Motions, neither party raised the question of what law the Court should apply when examining the preclusive effect of the foreign arbitration award (or any issue of foreign law per Federal Rule of Civil Procedure 44.1). As the Third Circuit has noted, litigants " generally carry [] the burden of raising the issue that foreign law may apply in an action, and . . . [w]here parties fail to satisfy [that] burden the court will ordinarily apply the forum's law." Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd., 181 F.3d 435, 440-41 (3d Cir. 1999). The Court therefore applies Pennsylvania law to the question of claim and issue preclusion, as this is a diversity jurisdiction case.

### b. Pennsylvania Standards for Claim and Issue Preclusion

"For claim preclusion to apply, Pennsylvania requires that the two actions share the following four conditions: (1) the thing sued upon or for; (2) the cause of action; (3) the persons and parties to the action; and (4) the capacity of the parties to sue or be sued." R & J Holding Co. v. Redevelopment Auth. of County of Montgomery, 670 F.3d 420, 427 (3d Cir. 2011). Issue preclusion has four requirements: "1) the issue decided in the prior adjudication must be identical with the one presented in the later action; 2) there must have been a final judgment on the merits; 3) the party against whom [it] is asserted must have been a party or in privity with the party to the prior adjudication; and 4) the party against whom [it] is asserted must have had a full and fair

opportunity to litigate the issue in question in the prior adjudication." <u>Witkowski v. Welch</u>, 173 F.3d 192, 199 (3d Cir. 1999).

The only case from this District examining the preclusive effect of a foreign arbitration that this Court has been able to locate is <u>Pirito v. Penn Engineering World Holdings</u>, 833 F. Supp. 2d 455, 475 (E.D. Pa. 2011), <u>supplemented</u>, 947 F. Supp. 2d 489 (E.D. Pa. 2013).  <u>Pirito</u> ultimately granted issue preclusion (aka collateral estoppel effect) based on a foreign arbitration after that award was confirmed by a foreign court (as Clientron's Taiwanese award has been here, <u>see</u> ECF 167).  947 F. Supp. 2d at 502-04.

It is unclear, however, if the foreign court which confirmed the arbitration award in <u>Pirito</u> only dealt with some of the issues raised during the arbitration in confirming the award.  The Taiwanese court order, rejecting Devon IT's petition to revoke the Taiwanese arbitration award, only examined the issue of whether the arbitration occurred contrary to an agreement between the parties (i.e., the SPA). The Taiwanese court specifically noted that "Other offensives and defensives by and between both parties and the evidence (exhibits) so submitted, through consideration of this Court, are believed having no impact upon the outcome of the Judgment and ***should not be probed into***."  ECF 121-1 (1/12/15 Taiwanese Court Order) at 27 of 32.  In other words, no foreign court has ever examined the substantive factual findings of the arbitration panel that would pertain to Devon IT's setoff defense.

Nevertheless, the Third Circuit has held that "[u]nder Pennsylvania law, arbitration proceedings and their findings are considered final judgments for the purposes of collateral estoppel [aka issue preclusion]." <u>Witkowski</u>, 173 F.3d at 199.  <u>Witkowski</u> also cited approvingly to the Restatement (Second) of Judgments § 84, which states that "a valid and final award by arbitration has the same effects under the rules of res judicata [aka claim preclusion], subject to

the same exceptions and qualifications, as a judgment of a court." Id. at 200.  Other district courts have also held that "the effects of foreign arbitration are no less preclusive than domestic arbitration."  See Alghanim v. Alghanim, 828 F. Supp. 2d 636, 665 (S.D.N.Y. 2011).  The Court therefore holds that both claim and issue preclusion may apply against a party based on a foreign arbitration, especially where such an award has been confirmed by a foreign court (even if that court did not review all of the panel's substantive findings).

