**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CLIENTRON CORP.,** <br><br> **Plaintiff** <br><br> **v.** <br><br> **DEVON IT, INC., JOHN BENNETT, and NANCE DIROCCO,** <br><br> **Defendants** | **CIVIL ACTION** <br><br> **NO. 13-05634** |

**MEMORANDUM RE PLAINTIFF'S MOTION TO AMEND THE JUDGMENT**

**Baylson, J.**                                                          **July 22, 2016**

### I.      Introduction

This Opinion is the latest, and perhaps final, chapter in the saga of litigation between

plaintiff Clientron Corporation ("Clientron") and defendants Devon IT, Inc. ("Devon IT") and its

two owners, Dr. John Bennett ("Bennett") and his wife, Nance DiRocco ("DiRocco").  In its

latest motion, ECF 329 (the "Motion"), Clientron seeks to have this Court order that DiRocco

and Bennett are personally liable for Devon IT's debts to Clientron.

The Court holds that Clientron failed to satisfy its burden of proof at trial as to alter ego

liability.  Separate and apart from that holding, however, the Court will pierce the corporate veil

against Bennett individually as a sanction for his egregious discovery misconduct.

### II.      Procedural History

The business relationship between Devon IT and Clientron should operate as a cautionary

tale for the need for secured transactions in international business dealings.  For several years,

Clientron shipped computer products to Devon IT for resale.  Clientron never obtained a letter of

credit from Devon IT, a security interest in any of the resale proceeds, or any other mechanism

1

of ensuring payment other than trusting Devon IT to honor its contractual commitments.  When Devon IT encountered unexpected financial difficulties in 2012, it used money it had obtained from reselling Clientron's products (and from other sources) to pay other creditors.  Litigation then ensued.

This case began as two separate actions.  See ECF 105 at 1-2.  Clientron initially sought judicial relief to confirm and enforce a Taiwanese arbitration award representing damages for Devon IT's refusal to repay Clientron for the products Clientron had shipped.  ECF 61 at 1.  In August and September 2015, the Court granted Clientron's motion for summary judgment and confirmed the award under Pennsylvania's Uniform Foreign Money Judgment Recognition Act. ECF 167; ECF 182.[1]  The Court awarded Clientron a judgment against Devon IT of just under $7 million.  ECF 196.

In a second action that was later consolidated with the first, Clientron sought an additional $14.3 million in damages for fraud and breach of contract stemming from Devon IT's refusal to pay for products Devon IT requested pursuant to 21 purchase orders.[2]  Unlike the products covered by the arbitration award, these purchase orders were never actually fulfilled; Clientron claimed the purchase orders were "non-cancellable."  At trial, the evidence established that Clientron did not bring a claim for damages for these purchase orders during arbitration in Taiwan because Clientron was unwilling to pay an additional $80,000 in arbitration fees.  ECF 319, Apr. 7, 2016 a.m. Trial Tr. 202:1-13.

In April 2016, the case proceeded to a jury trial on the purchase order claims and on the issue of whether to hold Bennett and DiRocco personally liable for Devon IT's debts to

---

[1] The Court alternatively confirmed the award as a discovery sanction against Devon IT.  ECF 169.

[2] The parties agreed in response to a question from the jury that there were 21 total invoices for the so-called "non-cancellable" purchase orders which were not covered by the Taiwanese arbitration award, despite earlier testimony stating that 35 purchase orders were at issue.  See ECF 315 Ap. 4, 2016 a.m. Trial Tr. 25:1-15; ECF 323 Apr. 11, 2016 p.m. Trial Tr. 16:6-19:12 ("MR. SAMMS: "That's our mistake, Your Honor, counsel's joint mistake.").

Clientron.  The jury awarded Clientron $737,018.00 in damages and refused to pierce Devon IT's corporate veil.  The Court entered an Order for Judgment based on the jury's verdict on April 13, 2016 (the "Judgment").  ECF 312.

In a prior ruling, the Court held that the jury's verdict on alter ego liability would be advisory only.  ECF 215 at 8-9.  Clientron now seeks to have this Court disregard the jury's verdict and order that Bennett and DiRocco are personally liable for Devon IT's debts.

### III.    Procedural Posture of This Ruling

The parties disagree on the current procedural posture of Clientron's Motion.  Defendants argue that because of the Court-entered Judgment on April 13, the Court has already ruled in their favor on the issue of veil piercing.  ECF 331 at 2.  Defendants contend that, pursuant to Federal Rule of Civil Procedure 59(e), Clientron must show the need to correct clear error of law or prevent manifest injustice to prevail on its Motion.  See N. River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995).

Clientron's initial Motion appeared to agree that the standards of Rule 59(e) apply.  ECF 329 at 5-6.  Its Reply, however, argued that the Judgment did not decide the veil piercing issue because the jury's verdict on that question was merely advisory.  The Reply instead framed the issue in terms of Rule 52(b).  ECF 332 at 1, 4.

Rule 52(b) appears to be the controlling standard, both because the Court has not yet entered findings of fact and conclusions of law pursuant to Rule 52(a) and because Clientron's Motion seeks for the Court to disregard the jury's findings and make additional findings.  See Durham Life Ins. Co. v. Evans, 166 F.3d 139, 158 n.14 (3d Cir. 1999) ("Rule 52(b) concerns findings and their effects on the judgment rather than errors in the judgment alone . . .").  The

distinction, however, does not appear significant in this case, as the Court will adopt the jury's advisory verdict denying veil piercing under either standard.