### D.  Clientron's Argument of Issue Preclusion/Collateral Estoppel Against Devon IT Fails

Clientron argues Devon IT is barred by issue preclusion/collateral estoppel from re-pleading the facts that it pled as setoff defense in the arbitration.  A comparison of Devon IT's counterclaims and the arbitration panel's decision reveals that although Devon IT never raised the JPMC contract in Taiwan, Devon IT is nevertheless rehashing identical disputes here.  E.g.:

1. **BOM +10% Overcharge.**  As noted above, Devon IT alleges that Clientron orally promised to charge Devon IT a price of BOM +10% only to secretly charge more, thereby causing almost $3.3 million in damage to Devon IT.  Devon IT presented this argument as a basis for setoff.  Compare ECF 83-3 (Pl. Second Am. Compl. Ex. C, Arbitration Panel Decision) at 38-39 ("[Devon IT] further claims that 'the Applicant had promised the Respondent that the prices of its hardware material will be costed BOM plus 10%") and id. at 35 ("It is thus evident that [Devon IT's] allegation of US$3,283,013.92 in damage associated with the Applicant's prices is groundless."), with ECF 205-3 ¶ 9(v) (Devon IT Statement of Facts) ("Devon IT paid overcharges equaling $3,283,013.92 as a result of Clientron's concealment of the costed BOM.");

2. **Cancellation of Dell contract/Dell acquisition of Wyse:** Also as previously noted, Devon IT alleges that certain Clientron actions (including delivering defective

products, charging more than the agreed BOM +10% price, and promising certain products would be available to Devon IT only to subsequently reverse course) caused nonparty Dell Inc. in April 2012 to prematurely cancel a three-year November 2010 contract Dell had with Devon IT, and/or to acquire Devon IT's competitor Wyse instead of Devon IT, by damaging Devon IT's relationship with Dell.  This argument also surfaced during the arbitration.  <u>Compare</u> ECF 83-3 (Pl. Second Am. Compl. Ex. C, Arbitration Panel Decision) at 40 ("Dell acquired Wyse and terminated its cooperation with [Devon IT] based on business judgment, which had nothing to do with [Clientron].  [Devon IT] should not put the blame on [Clientron] and request compensation from [Clientron].  ***[Devon IT] asserts that [Clientron's] product change, product defects and price overcharge led to Dell's termination of its agreement with [Devon IT]***, and [Devon IT] lost an expected profit of US $22.50 million from the Dell project as a result . . . The undeniable fact is Dell terminated its business cooperation with [Devon IT] because [Devon IT] has been replaced, which has absolutely nothing to do with [Clientron].") (emphasis added) <u>with</u> ECF 205-3 ¶ 9(v) (Devon IT Statement of Facts) ("Devon IT relied on Clientron's misrepresentations, and did so to its detriment, eventually losing the contract with Dell because of Clientron's misrepresentations and breaches and paying millions of dollars in overcharges . . . Conservatively estimated, Devon IT stood to make $22.5 million from the Dell contract over three years, expected profits which were lost as a result of Clientron's misrepresentations and breaches of contract.").

It is thus clear that three of the four <u>Witkowski</u> factors have been met: Devon IT raised the same factual claims (loss of the Dell contract and BOM +10% overcharge) in the Taiwanese

arbitration; there is now a final judgment on the merits confirming the arbitration award; and Devon IT was a party to both actions.

However, Devon IT's argument that it did not have a full and fair opportunity to present the set-off defense in arbitration precludes the Court from granting summary judgment on the basis of issue preclusion.  Devon IT's argument is admittedly thin, as it has offered little evidence in this action beyond what it presented to the Taiwanese arbitration panel. Nevertheless, a trial on the merits will conclusively resolve whether Devon IT did in fact have a full and fair chance to present its counterclaim allegations.  If it did so, collateral estoppel would bar the company from raising them again here.

### E. Devon IT's Argument of Res Judicata/Claim Preclusion Against Clientron Fails

Devon IT never raised res judicata in its Answer as an affirmative defense.  See ECF 107. Nevertheless, Devon IT's omission is not fatal to raising the defense now.  Kleinknecht v. Gettysburg Coll., 989 F.2d 1360, 1373 (3d Cir. 1993) (citations omitted) ("Failure to raise an affirmative defense in a responsive pleading, however, does not always result in waiver. For example, a party may raise an unpled affirmative defense in an appropriate motion.").

Devon IT notes that "[a] claim extinguished by res judicata includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction or series of connected transactions, out of which the action arose."  Elkadrawy v. Vanguard Grp., Inc., 584 F.3d 169, 174 (3d Cir. 2009) (citations omitted).  Devon IT's argument, sounding in principles of waiver, is that because Clientron contends that the P.O. products and the products submitted to arbitration in Taiwan are purportedly governed by the same SPA, Clientron's failure to submit the P.O. products to arbitration means Clientron is barred from asserting a separate breach of contract claim now.