**IV.    Findings of Fact**

Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of fact in its decision to adopt the jury's verdict and refrain from piercing the corporate veil.

### A.  Clientron Did Not Prove that Injustice Will Result from Refusing to Pierce the Corporate Veil

Clientron's Motion rests on the assumption that Devon IT's corporate veil must be pierced because Devon IT is unable to pay any judgment.  See ECF 329 at 1 ("[Refusing to pierce the corporate veil] would unfairly reward the Bennetts' scheme of systematically diverting Devon IT corporate assets to serve the Bennetts' personal desires and those of other Bennett/DiRocco-owned companies, while simultaneously leaving Clientron with no hope of collecting this Court's judgment against Devon IT.").

Clientron, however, has not offered any evidence that Devon IT cannot pay the judgment. The Court will assume for purposes of this Motion that Devon IT is judgment-proof, notwithstanding Clientron's failure to offer any specific evidence on the point.  It is true that emails in April and May 2012 suggested that Devon IT was on the verge of bankruptcy following cancellation of the Dell contract.[3]  Four years, however, have elapsed since then.  Joe Makoid ("Makoid") testified that he is still currently the president of Devon IT.  ECF 317 Apr. 6, 2016 a.m. Trial Tr. 8:5-10.  Although Makoid testified that Devon IT has "downsized," id. at 17:13, Clientron elicited no testimony from Makoid or Bennett as to Devon IT's current financials or the company's ability, or inability, to satisfy Clientron's judgment.

---

[3] See Pl. Ex. 50 ("Clearly if devon it goes under than [sic] nobody is getting paid."); Pl. Ex. 51 ("If I were you I would take this before Devon shuts down"); Pl. Ex. 180 ("Soon I cannot guarantee that you will receive anything.").

### B. Clientron Presented No Evidence of DiRocco's Complicity in Devon IT's Business or Any Wrongdoing

The undisputed evidence presented at trial shows that DiRocco had little to no role in running Devon IT or knowledge of its activities.  She was unaware, for example, of the existence of a purported $3.5 million loan to shareholders until Clientron asked her about it at her deposition.  ECF 319 Apr. 7, 2016 a.m. Trial Tr. 25:13-20.  Clientron presented evidence that DiRocco gave Bennett a proxy to act in her name, but did not present any evidence of DiRocco's knowledge or complicity in any of Devon IT's or Bennett's business affairs.

Contrary to what Clientron argues, DiRocco did not admit to receiving any shareholder distributions from Devon IT.  Clientron cites DiRocco's answer to interrogatory number 14 (see Pl. Ex. 124), which states, "Explain the purpose of each payment you received from Devon IT or any Devon Entity from October 2010 to December 2013."  In response, DiRocco wrote that she "received expense reimbursements and shareholder distributions from Devon entities," not necessarily from Devon IT.

Also contrary to what Clientron argues, Clientron has not proven that there is anything nefarious about DiRocco claiming $6,386 in meals and entertainment expenses on a 2010 Devon IT tax return.  Def. Ex. 55 at DIT0152.[4]  DiRocco testified that she occasionally hosted meals for Bennett's business guests when they came to her home, and that she did not have any knowledge of the tax deductions at issue.  ECF 319 Apr. 7, 2016 a.m. Trial Tr. 30:17-32:19.  Clientron has not cited a single case, nor has this Court been able to find such a case, in which such an event, or tax deduction, warranted imposition of the extraordinary equitable remedy Clientron seeks.[5]

---

[4] Curiously, Clientron does not highlight DiRocco's claimed meal and entertainment expenses of $9,277 in 2011. Def. Ex. 55 at DIT0205.
[5] Clientron also highlights the fact that DiRocco purportedly received $16,400 in rent from Devon Medical Products, although DiRocco testified she was unaware of this income.  Pl. Ex. 87; ECF 319 Apr. 7, 2016 a.m. Trial Tr. 19:3-21.  The evidence does not reflect that this payment relates to Devon IT or that it was in any way improper.

### C.  Clientron Presented Evidence of Bennett's Dishonesty Regarding His Receipt of a Salary from Devon IT

Clientron mentions in its Reply that "Bennett and DiRocco received approximately $88,000 in total wages from Devon IT from 2010 to 2012."  ECF 332 at 12.  In fact, either Bennett, DiRocco, or both received approximately $88,000 in wages on average for each of those years for a total of $265,457.  Pl. Ex. 129-21 (summarizing Bennett and DiRocco's joint tax return); ECF 319 Apr. 7, 2016 a.m. Trial Tr. 184:19-186:17.  Notably, Bennett denied that he and DiRocco drew any salary from Devon IT during that time.   ECF 318 Apr. 6, 2016 p.m. Trial Tr. 94:17-25.  DiRocco, by contrast, testified that Bennett's "salary that he gets from the company" (appearing to refer to Devon IT) is the source of income used to pay the couple's bills.  ECF 319 Apr. 7, 2016 a.m. Trial Tr. 60:2-6.