However, summary judgment is inappropriate because the record is unclear as to why Clientron did not submit the P.O. products to arbitration.  One possible explanation, which ironically finds support in Devon IT's cross-examination of Clientron's Taiwanese law expert,[20] is that the P.O. products are each independent contracts under Taiwanese law and not subject to the SPA at all despite Clientron's contentions.  Were that true, there is no basis to apply res judicata from an arbitration interpreting an unrelated contract.  Clientron also may have had legitimate reasons for differentiating between the P.O. products and those it submitted to arbitration.  This argument and the facts surrounding it must be fleshed out at trial.

### F.   Conclusion Regarding Claim and Issue Preclusion

Because of disputed facts about prior proceedings and their legal status, claim and issue preclusion do not bar Devon IT's counterclaims or Clientron's breach of contract claim.  The Court now turns to the merits of Clientron's Motion for Summary Judgment on Devon IT's counterclaims.

### V.   Merits of Clientron's Motion for Summary Judgment on Devon IT's Counterclaims for Fraud and Breach of Contract (JPMC, Dell, and BOM +10% Overcharge)

As previously noted, on September 15, 2015, Clientron moved for summary judgment on Devon IT's counterclaims.  ECF 185-1.  Defendants filed an Opposition on October 16, ECF 201, and Clientron filed a Reply on October 26, ECF 205.  As clarified in the Reply, Clientron argues that Devon IT cannot prove any of Clientron's actions harmed Devon IT.  Clientron also alleges that Devon IT cannot prove key elements of fraud such as a misrepresentation or reasonable reliance.

---

[20] ECF 61 at 35 ("Although he previously testified that all product orders 'related' to the SPA were governed by the SPA—without explanation for how a reader of the agreement is to determine that—Dean Shieh testified that individual Purchase Orders could themselves be independent contracts under Taiwan law.")

### A.  Governing Legal Standards for Fraud and Breach of Contract

The parties have analyzed Devon IT's counterclaims assuming Pennsylvania law applies despite the fact that Clientron is a Taiwanese company and other contracts between the parties such as the SPA have specified that they are governed by Taiwanese law.  In the absence of any identified conflict between Taiwanese and Pennsylvania law, and in light of the parties' briefing, the Court will apply Pennsylvania law.  See John Wyeth & Bro. Ltd. v. CIGNA Intern. Corp., 119 F.3d 1070, 1074 (3d Cir. 1997); see also Bel-Ray Co., 181 F.3d at 440-41 (burden on parties to raise foreign law and failure to do so results in application of forum state's law).

"Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action must establish (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (alteration and citations omitted).

"Under Pennsylvania law, fraudulent misrepresentation has five elements, each of which must be proved by clear and convincing evidence. The elements are: (1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as a proximate result."  Mellon Bank Corp. v. First Union Real Est. Equity and Mortg. Inv., 951 F.2d 1399, 1409 (3d Cir. 1991) (citations omitted).[21]

### B.  Devon IT's JPMC Fraud and Breach of Contract Claims Fail

Devon IT has failed to raise a genuine issue of material fact as to fraud or breach of contract regarding JPMC, and Clientron's Motion is granted as to those allegations.  Devon IT

---

[21] Pennsylvania provides a two-year statute of limitations for fraud claims and a four-year statute of limitations for contract actions, 42 Pa. Stat. and Consol. Stat. Ann. §§ 5524, 5525 (West 2015), and this Court must apply those periods in a diversity action, Stephens v. Clash, 796 F.3d 281, 289 (3d Cir. 2015).  However, Clientron has failed to raise a limitations defense in a responsive pleading or appropriate motion and has therefore waived any argument that Devon IT's counterclaims are untimely.  Chainey v. Street, 523 F.3d 200, 209 (3d Cir. 2008).

conclusorily posits that JPMC terminated its contract because of Clientron in March 2012 based on certain unspecified Clientron performance issues from November 2010.  ECF 107 ¶¶ 125-26, 136-138 (blaming "the quality issues and other technical issues with the TC5 product" for JPMC's termination of its relationship with Devon IT).  These allegations rest entirely on hearsay and speculation[22] and fail to raise any triable issues.[23]