The Court concludes that Bennett was not credible when he denied having received a salary from Devon IT.  It was not the only time during trial that Bennett was untruthful,[6] and this incident supports the conclusion that Bennett is not a credible witness.

Without more, however, Bennett's dishonesty and receipt of a salary do not justify piercing the corporate veil.  And as detailed below, Clientron failed to introduce enough evidence in support of its veil piercing claims.

---

[6] At several points during trial, Makoid offered the assertion – without any objection from Clientron – that Chinese businesses "don't look at lying" like American ones do.  ECF 317 Apr. 6, 2016 a.m. Trial Tr. 60:15-22; see also id. at 53:19-25 ("[T]his is typical in China . . . I was brought up here, in business school here, and we would just never do it that way."); id. at 58:8-24 ("[W]e're Americans and this is how we do business. Okay. And you go watch Jersey Boys. We -- some of the things are done on a handshake"); id. at 59:16-21 ("Look, it's tough, okay, because we're in a country now where we have to be politically correct.  But I think if you do some reading on the types of business transactions that are done between Chinese companies and American companies, what would you say?").  Bennett took exception to Clientron's suggestion that he too had stated that Chinese are liars.  ECF 318 Apr. 6, 2016 p.m. Trial Tr. 97:4-12.  However, Clientron then played a portion of Bennett's deposition at which he stated, "But, of course, he's from Taiwan, and he lied.  Chinese usually lie."  Id. at 99:3-6.

### D.  Much of Clientron's Evidence as to Bennett Was Speculative, Conclusory or Incomplete

#### i.  $24 Million Worth of Net Payments

As the Court noted in its summary judgment ruling, one of the key issues in this trial was "[w]hether there is a valid explanation for $24 million worth of purported net transfers from Devon IT to other Devon entities Bennett and DiRocco control, including whether Devon IT paid for consulting services to a Devon entity that did not provide them."  ECF 215 at 7.  It has always been Clientron's responsibility to demonstrate that these transfers took place and were improper.

Clientron did not present any evidence at trial to prove the consulting payments.[7]  As to the transfers, Clientron did present an expert forensic accountant, Kyle Anne Midkiff ("Midkiff").  Although the jury's verdict does not necessarily reflect any opinion by the jury of her credibility, the Court finds her credible.  Midkiff testified that from 2010-2013, Devon IT sent approximately $24 million more than it received to other Devon-related entities.  ECF 319 Apr. 7, 2016 a.m. Trial Tr. 147:19-23.  Clientron did not, however, present any evidence that these transactions somehow made their way into Bennett and/or DiRocco's personal accounts, or that they were otherwise improper.  The fact that these transactions are unexplained reflects a failure of proof at trial and is not sufficient to justify piercing the corporate veil.  To argue, as Clientron does, that "[a]s the sole shareholders of Devon IT, Bennett and DiRocco had to have known and benefitted from these transfers, and they did" (ECF 332 at 6) amounts to nothing more than ipse dixit.

---

[7] Midkiff's expert report, Pl. Ex. 129, noted at p. 10 a $10,000 transfer from Devon IT to Devon Protective for what appear to have been consultant fees.  An August 2010 email from Francis Lutz (then-CFO of Devon International Group) purportedly characterized Devon Protective as "purely a pass thru account for outbound international wires on behalf of Devon companies," id., which raises suspicions that the transfer was not actually payment for services rendered.  Clientron, however, did not attempt to introduce any evidence to prove this point.  Nor did Midkiff testify about it.

### ii.   $3.5 Million Loan to Shareholders

At trial, Clientron claimed that Devon IT made a $3.5 million dollar loan to its sole shareholders, Bennett and DiRocco.  Clientron's evidence on the point consisted of an entry of this loan in Devon IT's General Ledger, (Pl. Ex. 164; ECF 318 Apr. 6, 2016 p.m. Trial Tr. 75:1-76:22), and the fact that the loan appears on Devon IT's 2010 tax return, Def. Ex. 55 at DIT0147.  According to Midkiff, these returns were never amended.  ECF 319 Apr. 7, 2016 a.m. Trial Tr. at 162:9-164:7.[8]  However, Midkiff was unable to confirm that money was actually transferred from Devon IT to Bennett and DiRocco.  Id.; ECF 320 Apr. 7, 2016 p.m. Trial Tr. at 15:6-22; see also ECF 320 Apr. 7, 2016 p.m. Trial Tr. 77:24-75:3.  Bennett and DiRocco denied receiving any loan and claimed there must have been a mistake in Devon IT's corporate records.  ECF 318 Apr. 6, 2016 p.m. Trial Tr. 76:13-79:6 (Bennett); ECF 319 Apr. 7, 2016 a.m. Trial Tr. 23:11-26:9 (DiRocco).

It was Clientron's burden to prove that the loan was issued for some improper purpose, but Clientron failed to meet its burden as there is no evidence the loan actually occurred.  Midkiff did not confirm that it was issued.  The evidence Clientron points to is equally consistent with sloppy record keeping.  Clientron could have called Devon IT witnesses with more direct knowledge of the company's finances, such as former CFO Francis Lutz ("Lutz").  It did not do so.  The Court will not presume to bridge the gap, by assumption, where one of the parties failed to do so with either documentary or testimonial evidence.