### C.  Devon IT's Dell Fraud and Breach of Contract Claims Fail

Devon IT claims that Clientron's actions, whether fraudulent or in breach of contract, damaged the Dell-Devon relationship to such an extent that Dell acquired Wyse instead of Devon and/or terminated its contract with Devon IT.  ECF 205-3 ¶¶ 9(v).  Devon IT's argument undermines its claimed damage of lost profits from the Dell contract as measure of harm: if Devon IT would have been acquired but for Clientron's actions, Devon IT cannot point to anticipated lost profits from the Dell contract as a measure of damages because the contract would likely have been restructured to account for the change in relationship between Devon IT and Dell.  More to the point, however, Devon IT cannot point to any evidence beyond speculation and hearsay that Dell chose Wyse over Devon IT because of Clientron.[24]  Both

---

[22] The sum total of Devon IT's evidence as to JPMC, see ECF 205-3 ¶¶ 39, 41, consists of one hearsay email about JPMC's alleged dissatisfaction in November 2010 with a Clientron product, 201-22 Def. Opp'n Ex. V, and Devon IT's President Makoid offering double hearsay that Kevin McNamara of JPMC told someone in Devon IT's operations department at some unspecified time that "we would still have JPMC buying hardware from us if we could produce dual digital that was clear." ECF 205-3 ¶ 41; 201-2 Def. Opp'n Ex. B at 147-48.

[23] The Court notes for the sake of completeness that Clientron's unsworn declaration of Aaron Schweigert, JPMC's Executive Director of Infrastructure Services Support (ECF 185-4 Pl. Ex. H), is not admissible evidence.  Although "[u]nsworn declarations may substitute for sworn affidavits where they are made under penalty of perjury and otherwise comply with the requirements of 28 U.S.C. § 1746," Ray v. Pinnacle Health Hosps., Inc., Nos. 09-4508, 10-3571, 416 F. App'x 157, 164 n.8 (3d Cir. Nov. 2, 2010), the Schweigert declaration makes no mention of the fact that it is pursuant to the pains and penalties of perjury and fails to state where or pursuant to which jurisdiction's laws it was executed.  Accordingly, the Court disregarded the declaration in resolving the Motion.  Close v. Gen. Elec. Co., No. MDL 875, 2:09-CV-70107-ER, 2012 WL 2849393, at *1 n.1 (E.D. Pa. Apr. 2, 2012) ("[A] declaration that is not sworn to under penalty of perjury or accompanied by an affidavit is not proper support in disputing a fact in connection with a motion for summary judgment.").

[24] Devon IT offers anonymous hearsay testimony from its Vice President of Solutions Delivery claiming that "in hallway conversations with people that I was working with at Dell, you can say that [interest in acquiring Devon IT] was certainly passed around somewhat . . . There's a number of people who I wouldn't be able to say who exactly we talked to about it."  ECF 201-10 Def. Opp'n Ex. J (Sieczkowski Dep.) at 85.  Makoid (Devon IT's President)

Makoid (Devon IT's President) and Bennett (Devon IT's controlling shareholder) conceded that Dell never formally informed Devon IT that Dell was acquiring Wyse and terminating the Devon IT contract due to Clientron.  ECF 201-2 Def. Opp'n Ex. B at 263 (Makoid Dep.); 201-16 Def. Ex. P at 127-128 (Bennett Dep.) ("There was not a specific statement that we're terminating because of the quality.").   Accordingly, Devon IT cannot show any harm attributable to Clientron from cancellation of the Dell contract and/or Dell's decision to acquire Devon IT's competitor.  Summary judgment is therefore appropriate.

### D.  Devon IT's BOM +10% Overcharge Fraud Claim Fails

Devon IT's remaining fraud claim asserts direct damage to itself in the form of roughly $3.3 million from Clientron's charging prices higher for certain products than the agreed upon BOM +10%.  Given that this claim rests on exactly the same facts as Devon IT's breach of contract allegations, the gist-of-the-action doctrine bars it.[25]

The claim also fails as fraud because Devon IT has not shown that Clientron made any fraudulent utterance.  In Pennsylvania, "[s]tatements of intention made at the time of contracting are not fraudulent simply because of a later change of mind."  Mellon Bank Corp., 951 F.2d at