---

[8] Devon IT's 2011 tax return shows the $3.5 million loan at the beginning of the year with a zero balance at year's end.  Def. Ex. 55 at DIT0199.  Devon IT's 2012 tax return shows an initial balance of zero under "loan to shareholders," only to show $235,000 at year's end.  Def. Ex. 55 at DIT0235.  2012, of course, is the year that Devon IT refused to pay millions of dollars to Clientron.  Yet Clientron did not present any evidence as to this purported loan, even though it appears on one of Clientron's exhibits.  Pl. Ex. 129-15.

### iii.  Purported Commingling of Funds

Midkiff offered testimony regarding Devon IT's general ledger and certain transactions. ECF 319 Apr. 7, 2016 a.m. Trial Tr. 158:22-162:7; 180:21-182:2.  She opined that the ledger reflected a commingling of Devon IT's and Bennett's personal funds.  Id.  Although the records Midkiff has identified are poorly maintained, they do not prove commingling.  Despite questioning from Clientron, for example, Midkiff did not testify that a payment of $205,065 from Oakwell Cayman Company to Clientron (see Pl. Ex. 129-19) in March 2011 necessarily represented the same money as a purported $205,000 payment to Clientron in February 2011 "partially paid via JMB personal funding" according to the ledger (see Def. Ex. 64 at MAS 200_007540).[9]  In Midkiff's own words, "I don't know for sure what it shows."  ECF 319 Apr. 7, 2016 a.m. Trial Tr. 162:7.  While the Devon IT ledger is certainly no paragon of business record keeping, it alone does not support the inference that Bennett and Devon IT commingled funds.  Indeed, many of the entries purporting to show Bennett paying Clientron out of his own funds were reversed on the same day they allegedly occurred.  Def. Ex. 64 at MAS 200_007540. The Court simply cannot conclude from these documents that funds were commingled.

Clientron further argues, without evidentiary support, that Bennet and DiRocco used "Devon IT corporate funds to pay over $1 million of the Bennetts' personal American Express credit card charges."  ECF 332 at 2.  The record does reflect credit card charges of approximately $1.7 million by Bennett from 2010 to 2013.  Pl. Ex. 129-25; ECF 319 Apr. 7, 2016 a.m. Trial Tr. 178:10-179:11; 192:24-193:21.  The record also reflects $102,620.84 of credit card purchases

---

[9] At least one court has noted a conceptual difference between the commingling of assets and an individual's direct payment of an entity's debts from the individual's personal funds.  See In re LMcD, LLC, 405 B.R. 555, 562 (Bankr. M.D. Pa. 2009) ("The Trustee did not cite one example of LMcD funds being deposited in a personal account of McDonald or Damenti's Restaurant. Rather, the Trustee referred to numerous situations where McDonald or Damenti's Restaurant simply paid for bills that were incurred by LMcD. This is not commingling of assets by LMcD.").

and $94,762.13 in credit card payments by DiRocco.  Pl. Ex. 129-24.  Even assuming that

Bennett and DiRocco used funds from one or more of their corporations to get the money to pay

these personal bills, <u>see</u> Apr. 7, 2016 a.m. Trial Tr. 191:18-194:21 (Midkiff testifying that the

charges reflect more money than what Bennett and DiRocco declared on their tax returns), there

is no proof that Devon IT's funds were used to pay off this credit card debt.  As Midkiff testified,

"with the limited financial records I have . . . I cannot determine whether they were paid by the

corporation or not." <u>See</u> <u>id.</u> at 194:8-10.

### iv.  Rent Payments

At trial, evidence established that Devon IT's rent payments to another company owned

by Bennett and DiRocco fluctuated dramatically from 2011 to 2012 to 2013.  <u>See</u> Pl. Ex. 129-9

and Pl. Ex. 129-10 (documenting a decrease in Devon IT's rent and common area maintenance

payments from $459,003 in 2012 to $256,845 in 2013); ECF 319 Apr. 7, 2016 a.m. Trial Tr.

164:8-165:10.  These fluctuations are admittedly suspicious given an apparent lack of formal

leases documenting how rent was calculated.  Without more, however, the Court cannot

conclude that they represent a commingling of funds.[10]  Even assuming the rent payments were

improper, it is not clear that Bennett is to blame: Bennett testified that Devon IT's CFO had the

discretion to set the rent amount.  ECF 317 Apr. 6, 2016 a.m. Trial Tr. 150:12-151:6.  Clientron

failed to rebut this assertion.

---

[10] One possible explanation is that Devon IT's office space expanded once the Dell contract was signed and then shrank dramatically following the contract's 2012 cancellation.  Midkiff admitted on cross exam that Devon IT's rent payments for a given calendar year were always consistent from month to month and that other tenants had changes in their rent from year to year as well.  ECF 320 Apr. 7, 2016 p.m. Trial Tr. 36:9-15; 77:15-21.

### E.  Clientron Failed to Tie Devon IT's Use of Settlement Payments from Dell and IBM to Personal Benefits to Bennett and DiRocco

With regard to a $2 million settlement payment Devon IT received from Dell, Bennett admitted that it was his decision to spend the money on Devon IT's operations instead of repaying Clientron.  ECF 318 Apr. 6, 2016 p.m. Trial Tr. 53:16-54:11, 56:13-58:24.