---

first said "people at Dell" informed him that Dell was considering acquiring Devon IT but would not disclose who they were.  ECF 201-2 Def. Opp'n Ex. B at 263-265.  When pressed further, Makoid changed his answer: "You know what, nobody at Dell informed me that it was going to happen.  Fine."  ECF 205-2 Pl. Reply Ex. A at 266. Devon IT presents emails from January, February and April 2011 documenting some Dell dissatisfaction with Clientron.  ECF 201-18-20 Def. Opp'n Exs. R, S, T.  Devon IT gives no causal explanation for how this dissatisfaction translated into terminating a contract over a year later.  Devon IT also notes that at some point before June 2011, Dell asked the company to work with a manufacturer named Wistron instead of Clientron.  See 201-21 Def. Opp'n Ex. U; ECF 205-3 ¶ 31.  Devon IT obviously did not honor Dell's request.  Clientron for its part offered testimony from Dell Product Senior Consultant Juan Vega that Dell's decision to acquire Wyse was unrelated to Clientron, but as Devon IT notes, Vega admitted under oath that he had no involvement in Dell's final decision and did not know what role Clientron's issues may have played.  ECF 185-4 Pl. Ex. G; ECF 185-4 Pl. Ex. E at 18-19; ECF 201-5 Def. Opp'n Ex. E at 55-57, 61-62.

[25] "The gist-of-the-action doctrine is a theory under common law designed to maintain the conceptual distinction between breach of contract claims and tort claims . . . While the existence of a contractual relationship between two parties does not prevent one party from bringing a tort claim against another, the gist of the action precludes tort suits for the mere breach of contractual duties; the plaintiff must instead point to independent events giving rise to the tort."   Frank C. Pollara Grp., LLC v. Ocean View Inv. Holding, LLC, 784 F.3d 177, 186 (3d Cir. 2015) (citations omitted).

1411.  Devon IT offers no proof in the record beyond the bald speculation of its own employees that at the time Clientron made its alleged promise to Devon IT of charging BOM +10%, Clientron had no intention of carrying that promise out.  ECF 205-3 ¶¶ 9(i)-(iii).[26]

Finally, even assuming Clientron had made a fraudulent utterance, Devon IT could not state a case for fraud because it is simply unreasonable for sophisticated commercial entities to rely on oral price guarantees in the context of multimillion dollar business transactions.  See Mellon Bank Corp, 951 F.2d at 1412.

### E.  Devon IT's BOM +10% Overcharge Breach of Contract Claim Shall Proceed to Trial

Devon IT has only offered hearsay evidence to prove the amount of its damages from Clientron's alleged overcharge.  See ECF 201-3 Def. Opp'n Ex. C ¶¶ 26-30 (information came from "an industry representative familiar with pricing of memory components used in thin client devices, other OEM suppliers of Devon IT and the pricing information disclosed on the website of DRAM Exchange.").  This evidence does not appear to fall within any exception to the hearsay rule.

Nevertheless, the Court declines to grant summary judgment at this time on Devon IT's lone remaining counterclaim.  It shall be for the fact finder to determine if Clientron and Devon IT had an oral contract for the BOM +10% price, if Clientron charged more, and (assuming so) how much damage Devon IT suffered as a result.

---

[26] This legal principle additionally bars fraud claims related to the Dell contract involving Clientron's alleged promises of being able to manufacture a TC5 dual DVI device before announcing in December 2010 that it could not do so and being able to make a TC2c device available at the time of the bid only to phase it out shortly afterwards.  ECF 205-3 ¶¶ 9(i)-(ii).  These claims have already been dealt with because they relate to Devon IT's contention that Clientron's actions caused Dell to terminate its contract with Devon IT and/or to acquire Wyse.

## VI.     Issues Remaining for Trial

The following issues shall be resolved at trial:

1. Whether Devon IT's breach of contract counterclaim regarding the BOM +10%

   overcharge is barred by issue preclusion from the Taiwanese arbitration panel's rejection

   of Devon IT's setoff defense;

   a. If not, whether Devon IT's breach of contract counterclaim fails on the merits;

2. Whether Clientron's P.O. products breach of contract claim is barred by claim preclusion

   and/or waiver, including whether the P.O. products are subject to the SPA agreement;

   a. If not, whether Clientron's breach of contract claim fails on the merits;

3. Whether Clientron's fraud claim fails on the merits;

4. Whether this Court should pierce the corporate veil and impute liability for Devon IT's

   debts to Clientron onto Bennett and/or DiRocco on a theory of alter ego liability.

   An appropriate Order follows.

O:\CIVIL 13\13-5634 clientron v. devon it\13cv5634_2015.12.22 final Memo re Veil Pierce and

Counterclaims.docx