With regard to a $13.5 million settlement from IBM, Bennett and two other Devon IT officers (Makoid and Lutz) made a "business decision" about the proceeds received from this settlement.  They decided to have $2.9 million initially paid to Devon AD instead of Devon IT even though both companies and a third Devon entity were all plaintiffs in the IBM action. Although the record is somewhat unclear, this money apparently later went to Devon IT and Devon IT used it for operations and to pay back other creditors.  Subsequently, Devon IT appears to have spent an additional $3 million from the IBM settlement after Clientron refused to accept $3 million as fulfilment of Devon IT's outstanding $6.7 million debt. [11]

These decisions demonstrate Devon IT diverting at least $8 million to other entities or itself notwithstanding Devon IT's obligation to pay Clientron.  With regard to the decision to have $2.9 million given to Devon AD, the Court finds that Defendants purposefully structured that payment to keep money out of Devon IT's hands so as to pressure Clientron to accept the proposed $3 million settlement in May 2012.  See Pl. Ex. 180 (Bennett stating that if Clientron did not take $3 million, he would be unable to guarantee that Clientron would get anything). Defendants have not offered any justification for their actions.  As noted above, Clientron failed

---

[11] $6.5 million of the $13.5 million IBM settlement went to Burford Capital to repay a litigation finance loan. $2.9 million then went to Devon AD and subsequently to Devon IT.  The remaining $4.1 million was initially held in a court escrow account pending resolution of a dispute with Devon IT's former attorneys.  Once that dispute was resolved, $1.1 million went to several of Devon IT's former litigation vendors and Devon IT used the balance for its operations.  It appears that approximately $2 million of the IBM settlement went to pay Claret Capital and $1.9 million went to pay down Devon IT's line of credit with Wilmington Savings Fund Society.   See ECF 318 Apr. 6, 2016 p.m. Trial Tr. 59:6-62:24, 90:6-19; ECF 320 Apr. 7, 2016 p.m. Trial Tr. 111:11-15, 115:18-120:24; 141:15-145:4.

to protect itself from financial exposure to Devon IT.  These facts, however, do not prove that veil piercing is warranted.

Clientron has also not proven that this money was in fact used to benefit Bennett and DiRocco personally as opposed to benefitting Devon IT, albeit in flagrant breach of Devon IT's contractual obligations.[12]  Accordingly, the settlement payment distributions do not weigh in favor of piercing the corporate veil.

### F.   Other Miscellaneous Points

#### i.   Insolvency and Undercapitalization

Defendants admit that Devon IT was insolvent.  ECF 331 at 13.  There has been no proof, however, that Devon IT was undercapitalized when it was initially formed.  See Trs. of Nat'l Elevator Indus. Pension, Health Benefit and Educ. Funds v. Lutyk, 332 F.3d 188, 196 (3d Cir. 2003) (noting in a case applying federal common law that "as a matter of corporate law, mere insolvency is distinct from undercapitalization.").  Undercapitalization therefore does not weigh in favor of veil piercing.  While insolvency does weigh in favor, it does not tip the scale sufficiently to justify alter ego liability.

#### ii.   Corporate Formalities

Clientron argues, as it did during the summary judgment briefing, that Devon IT's purported failures to adhere to corporate formalities warrant piercing the corporate veil.  ECF 329 at 2-3.  As the Court noted previously, no federal precedent allows veil piercing when a husband and wife owned business does not strictly adhere to the formalities of major multinational corporations.  ECF 215 at 4; see Lutyk, 332 F.3d at 196 (finding in a case applying federal common law that non-functionality of officers, other directors, and shareholders in a

---

[12] As previously noted, however, Clientron possessed a mere unsecured debt from Devon IT.  Devon IT had no legal obligation to pay Clientron before any other creditor.

closely-held corporation is "not unusual, and not a strong factor in favor of piercing the corporate veil of such a company.").[13]

Moreover, Defendants' point that Clientron has been inconsistent on the issue of corporate formalities is well-taken: Clientron argues on the one hand that Devon IT's corporate officers had extensive control of the business, see ECF 329 at 19 (Devon IT's CFO purportedly had "unfettered access . . . to control money going in and out of Devon entities") while at the same time arguing that Devon IT's officers were non-functional, id. at 21-22.

### iii.   Non-Payment of Dividends

Despite suspicious wording in DiRocco's answers to Clientron's interrogatories, see ECF 215 at 8 n.11, Clientron did not prove at trial that Devon IT paid any dividends.  Although Devon IT did not pay dividends, that factor does not support piercing the corporate veil.  Indeed, the Third Circuit noted in a case applying federal common law that "many jurisdictions actually hold that the payment of dividends at a time when a corporation is insolvent favors piercing the corporate veil."  Lutyk, 332 F.3d at 196.

### iv.   Sanctions Against Bennett Because of Discovery Misconduct

Another incident from trial lends further support to this Court's decision to pierce the corporate veil against Bennett as a discovery sanction.  Bennett testified that despite the fact that he signed the verification for Devon IT's responses to Clientron's interrogatories, Pl. Ex. 168, he did not read the responses before doing so.  ECF 318 Apr. 6, 2016 p.m. Trial Tr. 87:11-88:5.  He also stated that at least one interrogatory answer was "wrong," id. at 86:25, notwithstanding his attestation to the answers' truthfulness and correctness.  The Court's prior opinion details Bennett's acts and omissions ignoring his discovery obligations.  ECF 169.  Bennett's cavalier

---

[13] Similarly, Bennett and DiRocco having Bennett's secretary at Devon IT pay the family bills does not weigh in favor of piercing the corporate veil.  Clientron failed to present any evidence of Bennett's secretary using Devon IT corporate funds to pay these personal bills.

attitude towards this verification is reflective of his other discovery shortcomings, as detailed

<u>infra</u>.

**V.     Conclusions of Law**

Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes the following

conclusions of law in its decision to adopt the jury's verdict and refrain from piercing the

corporate veil on the merits.

**A.  Evidentiary Issues**

**i.  The Court Did Not Err in Declining to Give a Missing Witness Instruction**

Clientron insists this Court erred in refusing to give a missing or absent witness

instruction to the jury regarding Defendants' failure to call Devon IT's former CFO, Francis

Lutz, as a witness.  Clientron's argument has no merit.

Although "[a] missing witness jury instruction may [] be appropriate when [one side]

fails to call a material witness that was peculiarly available to it or within its exclusive control,

regardless of any showing of the favorability of the witness' testimony[,] . . . [s]uch an

instruction is not appropriate when the witness is equally available to both parties."  <u>United

States v. Adigun</u>, 998 F. Supp. 2d 356, 366 (M.D. Pa. 2014), <u>aff'd</u>, 609 F. App'x 718 (3d Cir.

2015) (unpublished), <u>cert. denied</u>, 136 S. Ct. 261 (2015).  <u>See also</u> <u>United States v. Vastola</u>, 899

F.2d 211, 235 (3d Cir. 1990) ("[A] missing witness instruction is not appropriate when the

witness is available to both the defense and the prosecution."), <u>vacated on other grounds,</u> 497

U.S. 1001 (1990).

In this case, there is simply no evidence that Lutz was in Defendants' exclusive control. Clientron was aware of his existence and could have subpoenaed him to testify at trial. It did not. Therefore, a missing witness instruction was not appropriate.[14]

> ### ii. The Court Cannot Consider Testimony Regarding the Jury's Alleged Confusion

Clientron has offered the declaration of Diane Barker in support of its Motion. ECF 329-13. Attorney Barker purports to recount post-verdict interviews with six of eight jurors in this case to prove that they misunderstood this Court's adverse inference instruction. This declaration constitutes inadmissible hearsay. See Fed. R. of Evid. 802.

Even disregarding hearsay concerns, this declaration violates Federal Rule of Evidence 606(b)'s prohibition of evidence of a juror's statement on "any juror's mental processes concerning the verdict." See Marcavage v. Bd. of Trs. of Temple Univ., 400 F. Supp. 2d 801, 806 (E.D. Pa. 2005) ("[T]estimony regarding the deliberative process [] is clearly prohibited by Rule 606(b).").[15]

This Court has previously dealt with an improper attempt to attack a jury verdict through hearsay testimony from the jurors. See United States v. Holck, 398 F. Supp. 2d 338, 368 (E.D. Pa. 2005), aff'd sub nom., United States v. Kemp, 500 F.3d 257 (3d Cir. 2007). In Holck, Juror No. 6 failed to disclose that she was a part-time real estate agent. The defendants sought to introduce hearsay evidence that one juror relied on Juror No. 6's alleged expertise with mortgages in evaluating evidence that certain mortgage loans constituted bribes. The Court

---

[14] Notably, Clientron nevertheless repeatedly argued in its closing statement that Lutz was a "missing witness." See ECF 322 Apr. 11, 2016 Trial Tr. 58:20-23; 60:18-61:4; 67:8-14; 68:17-20; 70:9-10; 73:4-7.

[15] Although the Court granted the parties permission to interview willing jurors, it did not authorize them to violate this rule or rules against hearsay by making use of the information in this case. Rather, the interviews were intended solely as a learning experience for future cases.

rejected this attempt to peer behind the curtain of the jury's deliberations, holding "[s]uch inquiry is plainly improper under F.R.E. 606(b)."  Id.

Simply put, "ex parte post-verdict interviews between counsel and the jurors [] are outside the deliberative process and beyond the contemplation of the jury system. The broader policy of protecting jury verdicts from overreaching by excessive inquiries overrides any potential clarification of what the jury's verdict may have meant in this case." Triad Retail Partners v. Diemer, Civ. A. No. 88-3741, 1990 WL 4425, at *2 (E.D. Pa. Jan. 17, 1990), aff'd, 911 F.2d 719 (3d Cir. 1990).  Therefore, the Court has not considered the Barker declaration in ruling on Clientron's Motion.

### B.  The Court Adopts the Jury's Findings on Veil Piercing

"Pennsylvania law, applicable here, recognizes a strong presumption against piercing the corporate veil." In re Blatstein, 192 F.3d 88, 100 (3d Cir. 1999). "Pennsylvania . . . require[s] a threshold showing that the controlled corporation acted robot- or puppet-like in mechanical response to the controller's tugs on its strings or pressure on its buttons." E. Minerals & Chemicals Co. v. Mahan, 225 F.3d 330, 333 n.6 (3d Cir. 2000).  For this Court to hold that Bennett and DiRocco are the alter egos of Devon IT such that Devon IT's corporate veil should be pierced, the Court must consider factors including "the failure to observe corporate formalities; non-payment of dividends; insolvency of debtor corporation; siphoning the funds from corporation by dominant shareholders; non-functioning of other officers and directors; absence of corporate records; whether the corporation is a mere facade for the operations of a common shareholder or shareholders; and gross undercapitalization." Id. at 333 n.7.  As one court aptly observed, "[c]orporate control persons do not become liable to creditors for corporate guarantor obligations as alter egos based solely on their business decisions possibly motivated to

frustrate a corporate creditor's recovery unless there is a personal benefit as evidenced by commingling, lack of corporate formalities or other similar indicia showing the entity is the same as its control persons." Sugartown Worldwide LLC v. Shanks, 129 F. Supp. 3d 201, 206 (E.D. Pa. 2015).

Simply put, Clientron has failed to satisfy its burden of proof as to veil piercing. Clientron has not demonstrated that Bennett or DiRocco siphoned off money from Devon IT to benefit themselves or controlled Devon IT as "puppet masters."  This case is starkly different from Clientron's lone case citation in support of veil piercing, in which the plaintiffs presented evidence of company funds being used to make mortgage payments on the owner's home and for other personal expenditures.  See Plumbers' Pension Fund, Local 130, U.A. v. A-Best Plumbing & Sewer, Inc., No. 88 C 3087, 1992 WL 59098, at *4 (N.D. Ill. Mar. 16, 1992).

As to DiRocco, Clientron is simply wrong in arguing that her giving Bennett an unqualified proxy in her name somehow makes her liable for any of Bennett's misdeeds. Tenancy by the entirety is a valid and legitimate form of property ownership in Pennsylvania. Indeed, even without an explicit proxy "[i]t is presumed that each tenant by the entirety may, without specific consent, act individually on behalf of both."  In re Brannon, 476 F.3d 170, 173 (3d Cir. 2007).  Clientron has offered no evidence that DiRocco was aware of any fraud or other wrongful behavior on Bennett's part or that she played any role whatsoever in running Devon IT. The facts of this case therefore again differ from Plumber's Pension, in which the wife was a corporate officer who was actively involved in many of the actions giving rise to alter ego liability (as, for example, by receiving disproportionate compensation for clerical services). 1992 WL 59098, at *7.  Cf. Cantiere DiPortovenere Piesse S.p.A. v. Kerwin, 739 F. Supp. 231, 238 (E.D. Pa. 1990) (affirming jury's verdict to pierce the corporate veil against husband and

wife because of evidence of wife's participation in the corporation's financial operations and using the company to make payments for their personal benefit).[16]

The Court infers from the jury's verdict that it found DiRocco credible, and the Court similarly concludes she was credible in her testimony at trial.  Clientron did not impeach her detailed direct testimony of her very limited role in Devon IT's business.

As to Bennett, Clientron did not prove that he ever substantially commingled any of his (or DiRocco's) assets with Devon IT's or that he so dominated and controlled Devon IT as to render Devon IT's existence a mere sham.  See In re Blatstein, 192 F.3d 88, 101 (3d Cir. 1999) (finding veil piercing inappropriate because "Blatstein did not hide any of his personal assets in the corporations, nor did he commingle his assets with the corporations' assets so that separation would be impossible.").  The mere fact that Bennett directed the flow of settlement proceeds to keep them out of Clientron's hands does not support imposing liability on him personally.  The Court simply cannot conclude from the evidence presented that Bennett and Devon IT were one and the same.

Therefore, the Court adopts the jury's verdict and denies Clientron's request to modify the judgment.

## VI.    As a Discovery Sanction, the Court Holds Bennett Personally Liable for Devon IT's Debts to Clientron

Clientron's failure to prove that veil piercing is warranted, however, is not the end of the story.  As the Court previously recounted in a prior opinion, see ECF 169, Clientron moved for sanctions against all Defendants in July 2015.  ECF 154.  The Court granted Clientron's Motion in late August after holding oral argument.  ECF 169.  At that time, Bennett was under the protection of a bankruptcy stay, so the Court declined to sanction him personally.  ECF 169 at

---

[16] See also In re Jamuna Real Estate, LLC, 445 B.R. 490, 503 (Bankr. E.D. Pa. 2010) (refusing to pierce the corporate veil against a wife who was a mere "passive recipient" despite allegations against her husband).

15.  The Court nevertheless allowed Bennett to file a response to Clientron's Motion, ECF 165, and he did so.  ECF 166.  That stay has since been lifted, but the Court has deferred to now ruling on the issue of whether Bennett should be held personally liable for Devon IT's debt. ECF 215 at 9 n.12.[17]

As fleshed out in greater detail in the sanctions opinion, ECF 169, Bennett's conduct seriously impeded Clientron's ability to prove alter ego liability and warrants strong sanctions. Bennett did not take his obligations to search for and produce relevant documents seriously. ECF 169 at 3-4.  Bennett also committed spoliation of evidence by deleting emails after litigation began in this case.  ECF 169 at 9-12.  The Court previously analyzed the factors in Poulis v. State Farm and Casualty Co., 747 F.2d 863 (3d Cir. 1984) and found that Bennett acted willfully and in bad faith.  ECF 169 at 13-15.

The Court now joins a number of other courts which have held that piercing the corporate veil is an appropriate sanction for discovery misconduct impeding a party's ability to prove alter ego liability.[18]  While the Court is aware that making Bennett personally liable for the judgment Devon IT owes Clientron is a serious sanction, other federal courts have imposed liability on individuals as a discovery sanction in high-value alter ego cases.  See Compaq Computer Corp. v. Ergonome Inc., 387 F.3d 403, 412-14 (5th Cir. 2004) (affirming alter ego discovery sanction

---

[17] Defendants believe, erroneously, that the Court conclusively ruled on sanctioning Bennett individually when it decided not to make an adverse inference instruction against him personally to the jury.  ECF 331 at 18.  The Court did no such thing.  Instead, the Court stated, "I have considered whether I should now consider the sanction motion that Clientron filed against Dr. Bennett personally.  But I'm not going to do that.  I think that would be very prejudicial to you in the middle of the trial.  So I'm just telling you I'm not doing that."  ECF 322 Apr. 11, 2016 a.m. Trial Tr. 23:24-24:5.  The Court did not rule one way or the other on Clientron's pending sanctions motion against Bennett, but instead deferred resolution of the issue until after trial to avoid potentially unfair prejudice.

[18] E.g., S. New Eng. Tel. Co. v. Glob. NAPs Inc., 624 F.3d 123, 147 (2d Cir. 2010) (affirming the fact that "[t]he district court here deemed SNET's allegations with regard to the alter ego status of the Global entities to be established when these entities failed to comply with the discovery orders related to these allegations."); Flame S.A. v. Indus. Carriers, Inc., 39 F. Supp. 3d 752, 766 (E.D. Va. 2014) (imposing alter ego liability as a sanction for failure to produce documents bearing on the issue), aff'd sub nom., Flame S.A. v. Freight Bulk Pte. Ltd., 807 F.3d 572, 592 (4th Cir. 2015); Sentry Ins. A Mut. Co. v. Brand Mgmt., Inc., 295 F.R.D. 1, 8 (E.D.N.Y. 2013) (precluding evidence in opposition to alter ego claim as a discovery sanction); Volkart Bros., Inc. v. M/V Palm Trader, 130 F.R.D. 285, 290 (S.D.N.Y. 1990); Amway Corp. v. Shapiro Express Co., Inc., 102 F.R.D. 564, 570 (S.D.N.Y. 1984).

and corresponding liability of $2.8 million in attorney's fees for failure to respond to interrogatories); Indep. Nat'l Distribs., Inc. v. Black Rain Commc'ns., Inc., No. 94 Civ. 8464 (JFK), 1996 WL 238401, at *5 (S.D.N.Y. Apr. 4, 1996) (holding that owner of corporation would be jointly and severally liable for slightly less than $1 million in damages).  Simply put, Clientron would likely have had a much stronger case before the jury if not for Bennett's egregious misconduct and Bennett should not be able to escape liability due to his own wrongdoing.

As to DiRocco, however, the Court will not pierce the corporate veil as a discovery sanction.  Nothing has changed since this Court previously held that "the record does not support sanctions against DiRocco individually."  ECF 169 at 17.

## VII.   Conclusion

The evidence presented at trial, and throughout this litigation, shows improper business conduct on Devon IT's part as regards Clientron.  Devon IT took money from the sale of Clientron's products and pocketed it, in complete disregard of its contractual obligations.  Clientron has had to spend more than three years in litigation and arbitration on two continents in an attempt to recoup the money that it was owed.  Devon IT exploited the personal relationship between Bennett and Clientron's former president, Robert Chin, in order to bilk Clientron out of millions of dollars in computer products.[19]  While Clientron could and should have obtained a letter of credit or other security to protect itself, Clientron certainly did not deserve such mistreatment.

Today, the Court will find Bennett personally liable for both the jury's damage award of $737,018 and $44,320.40 Clientron incurred in attorney's fees as a result of Defendants'

---

[19] See Def. Ex. 87 (Chin writes to Bennett in April 2012, "[f]rom personal point of view.  I respect you as my elder brother and friend.").

discovery misconduct (see ECF 181).  The Court will amend the judgment so that Clientron can proceed against Bennett in execution thereof.  The Court believes that depriving Bennett of his personal assets, in part to compensate Clientron for its losses, will also send a strong warning that discovery misconduct of this type will not be tolerated.  In addition, although facts that may warrant an inference of fraud are not necessarily probative under Pennsylvania contract law, the Court believes that the record of this case warrants a referral to the United States Attorney's Office and directs the Clerk to send a copy of this Opinion to that office for such investigation as it may believe is warranted.  The Court is mindful of the fact that by refusing to pierce against Bennett and DiRocco jointly, Clientron may be hindered in its efforts to collect on its judgment.

An appropriate Order follows.


O:\CIVIL 13\13-5634 clientron v. devon it\13cv5634 Clientron opinion re Modify Judgment.docx